FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

2015 JAN -6  PM 2: 53

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
DEPUTY

| | | |
|---|---|---|
| WALTER OLENICK, and<br>    M. RAE NADLER-OLENICK,<br><br>        Plaintiffs,<br><br>v.<br><br>JOHN R. VASQUEZ,<br>    municipal court (assoc.) judge and<br>    individually,<br><br>MITCHELL B. SOLOMON,<br>    municipal court (assoc.) judge and<br>    individually,<br><br>BARBARA LYNN GARCIA,<br>    municipal court (assoc.) judge and<br>    individually,<br><br>MUNICIPAL COURT OF RECORD for<br>    the CITY OF AUSTIN,  officially<br>    and commercially,<br><br>ALLISON GARDNER, deputy clerk and<br>    individually,<br><br>SIERRA READY, deputy clerk and<br>    individually,<br><br>ERIC ANDRADE, deputy clerk and<br>    individually,<br><br>KIMBERLY JUAREZ, deputy clerk and<br>    individually,<br><br>REBECCA STARK, Clerk, muni. court,<br>    officially and individually<br><br>CITY OF AUSTIN, a municipal | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. **A15CV0005 LY** |

corporation, officially and                    §
commercially,                                  §
                                               §
BUILDING AND STANDARDS                         §
   COMMISSION, an agency of CITY's,    §
   officially,                          §
                                               §
TMCEC, officially and commercially,            §
                                               §
KAREN KENNARD, AUSTIN's CITY                   §
   ATTORNEY, officially and             §
   individually,                        §
                                               §
CARL SMART, Code Compliance, Dir,.             §
   officially and individually,         §
                                               §
KEITH LEACH, Code Compliance, Asst.            §
   Dir., officially and individually,   §
                                               §
PAUL TOMASOVIC, Code Compliance,               §
   Division Manager, officially and     §
   individually,                        §
                                               §
MICHAEL DIAL, official capacity and            §
   individually,                        §
                                               §
TERRY HURD, official capacity,                 §
                                               §
BRIAN KELLY, official capacity,                §
                                               §
CARLOS LONGORIA, official capacity,            §
                                               §
ROBERT MOORE, official capacity,               §
                                               §
MATTHEW NORIEGA, official capacity             §
   and individually,                    §
                                               §
MANUEL VILLEGAS, official capacity             §
   and individually,                    §
                                               §
TODD WILCOX, official capacity,                §
                                               §
MAURICE FORSHEE, official capacity,            §

---

SHAWN ROUGEAU, official capacity,                       §
                                                        §
THUY BAYER, official capacity,                          §
                                                        §
GORDON NIELS, official capacity,                        §
                                                        §
HENRY MORENO, official capacity,                        §
                                                        §
BRIAN CASANOVA, official capacity,                      §
                                                        §
CHRISTOPHER CHANDLER, official                          §
        capacity,                                       §
                                                        §
JULIE LONG, official capacity,                          §
                                                        §
RICHARD EGAL, official capacity,                        §
                                                        §
TIM BOSMA, official capacity,                           §
                                                        §
DARRELL DANDRIDGE, official                             §
        capacity,                                       §
                                                        §
KINTARO INOVEJAS, official capacity,                    §
                                                        §
JOHN LOWRY, official capacity,                          §
                                                        §
JOHN MARNEY, official capacity,                         §
                                                        §
ART ACEVEDO, Police Chief,                              §
        official capacity,                              §
                                                        §
RHODA MAE KERR, Fire Chief,                             §
        official capacity,                              §
                                                        §
DAVID ESCAMILLA, TRAVIS COUNTY §
        COUNTY ATTORNEY, officially and                 §
        individually                                    §
                                                        §
GREG ABBOTT,                                            §
STATE's ATTORNEY GENERAL,                               §
        officially and individually,                    §
                                                        §
STATE OF TEXAS, both officially and                     §

---

Original Complaint (OLENICK and NADLER-OLENICK)                    3
**Right Not to Contract, etc.**

as a commercial enterprise, and      §
                                      §
ERIC HOLDER, as ATTORNEY             §
    GENERAL for UNITED STATES,       §
    official capacity,               §
                                      §
    Defendants.                       §

## VERIFIED ORIGINAL COMPLAINT

COME NOW the Plaintiffs, WALTER (Walt) OLENICK and his wife, M. RAE NADLER-OLENICK, each *pro se*, seeking relief in equity, declaratory relief, and damages, who show as follows:

## TABLE OF CONTENTS

Subject Matter Jurisdiction.................................................................9

Personal Jurisdiction.......................................................................9

Venue ..............................................................................................9

Incorporation by Reference of all Standing Objections ..................9

EQUITY ..........................................................................................10

    CLAIM 1 – Preliminary injunctive relief...............................10

    CLAIM 2 – Permanent injunctive relief ...............................19

    CLAIM 3 – Trespass .............................................................20

DECLARATORY RELIEF ...............................................................25

Statutory Challenges.......................................................................25

    CLAIM 4 – Tex. Code Crim. Proc. art. 45.019 .....................25

    CLAIM 5 – Tex. Code Crim. Proc. art. 25.04 .......................27

        Art. 25.04. ...................................................................27

CLAIM 6 – Tex. Code Crim. Proc. art. 45.018(b)...................................................28

CLAIM 7 – 42 U.S.C. §§ 1985, 1986....................................................................29

Procedural Challenge .........................................................................................30

CLAIM 8 – Fᴇᴅ. R. Cɪᴠ. P. 4..............................................................................30

DAMAGES..........................................................................................................32

CLAIM 9 – M. RAE NADLER-OLENICK's MALICIOUS PROSECUTION
CLAIM AGAINST STATE – RE: BUILDING CODE .....................................32

CLAIM 10 – M. RAE NADLER-OLENICK's MALICIOUS PROSECUTION
CLAIM AGAINST CITY – RE: BUILDING CODE..........................................55

CLAIM 11 – M. RAE NADLER-OLENICK's MALICIOUS PROSECUTION
CLAIM AGAINST ALLISON GARDNER – RE: BUILDING CODE ..............70

CLAIM 12 – M. RAE NADLER-OLENICK's MALICIOUS PROSECUTION
CLAIM AGAINST SIERRA READY – RE: BUILDING CODE.......................90

CLAIM 13 – M. RAE NADLER-OLENICK's MALICIOUS PROSECUTION
CLAIM AGAINST DIANE MONTOYA – RE: BUILDING CODE ...............109

CLAIM 14 – M. RAE NADLER-OLENICK's MALICIOUS PROSECUTION
CLAIM AGAINST THE CONSPIRATORS, INCLUDING STATE, CITY,
GARDNER, READY, MONTOYA, and KIMBERLY JUAREZ – RE:
BUILDING CODE ........................................................................................130

CLAIM 15 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST STATE –
BUILDING CODE CHARGE(S) VIOLATE(S) RIGHT NOT TO CONTRACT137

CLAIM 16 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST STATE –
ALLOWING (STATE-WIDE) (LONG-STANDING) PRACTICE OF
SIMULTANEOUS ROLES OF CUSTODIAN OF RECORD AND
COMPLAINING WITNESS VIOLATES RIGHT TO FAIR TRIAL ..............139

CLAIM 17 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST CITY –
BUILDING CODE CHARGE(S) VIOLATE(S) RIGHT NOT TO CONTRACT141

CLAIM 18 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST CITY –
ALLOWING (LONG-STANDING) PRACTICE OF SIMULTANEOUS ROLES
OF CUSTODIAN OF RECORD AND COMPLAINING WITNESS VIOLATES

RIGHT TO FAIR TRIAL ............................................................................143

CLAIM 19 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST
GARDNER –BUILDING CODE CHARGE(S) VIOLATE(S) RIGHT NOT TO
CONTRACT ...................................................................................................145

CLAIM 20 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST
GARDNER – SIMULTANEOUS ROLES OF CUSTODIAN OF RECORD
AND COMPLAINING WITNESS VIOLATES RIGHT TO FAIR TRIAL .....147

CLAIM 21 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST READY –
BUILDING CODE CHARGE(S) VIOLATE(S) RIGHT NOT TO CONTRACT149

CLAIM 22 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST READY –
SIMULTANEOUS ROLES OF CUSTODIAN OF RECORD AND
COMPLAINING WITNESS VIOLATES RIGHT TO FAIR TRIAL ..............151

CLAIM 23 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST
MONTOYA –BUILDING CODE CHARGE(S) VIOLATE(S) RIGHT NOT TO
CONTRACT ...................................................................................................153

CLAIM 24 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST
MONTOYA – SIMULTANEOUS ROLES OF CUSTODIAN OF RECORD
AND COMPLAINING WITNESS VIOLATES RIGHT TO FAIR TRIAL .....155

CLAIM 25 – M. RAE NADLER-OLENICK's § 1983 CONSPIRACY CLAIM
AGAINST STATE, CITY, GARDNER, READY, MONTOYA, and JUAREZ –
BUILDING CODE CHARGE(S) VIOLATE(S) RIGHT NOT TO CONTRACT157

CLAIM 26 – M. RAE NADLER-OLENICK's § 1983 CONSPIRACY CLAIM
AGAINST STATE, CITY, GARDNER, READY, MONTOYA, and JUAREZ –
(STATE-WIDE) (LONG-STANDING) PRACTICE OF SIMULTANEOUS
ROLES OF CUSTODIAN OF RECORD AND COMPLAINING WITNESS
VIOLATES RIGHT TO FAIR TRIAL ...........................................................159

CLAIM 27 – M. RAE NADLER-OLENICK's § 1985(3) CONSPIRACY CLAIM
AGAINST STATE, CITY, GARDNER, READY, MONTOYA, and JUAREZ –
BUILDING CODE CHARGE(S) VIOLATE(S) RIGHT NOT TO CONTRACT162

CLAIM 28 – M. RAE NADLER-OLENICK's § 1985(3) CONSPIRACY CLAIM
AGAINST STATE, CITY, GARDNER, READY, MONTOYA, and JUAREZ –
(STATE-WIDE) (LONG-STANDING) PRACTICE OF SIMULTANEOUS
ROLES OF CUSTODIAN OF RECORD AND COMPLAINING WITNESS
VIOLATES RIGHT TO FAIR TRIAL ...........................................................165

CLAIM 29 – M. RAE NADLER-OLENICK's § 1986 CLAIM AGAINST STATE's
     ATTORNEY GENERAL FOR FAILURE TO PREVENT THE CONSPIRACY
     TO VIOLATE THE RIGHT NOT TO CONTRACT.......................................168

CLAIM 30 – M. RAE NADLER-OLENICK's § 1986 CLAIM AGAINST TRAVIS
     COUNTY's COUNTY ATTORNEY FOR FAILURE TO PREVENT THE
     CONSPIRACY TO VIOLATE THE RIGHT NOT TO CONTRACT ..............173

CLAIM 31 – M. RAE NADLER-OLENICK's § 1986 CLAIM AGAINST AUSTIN's
     CITY ATTORNEY FOR FAILURE TO PREVENT THE CONSPIRACY TO
     VIOLATE THE RIGHT NOT TO CONTRACT .............................................178

CLAIM 32 – M. RAE NADLER-OLENICK's § 1986 CLAIM AGAINST THE
     MUNI. COURT's CLERK OF COURT FOR FAILURE TO PREVENT THE
     CONSPIRACY TO VIOLATE THE RIGHT NOT TO CONTRACT ..............183

CLAIM 33 – M. RAE NADLER-OLENICK's § 1986 CLAIM AGAINST STATE's
     ATTORNEY GENERAL FOR FAILURE TO PREVENT THE CONSPIRACY
     TO VIOLATE HER RIGHT TO FAIR TRIAL ................................................187

CLAIM 34 – M. RAE NADLER-OLENICK's § 1986 CLAIM AGAINST TRAVIS
     COUNTY's COUNTY ATTORNEY FOR FAILURE TO PREVENT THE
     CONSPIRACY TO VIOLATE HER RIGHT TO FAIR TRIAL......................192

CLAIM 35 – M. RAE NADLER-OLENICK's § 1986 CLAIM AGAINST AUSTIN's
     CITY ATTORNEY FOR FAILURE TO PREVENT THE CONSPIRACY TO
     VIOLATE HER RIGHT TO FAIR TRIAL ......................................................196

CLAIM 36 – M. RAE NADLER-OLENICK's § 1986 CLAIM AGAINST THE
     MUNI. COURT's CLERK OF COURT FOR FAILURE TO PREVENT THE
     CONSPIRACY TO VIOLATE HER RIGHT TO FAIR TRIAL......................200

CLAIM 37 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST TMCEC
     FOR FAILURE TO TRAIN – VIOLATION OF RIGHT TO FAIR TRIAL....205

CLAIM 38 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST AUSTIN's
     CITY ATTORNEY FOR FAILURE TO TRAIN..............................................208

CLAIM 39 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST AUSTIN's
     MUNICIPAL COURT FOR FAILURE TO TRAIN .......................................212

CLAIM 40 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST THE
     MUNICIPAL COURT's CLERK OF COURT FOR FAILURE TO TRAIN ...216

CLAIM 41 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST CITY FOR
    FAILURE TO TRAIN ................................................................................... 220

CLAIM 42 – M. RAE NADLER-OLENICK's CLAIM AGAINST STATE FOR
    VIOLATION OF STATE's DEBT COLLECTION PRACTICES ACT ........... 224

CLAIM 43 – M. RAE NADLER-OLENICK's CLAIM AGAINST CITY FOR
    VIOLATION OF STATE's DEBT COLLECTION PRACTICES ACT ........... 225

CLAIM 44 – M. RAE NADLER-OLENICK's CLAIM AGAINST STATE FOR
    VIOLATION OF THE NATIONAL DEBT COLLECTION PRACTICES ACT 226

CLAIM 45 – M. RAE NADLER-OLENICK's CLAIM AGAINST CITY FOR
    VIOLATION OF THE NATIONAL DEBT COLLECTION PRACTICES ACT 227

Request for Relief .......................................................................................... 228

§ 1746 Declaration – WALTER OLENICK .................................................. 228

§ 1746 Declaration – M. RAE NADLER-OLENICK ..................................... 229

## Subject Matter Jurisdiction

1.      Federal question, civil rights, USOA as defendant (declaratory relief), and pendant/supplemental.  28 U.S.C. § 1331, § 1343, § 1346, § 1367.

## Personal Jurisdiction

2.      All parties reside or engage in commerce within TEXAS.

3.      All parties have sufficient contact with the forum STATE to expect to be haled into court in TEXAS.

## Venue

4.      The land of focus is situated in TRAVIS COUNTY.

5.      The acts committed against the Plaintiffs occurred in TRAVIS COUNTY.

6.      Plaintiffs reside in TRAVIS COUNTY.

7.      Defendants work and/or reside in TRAVIS COUNTY.

## Incorporation by Reference of all Standing Objections

8.      With this Original Complaint, THE OLENICKS also file some Standing Objections.

9.      They incorporate by reference those Standing Objections into this pleading.

10.     The purpose is to assert those objections formally one time rather than with every document they may need to file in this matter.

## EQUITY

### CLAIM 1 – Preliminary injunctive relief

11.    THE OLENICKS request preliminary injunctive relief to keep CITY in all of its relevant components, departments, and officers, agents, and employees and STATE in all of its relevant components, departments, and officers, agents, and employees off THE OLENICKS property and within the applicable law, pending final resolution of this suit.

A.    THE OLENICKS have never consented to arbitration by or before CITY's B.S. Comm'n, and yet the B.S. Comm'n has an active agenda item involving THE OLENICKS.  Therefore, THE OLENICKS seek a preliminary injunction holding the present situation at its status quo regarding any and all activity by or before CITY's B.S. Comm'n involving or directed at THE OLENICKS and/or at any property owned by THE OLENICKS or by either of them.

B.    THE OLENICKS have never consented to being regulated by CITY through any of its "code enforcement" offices or personnel.  Therefore, THE OLENICKS seek a preliminary injunction holding the present situation at its status quo regarding any and all "code enforcement" activity involving or directed at THE OLENICKS and/or at any property owned by THE OLENICKS or by either of them.

12.    Regarding "criminal" matters asserted *in STATE's name* arising from alleged ordinance violations and filed in the muni. court.

A.    As already demonstrated by the dismissal of the Building Code matter directed at NADLER-OLENICK, *see* Exhibts, and by the dismissal of the Fire Code

matter directed at OLENICK, *see* Exhibits, THE OLENICKS are highly likely to succeed on the merits of their Claims sounding in equity.

**B.** When it comes to "criminal" matters asserted ***in STATE's name*** arising from alleged ordinance violations and filed in the muni. court sitting in AUSTIN, the muni. court has never had, does not have, and will never have subject matter jurisdiction to grant affirmative relief on those charges.

1. That's because, in general, *STATE* has no horse in any race involving any city's ordinances, including *CITY*'s ordinances. *STATE* has no commercial nexus arising from any city's ordinances, including *CITY*'s ordinances, with anyone, including OLENICK and NADLER-OLENICK. As a result, *STATE* has no direct "injury in fact" or "actual grievance," whether civil *or* criminal, arising from any alleged ordinance violation.

2. As is detailed in and for the malicious prosecution Claims, *infra*, there ***is*** a way STATE would have standing to assert a criminal charge arising from an alleged violation of a municipal ordinance. To recognize the "criminal" enforcement possibility arising from an alleged ordinance violation, CITY and STATE both have to recognize the commercial nature of ordinances, generally, especially the "thou shalt!" ordinances.

3. CITY has a police force, but CITY does not have STATE's police power. Because STATE is the only party with a police power to exercise, STATE is the sole party plaintiff allowed for any "criminal" charge filed in any muni. court sitting in TEXAS.

4.     That restriction was never intended to serve merely as a perfunctory device.  Instead, it was always intended as a threshold evaluation standard on what sorts of matters could *ever* be filed as "criminal" charges in that trial forum.

5.     No muni. court in TEXAS has *ever* had jurisdiction to entertain *CITY*'s "criminal" charges arising from *CITY*'s evaluation, analysis, or assertion that a *CITY ordinance* had been violated.  ***Nothing*** about asserting those "criminal" claims ***in STATE's name*** has ever satisfied any muni. court's threshold jurisdictional requirements.  All that such practice has done is confirm all the more the total and complete lack of jurisdiction that exists in the muni. courts over those matters.

6.     What is a city?  It's a municipal corporation.  It is not a body politic that has a legislative power, a police/executive power, or a judicial power.  It's a commercial entity/enterprise created by the body politic presently known as TEXAS.  It's TEXAS that is recognized as having a legislative power, a police/executive power, and a judicial power.  Key, CITY does not have a police power by which to justify being a plaintiff in or for any "criminal" charge.  Only STATE has that police power.

7.     CITY is confused because CITY has police but no police power.

8.     How do corporations function?  "Federally," as in "commercially," as in "by agreement."

9.     Thus, what is an ordinance?  It's a (commercial) proposal.

10.    Thus, only where CITY has evidence of a viable commercial nexus does CITY even have a *civil* claim for an alleged breach of ordinance language.

11.    This commercial nexus concept is all the more self-evident where the language that is alleged to justify a "criminal" charge is "thou shalt!" language, such as we find in the language that the dual "criminal" plaintiffs, i.e., CITY *and* STATE, have asserted as violated by THE OLENICKS or either of them.

12.    For understanding "criminal" enforcement of **any** ordinance, we also have to understand the nature of the commercial nexus that in any way lends itself to "criminal" enforcement.

a.    In short, there are two generic forms of agreements: contracts and trusts.

b.    There is no risk of criminal enforcement for mere breach of contract.

c.    For there to be **any** *remote* risk of *criminal* enforcement of a commercial-nexus-based, i.e., non-Penal-Code-based, claim, that commercial nexus *must* sound in trust.  It's a mere breach of *trust* that is susceptible to *criminal* enforcement options.

13.    Since what the dual plaintiffs have charged THE OLENICKS, or either of them, "criminally" over has to do with land or land use, CITY has yet another hurdle to overcome even to begin to justify hauling off and

charging someone "criminally" for an alleged ordinance violation.  No trust involving land is even recognized unless it's in writing and signed (by the party to be charged).  *See* TEX. PROP. CODE ANN. § 112.004.

14.     Placing, then, the final piece to this puzzle, even if CITY *had* a signed trust agreement naming THE OLENICKS or either of them as a fiduciary, with CITY as a beneficiary, and with land owned by THE OLENICKS or either of them as at least part of the trust *res*, and the content of that agreement included whatever ordinance or set of ordinances that CITY wants to complain about not being obeyed, which agreement has never existed, but if it were to exist, no *muni.* court would *ever* have jurisdiction over that alleged "crime."  "Criminal" breach of trust is a state jail felony level offense, TEX. PENAL CODE ANN. § 32.43, and no city may by ordinance alter the punishment level where STATE's legislature has already established the punishment level. *State v. Chacon*, 273 S.W.3d 375 (Tex. App. – San Antonio 2008, no pet.) (can't change Penal Code (STATE's established) punishment level via an ordinance, i.e., by agreement of the parties). In other words, CITY can't by ordinance reset the punishment level to misdemeanor in order that a muni. court assert jurisdiction.

15.     The bottom line, then, is this. *STATE* has no standing to assert **any** *civil* claim in **any** state court or in **any** U.S. court arising from **any** alleged violation of any municipal ordinance, including any and all of CITY's ordinances, for the simple reason that STATE has no commercial nexus with

anyone via **any** municipality's ordinance(s). And, while STATE *would* have standing to assert its police power for a "criminal" claim arising from an alleged ordinance violation if a commercial nexus existed, which it doesn't, but if it did, such "criminal" claim is a "criminal" breach of trust claim, which is a state jail felony offense, rendering such claim *totally* beyond the jurisdictional limits of every muni. court sitting in TEXAS.

16.     Therefore, THE OLENICKS, or either of them, will prevail, in addition to the two already behind them, in *every* "criminal" matter filed in the muni. court alleging **any** violation of **any** of CITY's ordinances.  Not only is there no viable commercial nexus, i.e., no trust agreement by which THE OLENICKS, or either of them, has voluntarily assumed a fiduciary duty with respect to CITY (or STATE or anyone or anything else) regarding any land thereby rendering that land subject to regulation per CITY's ordinances, but also, even if such agreement were ever to exist in the future, which it won't, but if it were to exist, no muni. court in TEXAS has jurisdiction to preside over state jail felony level offense matters.

13.   Regarding the civil/administrative matters asserted via CITY's B.S. Comm'n.

A.     The proper label for decision-making activity by any agency is "arbitration."

B.     The only people subject to arbitration are those who have consented to that form of non-judicial decision-making.

C.     THE OLENICKS have never consented to arbitration by CITY or any

of CITY's agency (or by STATE or by any of STATE's agencies, either, for that matter).

      **D.**     Therefore, there simply is no authority in or to be exercised by CITY's B.S. Comm'n regarding anything, generally, much less regarding any claim purporting to arise from any alleged violation of any of CITY's ordinances.

**14.**     Regarding both lines of attack against THE OLENICKS, there is no substantial issue of fact.

      **A.**     There simply is no commercial nexus; not with STATE and not with CITY.

      **B.**     There is no signed writing by which THE OLENICKS or either of them has volunteered into a fiduciary role with respect to CITY (or STATE or anyone or anything else) regarding any of CITY's ordinances.

**15.**     THE OLENICKS seek the holding of *status quo* pending final resolution of the relevant issues associated with their request for permanent injunctive relief, declaratory relief, and damages.

      **A.**     Holding *status quo* keeps CITY and all of its departments, and all of its officers, agents, and employees off THE OLENICK's property.

      **B.**     Holding *status quo* also keeps CITY from aggravating its existing condition of insisting on criminally violating THE OLENICKS under color of law and office.

**16.**     Inadequacy of legal remedies for the extant problems.

      **A.**     While damages claims certainly exist, for they are asserted in this very

Complaint, the *existence* of damages claims isn't the right question.

     **B.**    The right question is whether those damages claims are "adequate" in the face of the irreparable injury caused by trespass after trespass after trespass and the associated unwarranted invasion of privacy, not to mention the illegal searches, associated property damage (lock, door, and wall broken), and illegal seizure by CITY committed by CITY and by CITY's officers, agents, and/or employees against THE OLENICKS while on THE OLENICKS' clearly posted property.

     **C.**    The right question is whether CITY may continue to harass THE OLENICKS by its methods that involve trespass and privacy invasion and intentional, even criminal, violations of THE OLENICKS rights, or the rights of either of them, leaving THE OLENICKS' sole remedy various damages remedies that may exist every time CITY commits these acts, or whether THE OLENICKS may obtain relief in equity by which such trespasses and intentional rights violations may be prevented.

**17.**    Public interests favor the granting of a preliminary injunction.

     **A.**    By preventing CITY from pursuing its current agenda and line of conduct, CITY and CITY's officers, agents, and employees will be ordered to stop engaging in acts that literally constitute crimes against THE OLENICKS, in violation not only of STATE's Penal Code but also UNITED STATES' Title 18, including criminal violations of rights under color of law and office, against THE OLENICKS.

**B.**    Key to the rights violations committed by CITY and by CITY's officers, agents, and employees, which rights violations constitute both civil and criminal violations, is the harassment CITY is dishing out in retaliation against and in the steady barrage of harassment of THE OLENICKS for their unshakable assertion of their right not to contract.

**C.**    Moreover, when CITY and its officers, agents, and employees are prohibited from engaging in further lawless "ordinance enforcement" conduct against and toward THE OLENICKS, or either of them, CITY's further damages will be that much more mitigated, which mitigation also benefits public interests.

**18.**    Balancing potential harm.

**A.**    *With* the preliminary injunction, CITY is out nothing.  The land will still be there; THE OLENICKS will still be there.

**B.**    *Without* the preliminary injunction, THE OLENICKS will still be subject to rights violations, civil and criminal, and to additional criminal acts committed by CITY and by CITY's officers, agents, and/or employees. *Without* the preliminary injunction, CITY will have effectively compelled THE OLENICKS to agree to being regulated per CITY's ordinances.

**19.**    End *both* parts of the dual-forum/-procedure attack.

**A.**    CITY has unleashed both an administrative line of litigation, via its B.S. Comm'n, and a judicial line of litigation, via these various bogus "criminal" charges (filed in the muni. court), against THE OLENICKS.

**B.**    Both forms of "enforcment" require a viable commercial nexus, and

---

there simply is no such commercial nexus.

    **C.**    Thus, it's not a matter of motivating CITY to "pick one." It's a matter of motivating CITY to back off completely, to cease and desist permanently, regarding *both* lines of attack. Getting that permanent form of relief starts with some preliminary relief.

    **D.**    An ordinarily prudent person in CITY's position would see the dismissals of the "criminal" charges against THE OLENICKS and realize that there is no factual or legal basis for continuing the assault engaged under color of law and office against them. But, that connection hasn't come to mind yet with CITY. These most recent "administrative search & seizure warrants" were issued after *both* of the two existing dismissals.

**20.**    Based on these facts and circumstances, THE OLENICKS request a preliminary injunction ordering CITY, all of CITY's departments and agencies, including "Code Enforcement" and CITY's B.S. Comm'n, all of CITY's civil and criminal enforcement personnel, and the judges of the municipal court to stand down and to maintain that level of (in)activity pending final resolution of this suit.

### CLAIM 2 – Permanent injunctive relief

**21.**    The legal standards for the permanent injunctive relief is essentially the same as for the preliminary injunctive relief.

**22.**    The relevant facts and circumstances are also the same.

**23.**    Also the same is the fact that there's no dispute as to any of the facts.

    **A.**     Key, CITY can prove up no commercial nexus on which it bases either line of "enforcement."

    **B.**     There is no commercial nexus justifying any administrative activity via CITY's B.S. Comm'n.

    **C.**     There is no commercial nexus justifying any judicial activity via the "criminal" charges leveled against each of THE OLENICKS.

**24.**    Based on the facts and circumstances previously detailed regarding preliminary injunctive relief, THE OLENICKS request a permanent injunction ordering CITY, all of CITY's departments and agencies, including "Code Enforcement" and CITY's B.S. Comm'n, all of CITY's civil and criminal enforcement personnel, and the judges of the municipal court to cease and desist with any and all present and future ordinance "enforcement" activity for which CITY has no viable commercial nexus with THE OLENICKS, or either of them.

**CLAIM 3 – Trespass**

**1.**    While the information requested via CITY's Public Information Request (PIR) process may still be coming in, thus, while this may need amendment, THE OLENICKS can at least start with the information already in hand.

**2.**    THE OLENICKS have plainly posted "No Trespassing" signs on their property.

**3.**    No one from CITY's "Code Enforcement" department has permission to enter

THE OLENICKS' property.

4.      WALT OLENICK gave specific, personal, verbal "no trespass" Notice when "Code Enforcement" showed up the first time.

5.      "Code Enforcement" has ignored all such Notice.

6.      The Fire Department personnel have ignored all such Notice.

7.      The Police Department personnel have refused to enforce the laws proscribing trespass when it comes to trespass on THE OLENICKS' property, and have, instead, participated as trespassers, themselves.

8.      All parties listed as trespassers entered upon THE OLENICKS' property, despite the signs and despite the additional Notice, and stayed on the property even after the additional Notice was given.

9.      Such entry was bodily (physical), intentional, unilateral, and voluntary.

10.      OLENICK has had to replace a destroyed lock, repair a damaged door, and repair a damaged wall, which damage was caused by one or more of the trespassers, each of whom works for CITY in some office or employment or other, whether "Code Enforcement," Fire Department, or Police Department.

11.      The trespass also constitutes a privacy invasion, infringing upon THE OLENICKS' right to privacy.

12.      The trespass also is part and parcel of the violation of THE OLENICKS' rights to be free from unreasonable search and seizure.

13.      At the base of the trespass is the violation of THE OLENICKS' right not to contract with CITY regarding its ordinances. By "enforcing" ordinances to which

THE OLENICKS, both individually and jointly, have never consented to, CITY is purported THE OLENICKS to consent to such regulation, and THE OLENICKS do not so consent and have no intention of consenting.

14.     The following individuals have entered THE OLENICKS' property, bodily, intentionally, unilaterally, and voluntarily, and without consent by THE OLENICKS:

      A.    "Code Enforcement"

            1.    MICHAEL DIAL;

            2.    TERRY HURD;

            3.    BRIAN KELLY;

            4.    CARLOS LONGORIA;

            5.    ROBERT MOORE;

            6.    MATTHEW NORIEGA;

            7.    MANUEL VILLEGAS; and

            8.    TODD WILCOX.

      B.    Police Department

            1.    MAURICE FORSHEE, 4193, Region 4 Tactical Support;

            2.    SHAWN ROUGEAU, 4893, Region 4 Tactical Support;

            3.    THUY BAYER, 4986, Region 4 Tactical Support;

            4.    GORDON NIELS, 6474, Region 4 Patrol;

            5.    HENRY MORENO, 3954, Major Crimes;

            6.    BRIAN CASANOVA, 6429, Region 4 Patrol;

    **7.**    CHRISTOPHER CHANDLER, 6763, Region 4 Patrol;

    **8.**    JULIE LONG, 2270, Nuisance Abatement; and

    **9.**    RICHARD EGAL, 3936, Region 4 Tactical Support.

**C.**    Fire Department

    **1.**    TIM BOSMA, 1406;

    **2.**    DARRELL DANDRIDGE, 406;

    **3.**    KINTARO INOVEJAS, 1855;

    **4.**    JOHN LOWRY, 1370; and

    **5.**    JOHN MARNEY, 1709.

**15.**    They may feel they had "authority" to enter, given the "administrative search & seizure warrant(s)" obtained by various muni. court judges.  However, nothing about any of those purported "warrants" allows, justifies, or excuses any act of trespass involved. Those details are addressed as regarding the relief requested against those particular muni. court judges, which details are reasserted here verbatim.

**16.**    These folks honestly and sincerely believe they had authority to do exactly what they've done, and while THE OLENICKS appreciate the fact that each of them serves this community in their respective capacities, each of these trespassers has compelled THE OLENICKS "to insist" that the "no trespassing" policy be respected. Unless and until there's an emergency, the police and fire department personnel don't really have a reason to be there, and there's no reason that THE

OLENICKS can conceive as to when or why anyone with "Code Enforcement" would ever have authority or need or justification to be there.

17.    CITY is going to get the bill for the destroyed lock, the damaged door, and the damaged wall.

18.    What THE OLENICKS need and request from this court regarding each of these individual trespassers is injunctive relief.

A.    Preliminary injunctive relief to maintain status quo, which is a condition in which each of these people is not on THE OLENICKS' property, save for emergency conditions/situations, and then only the police and fire department personnel.

B.    Permanent injunctive relief, especially as involves "Code Enforcement" so that they have to pre-justify entrance on THE OLENICKS' property to *this* court for all issues of entrance in the future.

## DECLARATORY RELIEF

### Statutory Challenges

**CLAIM 4 – Tex. Code Crim. Proc. art. 45.019**

**25.**     Does Art. 45.019 violate Due Process?

**26.**     Nothing about those requirements, facially or as applied, compels inclusion of a contact name or address for purposes of any response, whether by motion or pleading, to the party or office filing (and serving) the complaint.

**27.**     Muni. courts of Record "require" the documentation of the defense, which, obviously, necessitates the filing of documents.

**28.**     Right now, the respondent has to guess as to where and on whom to serve those filed documents.  Service should not be relegated to guesswork.

**29.**     Thus, on the one hand, Art. 45.019, facially and as applied, violates Due Process for failure to include name and address for purposes of service of responsive filings, whether motions, pleadings, etc.

**30.**     On the other, we have this situation.

    **A.**     As of 1999, STATE's legislature performed a substantial overhaul of the criminal procedures.

    **B.**     Key for this Claim is the repeal of Art. 45.01.  It was this Article by which the ubiquitous practice of "complaint only" "criminal" matters was justified throughout the state.

    **C.**     The repeal of Art. 45.01 shifted the carte blanche perspective regarding "complaint only" "criminal" matters to a highly restricted policy regarding

Original Complaint (OLENICK and NADLER-OLENICK)                    25
**Right Not to Contract, etc.**

"complaint only." In the present perspective, "complaint only" still exists, in some places, but the analysis is guided by Art. 2.05. In those Counties for which there's a County Attorney, there is no more allowance of "complaint only." Misdemeanor matters must be charged by Information (which is based on a/the complaint). In those Counties that don't have a County Attorney but have at least one criminal district court, again, misdemeanor matters must be charged by Information.

D.     TRAVIS COUNTY has both a County Attorney and at least one (about seven, actually) criminal district courts.

E.     Thus, as of 1999, "complaint only" as a charging process ended in TRAVIS COUNTY.

31.     That history and analysis is included to say this. Art. 45.019, both facially and as applied, may be just fine in and for TRAVIS COUNTY, in that in TRAVIS COUNTY, the contact information, including name and address, for purposes of service of defense motions, pleadings, and etc., will be found in the Information.

32.     Thus, if what renders Art. 45.019 *acceptable* under Due Process is the necessity of the accompanying Information for any and all misdemeanor charges filed in any trial court in TRAVIS COUNTY with jurisdiction to address misdemeanors, then the formal, judicial documentation of that perspective would resolve the question(s) regarding Art. 45.019. In other words, if Art. 45.019 can't be read alone but must be read *in pari materia* with Art. 2.05, and where it's the *Information* that provides the contact information in the normal course, then, Art. 45.019 might be just fine in its present content, both facially and as applied.

**CLAIM 5 – Tex. Code Crim. Proc. art. 25.04**

33.    Does Art. 25.04 facially violate Due Process?

> Art. 25.04.
>
> In misdemeanors, it shall not be necessary before trial to furnish the accused with a copy of the indictment or information; but he or his counsel may demand a copy, which shall be given as early as possible.

Art. 25.04.

34.    By this provision, STATE purports to relieve itself of its duties under Due Process of service of STATE's pleading.

35.    No respondent has Notice of anything until being served.  No respondent is on Notice just because the *trial court* has received a filing.   Notice to the trial court is not Notice to the respondent.

36.    And, it's not merely a waivable matter of personal jurisdiction.  In the TEXAS trial courts, the filing of the Information or Indictment is jurisdictional. While an Indictment may be waived, an Information may never be waived (where "complaint only" doesn't apply).

37.    Since Due Process requires STATE not only to file a competent charging instrument but also serve that charging instrument, Art. 25.04, by which STATE purports to relieve itself of its duties under Due Process facially violates Due Process.

**CLAIM 6 – Tex. Code Crim. Proc. art. 45.018(b)**

**38.**     Does Art. 45.018(b) violate Due Process?

**39.**     The language:

> **Art. 45.018. Complaint [Justice and Municipal Courts]**
>
> (a) For purposes of this chapter, a ***complaint*** is a sworn allegation charging the accused with the commission of an offense.
>
> (b) *A defendant is entitled to <u>notice of a complaint</u> against the defendant not later than the day before the date of <u>any proceeding</u>* in the prosecution of the defendant under the ***complaint***. The defendant may waive the right to notice granted by this subsection.

Art. 45.018 (emphasis added).

**40.**     One day's Notice is unconscionable on its face.

     **A.**     While specific trumps general in the typical discipline of statutory construction, it's also the case that Art. 27.11 appears to tolerate no exceptions.

     **B.**     Per Art. 27.11, the minimum time period is 10 days, which time period starts on the date of service of the document to which the response is directed.

**41.**     Moreover, in the muni. courts of Record, documents are required in order that objections be documented in the event of appellate review. It's outrageous to consider the situation of having less than 24 hours to get a responsive motion filed. Where one day's Notice might be passable where viva voce pleadings are allowed, it's an unconscionably short period where a document is necessary.

**42.**     Still further, certain objections to the charging instrument have to be filed within a certain time period ahead of time. Art. 45.019(f). That time period is impossible to satisfy where STATE is allowed to serve its original pleading so as to

provide only one day's Notice.

**43.**    Additionally, STATE thinks that STATE gets to pick "which" proceeding is the one before which to serve something.  Thus, naturally, STATE picks trial as the proceeding for which Notice is due the day prior.  That practice and mendacity defies everything about meaningful Notice at a meaningful time in a meaningful manner.  What needs to be ruled on plainly is the fact that "any proceeding" means "the first proceeding," whatever may be its nature.  For example, in *Rothgery*, the arraignment was formally confirmed as a "proceeding."

**44.**    Thus, "any proceeding" doesn't mean that STATE gets to pick "which" proceeding.  Quite to the contrary, what "any proceeding" must necessarily mean is that whether it's an arraignment or a motions hearing or any other proceeding relevant to the prosecution of the charge, whatever of those types of proceedings first occurs sets STATE's deadline for service of its original pleading.


**CLAIM 7 – 42 U.S.C. §§ 1985, 1986**

**19.**    THE OLENICKS are Caucasian.

**20.**    At least one of them, and actually each of them, has at least one damages claim within the scope and purpose of each of 42 U.S.C. §§ 1985 and 1986, as detailed below.

**21.**    Individually and jointly, THE OLENICKS request a declaratory judgment on this issue:  Are 42 U.S.C. §§ 1985 and 1986 still limited to benefit only members of (formerly) racial minority groups?

22.     The question arises from rulings like these: *Shelby County v. Holder*, 133 S.

Ct. 2612 (2013); *Gratz v. Bollinger*, 539 U.S. 244 (2003).

23.     Clearly, where one or more of the damages claims moves forward, this

request for declaratory relief will be moot.

### Procedural Challenge

### CLAIM 8 – FED. R. CIV. P. 4

24.     THE OLENICKS intend to contract with the Process Server directly rather

than indirectly.

25.     That sort of direct contracting has raised eyebrows in the past, in this court

in particular, for which reason this issue is raised up front.

26.     Since the Process Server of choice is a fully recognized and authorized

Process Serving enterprise, nationwide, and since that enterprise is not a party to

this suit, it follows that there should be no issue on the matter, at all, whatsoever.

27.     Individually and jointly, THE OLENICKS request a declaratory judgment on

this issue: May any plaintiff be compelled into commerce, under FED. R. CIV. P. 4, or

any other procedural rule or judicial ruling, regarding hiring Process Servers?

28.     On the one hand, there's no question that Due Process is satisfied only where

a party without an interest in the litigation performs the acts of Service.  Thus, if

there's an exception to the general concept that commerce may not be compelled,

threshold Service is it, and there's simply no way around it.  Due Process requires

third-party participation for threshold Service.

**29.**     On the other, in general, commerce cannot be compelled.

    **A.**     *See, e.g., Griswold v. Connecticut*, 381 U.S. 479 (1965) (women cannot be compelled to make babies); *National Federation of Independent Businesses v. Sebelius*, 132 S. Ct. 2556 (2012) (***NFIB***) (neither STATEs nor individuals may be compelled to engage in commerce (about health/medical (insurance) matters)); *Lozman v. City of Riviera Beach*, 133 S. Ct. 735 (2013) (individual may not be compelled into "transportation").

    **B.**     Inherent in the "right *to* contract" is the "right *not* to contract."

        **1.**     *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1 (1910) (in discussion of anti-trust law origin, right to carry on trade or business is recognized in context of right to contract); *Goodman v. Lukens Steel Co.*, 482 U.S. 656 (1987) (right to contract in race discrimination context); *Plumbers' Union v. Borden*, 373 U.S. 690 (1963) (union tortiously interfered with right to contract).  *See also, e.g.*, FED. R. CIV. P. 8(c)(1) (affirmative defense of duress).

        **2.**     Should STATE law be relevant, the right not to contract is recognized by both high courts of TEXAS.

            **a.**     *Storrie v. Cortes*, 90 Tex. 283, 287, 38 S.W. 154, 156 (1896); *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 768-70 (Tex. 2011).

            **b.**     *Jordan v. State*, 51 Tex. Crim. 531, 532, 103 S.W. 633, 634 (Tex. Crim. App. 1907); *Ex parte Smythe*, 116 Tex. Crim. 146, 149, 28 S.W.2d 161, 163 (Tex. Crim. App. 1930).

      **c.**     Tex. R. Civ. P. 94 (affirmative defense of duress).

**30.**    THE OLENICKS would view compelled commerce on the topic of hiring Process Servers as an infringement on their individually and jointly asserted and exercised right not to contract.

**31.**    THE OLENICKS raise this point hoping it renders itself moot.

### DAMAGES

### CLAIM 9 – M. RAE NADLER-OLENICK's MALICIOUS PROSECUTION CLAIM AGAINST STATE – RE: BUILDING CODE

**32.**    This claim is in addition to all of the foregoing.

**33.**    STATE has no immunity.

    **A.**    This was at no time a "criminal" matter but rather was at all times a "civil" matter.  In other words, STATE acted at all times as a commercial player.

    **B.**    STATE initiated the civil/commercial litigation.

        **1.**    STATE's choice of forum isn't to STATE's advantage.  All that this choice of forum proves is just exactly how little STATE understands about the legal mechanism of this present ("funny money" based) system.

        **2.**    That STATE just happened to initiate civil litigation in a forum that had no jurisdiction not only for STATE's claim but also for any counter-claim is STATE's problem.

    **C.**    STATE never disavowed or negated CITY's authority to act as agent

for STATE.

**34.**   Criminal proceeding against NADLER-OLENICK.

    **A.**   STATE commenced a proceeding against NADLER-OLENICK that STATE intended to be a criminal prosecution.

    **B.**   STATE charged NADLER-OLENICK for doing roof repair, which allegedly "criminally" violated a CITY OF AUSTIN ordinance. *See* Exhibits.

    **C.**   NADLER-OLENICK defended (vigorously), starting with her Special Appearance, which challenged the muni. court's jurisdiction in all respects.

    **D.**   Favorable ruling.  The municipal court eventually granted STATE's motion to dismiss, which asserts "IE," which is understood to mean "insufficient evidence." *See* Exhibits.

**35.**   No Probable Cause.  Facially, STATE not only *never* had any evidence but also *never* had Probable Cause to initiate its claim against NADLER-OLENICK.

    **A.**   "Criminal" prosecution of alleged ordinance violation(s) is legally impossible in the muni. court.

        **1.**   To make the everlastingly obvious "no jurisdiction" point early, the *only **possible*** way to turn an alleged ordinance violation into a "*criminal*" proceeding is for a city, or someone on behalf of said city, to complain to STATE that the "target," here, NADLER-OLENICK, engaged in "commercial bribery." *See* TEX. PENAL CODE § 32.43.

        **2.**   Since muni. court's are limited to Class C misdemeanor matters, and since a commercial bribery charge carries state jail felony level

punishment, such charge is facially and instantly beyond the jurisdictional reach of any and every muni. court, whether original or the newer "of Record" forums, throughout TEXAS.

3.      How do we get to the obvious conclusion that the *only* way to charge "*criminally*" an alleged ordinance violation is via *that* charge? With the intent that CITY/STATE forever be motivated to find someone else to harass, someone else's rights to violate, someone else to retaliate against for his/her/their assertions of rights, in particular where CITY is acting on behalf, of course, of developers who want to engage in "land grab" at bargain basement costs, let's look at what is involved in turning an alleged breach of an alleged agreement arising from an ordinance into some semblance of a "criminal" charge.

4.      Perhaps the most obvious of the huge clues is this.

a.      What is a "city?"  It's a "municipal corporation."

b.      How does **any** corporation function? "*Federally*," as in *commercially*, as in "*by agreement*."

c.      What, then, is **any** ordinance?  It's a proposal.

d.      And, how, then, is **any** ordinance enforced? By proof not only of agreement with or consent to the proposal but then also of breach of said agreement.

e.      Therefore, we know facially and instantly that there must be a viable commercial nexus even for *civil* enforcement of alleged

violation of alleged ordinances.

5.    Directly related is this huge clue.  Since we're talking *"criminal"*

enforcement in a situation for which there's no enforcement, at all, without

proof of a viable commercial nexus, we know, then, facially and instantly,

what the nature of that agreement must be.

      a.    There are two generic forms: contracts and trusts.

      b.    Mere breach of contract doesn't carry "criminal"

sanctions, anymore. Debtor's prison doesn't exist. *See* both the state

and national Debt Collection Practices Acts to confirm that

threatening criminal prosecution for alleged debt violates public policy.

      c.    That leaves trust agreements as the actual, legal

mechanism behind enforcement of **any** ordinance.

6.    A third huge clue is the language of TEX. CODE CRIM. PROC. art.

45.019 (ch. 45 – muni. courts; .019 – complaints), which overtly limits the role

of plaintiff to STATE, even in the muni. courts. [1]

---

[1] "Municipal court," as a labeling/marketing concept, is a planned, and now back-firing, mislabeling campaign.  It's not *CITY's* court in which to do what CITY will. Muni. courts are of *STATE's* creation, not of **any** city's. Said another way, muni. courts are *STATE* courts (with rather limited jurisdiction), *not city/municipal* courts, as the mislabeling otherwise suggests.

In *Aguirre v. State*, 22 S.W.3d 463 (Tex. Crim. App. 1999), the Court studied of the question of whether the prosecutor in the municipal court had authority to petition the Court of Criminal Appeals for review.  Per that study, the Court documented a very complete history of the municipal court system.  Key in that history is this observation:

    The purposes of the constitutional amendment of 1891 and the legislation of
    1899 that created corporation courts were to make it clear that municipal courts

       **a.**      Cities, in general, whether "home rule" or otherwise, may have *police*, but not one of them has *STATE*'s **police power**. Therefore, just because a city's ordinance *says* there's a "criminal" penalty associated with it in no way means that said *city* has the direct authority to prosecute ***anything* as the plaintiff** in such proceeding.

       **b.**      Specifically, here, CITY has police but not *STATE*'s police power.  Therefore, CITY, in and of itself, has no authority or standing to initiate *"criminal"* proceedings in *CITY*'s name.

       **c.**      CITY *may* be a *complainant **but not** a plaintiff*.

      **7.**      The concept in 35.A.6 translates into this.  Because CITY ***can't*** show up as the plaintiff in such a proceedings, nothing about *CITY*'s assertion of punishment level is relevant to anything. [2]

---

were creatures of the State and that prosecutors in those courts acted with the authority of the State. [n.22 omitted] Accordingly the legislature decided that all municipal prosecutions would be "In the name and by authority of the State of Texas." [n.23 omitted]

*Aguirre*, 22 S.W.3d at 470.

    As plain as day regarding these "criminal case only" forums (with a few "civil" matter exceptions) is that STATE is the only party allowed/tolerated as a plaintiff for the "criminal" matters. *See also* TEX. CODE CRIM. PROC. art. 45.019. Why is that? Because *STATE* is the entity with the "police power." CITY is confused, because it has the "police" but not the "police power." **STATE** has the "police power." *No **city*** has standing as a plaintiff in **any** *criminal* proceeding. Thus, *STATE* has to have "an injury in fact," an "actual grievance," in order to initiate a proceeding in the muni. court. *Not* **CITY**, *but **STATE***, and *not* "civil," *but* "**criminal.**" Thus, muni. court prosecutions are not only "in the name of" STATE but also per this or that *STATE code*, something for which STATE might at least have a *shot* at producing a viable commercial nexus, which list does not now include and has never included *any* muni. ordinance.

    [2] *State v. Chacon*, 273 S.W.3d 375 (Tex. App. – San Antonio 2008, no pet.) (can't

8.     The concept in 35.A.6 also translates into this.

a.     It's legally impossible for there to be **any** *"criminal"* proceeding arising from the mere existence of an alleged ordinance *and* the mere, bare assertion of an alleged violation of such ordinance.

b.     *Ordinances* ***are not*** statutes processed legislatively by a body exercising legislative power, much less codified as a penal code. [3]

c.     Ordinances, then, ***are not***, in and of themselves, self-applying **"criminal"** provisions.

9.     In general, the ***only*** way to turn an alleged ordinance violation into a "criminal" proceeding is to prove up a viable commercial nexus sounding in trust.

10.    Given that STATE has already established policy in the area of "criminal" breach of trust matters, setting such punishment level as that of state jail felony, it follows that it's simply and facially impossible, as a matter of law, for **any** alleged ordinance violation to be prosecuted *"criminally"* in **any** muni. court, of either type, anywhere in TEXAS.

11.    There is, then, no jurisdiction in any muni. court, of either type, with or without proof of a viable commercial nexus sounding in trust.

---

change Penal Code (STATE's established) punishment level via an ordinance, i.e., by agreement of the parties).

   [3] It's the *STATE* that still purports to be the democratic body politic; hence, the body with the inherent legislative, executive (police), and judicial powers.  A "municipal corporation" is just that, a commercial enterprise; hence, it *doesn't* come with "police power."

    **a.**    *Without* proof of such indispensable commercial nexus, the case isn't just baseless and frivolous but also malicious.

    **b.**    *With* proof of such indispensable commercial nexus, there's no jurisdiction in any muni. court to process such charge.

**12.**    Ordinance enforcement, in general, is "civil" activity.

    **a.**    Ordinance enforcement has never had any justification sounding "criminal," ***especially*** as regards the edict-torial "thou shalt!" language.

    **b.**    But, if there *were* ever a reason to strike out against anyone "criminally" for an alleged ordinance violation, that claim, necessarily sounding in trust (for trust is the sole form of commercial nexus that even ***remotely*** allows or lends itself to "criminal" sanctions), **is a state jail felony matter**, i.e., ***a matter totally and completely beyond the jurisdiction of any and all muni. courts in TEXAS***, including all muni. courts sitting in AUSTIN.

**B.**    The "thou shalt!" language.

    **1.**    The ordinance language at issue is "thou shalt!" language.

        **a.**    CITY's "thou shalt!" language …

§ 25-1-391  COMPLIANCE WITH TITLE REQUIRED.

A person ***shall comply*** with the requirements of this title.

*Source: Section 13-1-60; Ord. 990225-70; Ord. 031211-11.*

---

AUSTIN, TEX., CODE § 25-1-391 (*emphasis* added).

> **b.**   … incorporates the International Building Code's (IBC's)
>
> "thou shalt!" language.
>
> **SECTION 105 PERMITS**
>
> **105.1 Required.** Any owner or authorized agent who intends to construct, enlarge, alter, repair, move, demolish, or change the occupancy of a building or structure, or to erect, install, enlarge, alter, repair, remove, convert or replace any electrical, gas, mechanical or plumbing system, the installation of which is regulated by this code, or to cause any such work to be done, ***shall first make application*** to the *building official **and obtain*** the required *permit.*

<http://publicecodes.cyberregs.com/icod/ibc/2009/icod_ibc_2009_1_sec007.htm>

(*emphasis* in the original; ***emphasis*** added).

> **2.**   "Thou shalt!" language **never *proscribes*** *any*thing.  Therefore, standing alone, i.e., as bare language unsupported, as here, with any viable commercial nexus, it is ***facially*** not "criminal" enforcement language no matter who/what purports to be the plaintiff, i.e., whether CITY *or* STATE.

> **C.**   The language of focus is out-sourced!

> **1.**   The "thou shalt!" language of focus isn't even codified in the ordinances but is, instead, "incorporated by reference" into said ordinances from third-party sources.

> **2.**   This is another ***huge*** clue that the language, by itself, standing alone, as printed words on a page, ***isn't*** subject to "*criminal*" enforcement.

3.      *Agreements* incorporate by reference, **not penal codes**.  No one is "on Notice" of something that is "out there, somewhere," that's incorporated by reference.  "Notice" of ***proscribed*** conduct is the by-product of publication of the language in a self-contained publication the content of which is ***within the exclusive control*** of the body exercising the police power.  Penal Code content is not ***out-sourced*** to third parties (rendering such language subject to change without Notice at the whim of such third party(ies)).

4.      Out-sourced language applies, if at all, if and only if there is a viable commercial nexus.

**D.**    No commercial nexus.

1.      As demonstrated by this segment and several that follow, STATE's total lack of Probable Cause is not merely a by-product of STATE's hauling off and filing charges incompetently in a court facially lacking jurisdiction to entertain the claim.  Total lack of Probable Cause is also the by-product of STATE's having no "injury in fact" or "actual grievance," *period*, "criminal" or "civil," to be addressed in **any** court within STATE's or UNITED STATES's jurisdiction.

2.      Ordinance language, generally, and ***especially*** the "thou shalt!" edict-torial language, in particular, and ***all the more especially*** the "thou shalt!" edict-torial language incorporated by reference from some third party, which third-party is under absolutely no control of CITY's, is enforceable, in

either context, i.e., whether "civil" or "criminal," if and only if there's a viable commercial nexus.

3.     There is no commercial nexus.  STATE has no commercial nexus with NADLER-OLENICK regarding any ordinance of any city, including all of CITY's ordinances. NADLER-OLENICK has nowhere consented, in any capacity, to being regulated by STATE per *any* municipal ordinance, including CITY's.

4.     There being no commercial nexus, then, legally speaking, STATE never had any "injury in fact" or any "actual grievance;" hence, never had standing.

5.     If there's a point that self-proves malice, e.g., callous disregard, deliberate indifference, ill will, evil motive, gross indifference, or reckless disregard of the rights of others, which a facial lack of Probable Cause does prove, it's the fact that STATE proceeded against NADLER-OLENICK, very deliberately, with *three* different ordinance-based complaints, never once even alluding to one shred of evidence of **any** viable commercial nexus. Where it's facially obvious that *no* **ordinance** is anything like the equivalent of a Penal Code provision, i.e., subject directly to "criminal" enforcement" solely because words are printed on a page, somewhere, all the *more* obviously "*criminally*" unenforceable as stand alone language where we're talking about "thou shalt!" edict-torial language, all the more especially unenforceable due to the fact of "incorporation by reference," STATE

proceeded very intentionally, with *three* different ordinance-based complaints, without one iota of a shred of evidence of anything about **any** viable commercial nexus.  STATE just flat out never cared that STATE had no case.

6.     At the heart of NADLER-OLENICK's defense is her compelling STATE to prove a commercial nexus. STATE has no commercial nexus with *anyone* via **any** municipal ordinance.  STATE has no horse in that race. STATE has no "police power" to exercise relevant to municipal ordinances. Thus, STATE simply has no commercial interest in the enforcement of municipal ordinances, generally, thus CITY's ordinances, in particular.

7.     Additionally, CITY is a "home rule" city, meaning that CITY's ordinances do not necessarily have to be consistent with STATE's statutory policy(ies), meaning, as a general starting place, that STATE's interest in the matter is even less than zero.

8.     In short, STATE has no commercial nexus with NADLER-OLENICK, period, *including* any alleged municipal Building Code matter.

9.     Moreover, having already established that the nature of the commercial nexus must sound in trust, that trust would have to be a signed writing, because STATE is complaining about a matter involving land or land use. *See* TEX. PROP. CODE ANN. § 112.004 (trust agreement involving land must be a signed writing).

10.     Thus, for there to be any *"criminal"* claim against NADLER-

OLENICK arising out of **any** ordinance affecting land she owns, NADLER-OLENICK would have to have signed a trust agreement agreeing not only to be a fiduciary with respect to the claimant, here STATE, but also regarding whatever municipal ordinance is at issue.

      **11.**    STATE proffered/tendered no such agreement, because there simply is no such agreement, whether written and signed or otherwise. No such agreement exists.

**E.**    Double Jeopardy.

      **1.**    OLENICK and NADLER-OLENICK are husband and wife.

      **2.**    The property of focus is community property.

      **3.**    STATE didn't charge all (both) owners in one claim.  STATE charged each owner *separately* for the one (same) alleged matter.

      **4.**    The gravamen, the unit of prosecution, for a "permit" matter is the permit, not the list of owners who might apply for such permit. [4] Therefore, when STATE first charged only OLENICK and tried him and convicted him (which matter is under state appellate review), [5] that ended the matter as far as other owners are concerned and as far as the community

---

[4] Which permit isn't even relevant until *after* a viable commercial nexus arises.
[5] STATE had no more Probable Cause against OLENICK than against NADLER-OLENICK. OLENICK defended, got "convicted" on trial, and moved for a new trial, which ruling the muni. court never served on him.  Given the flagrant lack of subject matter jurisdiction, OLENICK pursued mandamus in the county court, which, when denied, he appealed.

estate is concerned.

**F.**      Building Code.

    **1.**      The municipal ordinances collectively referred to as the Building Code exist to punish those who ***don't*** do repairs.

    **2.**      STATE charged both OLENICK and NADLER-OLENICK under the Building Code for *doing* repairs.

    **3.**      To assert the obvious conclusion regarding the facial lack of Probable Cause, it's legally impossible for THE OLENICKS, or for anyone else, to violate the Building Code by *doing* repairs.

**G.**      Grandfather Clause.

    **1.**      The language.

§ 214.216.  International Building Code

(b) The International Building Code applies to all commercial buildings in a municipality ***for which construction <u>begins</u> on or after January 1, 2006***, and to any alteration, remodeling, enlargement, or repair ***of <u>those</u> commercial buildings***.

TEX. LOCAL GOV'T CODE ANN. § 214.216(b) (all emphasis added).

    **2.**      The facts.

        **a.**      STATE tried OLENICK first.

            *I.*      Despite OLENICK's objections, and despite STATE's flagrant confessions of "no case" and "limitations," etc., the

muni. court railroaded him into a conviction.

*II.* He timely filed his motion for new trial, which is how the appellate process is activated.

*III.* The muni. court secretly denied that motion instantly, never sending OLENICK Notice of such ruling, which act of Notice, per Due Process, the muni. court purports to excuse itself from via local rule.

*IV.* Since there's also a "denied by operation of law" time period, OLENICK waited to hear from the court.

*V.* When he got wind that the motion had already been denied, the available process for review was mandamus.

*VI.* The County Court denied mandamus, which ruling OLENICK appealed to the state appellate court.  That matter is still pending.

**b.** STATE's "evidence" in that first trial, which didn't involve NADLER-OLENICK but only OLENICK, included two satellite pictures: one from 2003, and one from 2006. *See* Exhibits.

*I.* By those photographs, STATE intended to prove a change in the roof sometime between 2003 and 2006.

*II.* By those very same photographs, STATE effectively confessed/recognized that the roof existed in *2003*; hence, that the building existed (well) before Jan. 1, 2006.

       c.      STATE should never have filed any claim, and yet, despite the Grandfather Clause, STATE filed ***three*** complaints against NADLER-OLENICK before unilaterally dismissing.

**H.**      Limitations.

       **1.**      For any misdemeanor, the limitations period is two years.

       **2.**      What STATE alleged in 2013 was activity in 2013, but the actual events of focus, as STATE went to so much trouble to get satellite images to prove, occurred between 2003 and 2006.

       **3.**      The alleged activity in 2013 was an/the "investigation," ***not*** roof repair.

       **4.**      Knowing there was no viable claim due to the long-since expired limitations period, not only did STATE assert stale claims but also STATE asserted those stale claims ***three*** times against NADLER-OLENICK.

**I.**      [Deliberately skipped to avoid possible reference confusion.]

**J.**      CAPACITY/Capacity.

       **1.**      No recognized defendant.

       **a.**      STATE didn't charge "NADLER-OLENICK" but rather "Nadler-Olenick." *See* Exhibits.

       **b.**      No one is liable in "this state" in that capacity for or about

*any*thing.  For STATE to assert that capacity is for STATE to assert that there's no expectation of waiver of objection to the debts of the United States, which renders all such commercial matters totally beyond the reach of "this state."

      **2.**     No complainant. The "complaint" is unsigned.  Looking at the very same CAPACITY/Capacity problem, there simply is no complainant.

      **3.**     No verifier. The "complaint" is unverified. Looking at the very same CAPACITY/Capacity problem, there simply is no verification.

      **4.**     Thus, in review, on the face of the inadequate ("complaint only") charging instruments, there is no Defendant, no Complainant, *and* no Verification. Yet, STATE filed ***three*** of those, *see infra*, before finally accepting that NADLER-OLENICK would prevail, i.e., that STATE's persistent, abusive, baseless bluffing simply wasn't going to work.

      **K.**     In sum, Probable Cause is facially and legally impossible.

      **L.**     Probable Cause being legally impossible on its face, for STATE to charge anyone, including NADLER-OLENICK, "criminally" at <u>**any**</u> time under a municipal ordinance is for STATE to act with malice, as a matter of law.

**36.**     Causation.

      **A.**     STATE caused the prosecution to be initiated.

      **B.**     Also, on a different type of causation, STATE knowingly provided false

information, under oath, three different times, against NADLER-OLENICK. The complaints were false, in that there was no commercial nexus to enforce.

**37.**   Malice.

**A.**   As just demonstrated, STATE had, very plainly, no Probable Cause. The absence of Probable Cause is sufficient to establish the element of "malice."

**B.**   In addition to the malice shown by the facial lack of Probable Cause, all of which facts and discussion is intended to be included here for purposes of the element of malice, which is defined as "ill will, evil motive, gross indifference, or reckless disregard of the rights of others," *Gunnels*, malice is self-evident in additional ways.

**1.**   STATE asserted false information under oath, not only about the substance of the claim against NADLER-OLENICK but also about the timing. Falsity instantly satisfies "ill will, evil motive, gross difference, or reckless disregard of the rights of others."

**2.**   STATE never even *filed* an Information.

**a.**   Before the 1999 amendments, STATE's judicial system seemed to tolerate/allow "complaint only" matters, at least in the muni. courts. However, as of those 1999 amendments, which included the repeal of Art. 45.01, "complaint only" matters became greatly limited.

*See* Art. 2.05.

**b.     Art. 2.05. [29] [35] [36] When complaint is made**

If the offense be a misdemeanor, the attorney shall forthwith prepare ***an information based upon such complaint*** and file the same in the court having jurisdiction; provided, that in counties having no county attorney, ***misdemeanor cases may be tried upon complaint alone***, without an information, **provided, however**, in counties having one or more criminal district courts an information must be filed in each misdemeanor case. ...

Art. 2.05 (emphasis added).

**c.**     Travis County has "always" had a County Attorney.  Of course, Hon. DAVID ESCAMILLA is the present Travis County Attorney. Moreover, the information at this site, < http://www.co.travis.tx.us/courts/criminal/district/default.asp >, suggests that there are at least seven criminal district courts serving Travis County. Therefore, if there *is* a list of counties in TEXAS that *still* qualify for "complaint only" matters, TRAVIS COUNTY is not on that list.

**d.**     For any and all alleged misdemeanor matters initiated as of late 1999 and to date, it's facially incompetent to initiate a proceeding that intends to be "criminal" while failing to prepare, failing to file, *and* failing to serve an Information as the charging instrument.

**e.**     *Indictments* may be waived.  But, there's no "criminal" proceeding without either an Indictment or an Information.  Thus, Information filing/serving may/can never be waived.

**f.**    To refuse to file an Information, in 2014, for **any** misdemeanor matter is to intend to pursue a completely bogus judicial proceeding for the sole or primary purpose of harassment.

**g.**    It's an evil motive and/or ill will and/or gross indifference and/or reckless disregard for the right of Due Process that perpetuates this habitual abuse of process within the muni. court system STATE-wide. "Complaint only" ended in Travis County in 1999, but the practice persists, as self-proved in these matters.

**3.**    STATE alleged an issue arising under a 2003-based code, "as amended," and a 2009-based International Building Code, in the face of the CITY's adopting only the 2012 edition of the IBC. AUSTIN, § 25-12-1. It's an evil motive and/or ill will and/or gross indifference and/or reckless disregard for rights that spawns this type of misleading *and* backward-looking claim.

**4.**    Down this same path, CITY hadn't adopted anything in the way of the Building Code until 2010.

**a.**    To make this point in yet this additional manner, how is *any* edition of *any* Building Code, not adopted until 2010, relevant to a matter that arose, if at all, between 2003 and 2006?

**b.**    There *is* a way, of course, and that's by means of commercial consent, which reality takes us right back to the complete

lack of any commercial nexus in the matter from its inception.

c.     The point is that while some might argue an "*ex post facto*" position, NADLER-OLENICK isn't looking at *ex post facto*, because agreements may be made subject to whatever timing the parties assert.  Even more to the point, "by agreement" is the **only** way CITY or STATE end-runs what would otherwise appear to most to be an *ex post facto* problem. Said still another way, **if** the ordinance language of focus *were* stand-alone, enforceable-solely-because-it's-in-print language, **then** all claims against THE OLENICKs **would** fail, instantly, for *ex post facto* problems.  It's because that language would apply, if at all, only per a viable commercial nexus that *ex post facto* concepts are simply irrelevant.

d.     Since there is no commercial nexus, the only other way to try to crowbar a case into existence is to lie boldly to the muni. court and allege that the facts giving rise to the matter existed in 2013 rather than in their actual time frame, namely between 2003 and 2006. This is the path STATE took, via CITY, its agent.

e.     It's an evil motive and/or ill will and/or gross indifference and/or reckless disregard for rights that motivates STATE to lie about the timing, and that in the face of STATE's very own 2003 and 2006 satellite photos, in order to try to have a case.

**C.** Robo-signing.

**1.** The second of STATE's *three* complaints against NADLER-OLENICK is dated Nov. 29, 2013. *See* Exhibits.

**2.** That's a very curious date, given that it was a STATE holiday and that the court wasn't open.

**3.** So, how *did* the deputy clerk, "Sierra Ready," actually sign that document? The only explanation is "robo-signing," which isn't any more legal here than with the mortgage fraud scandal involving "robo-signing."

**D.** STATE filed multiple complaints against NADLER-OLENICK.

**1.** "Complaint" 1 is dated Jun. 13, 2013, which is the same date as the "complaint" used against OLENICK.

**2.** "Complaint" 2 is dated Nov. 29, 2013.

**3.** "Complaint" 3 is dated Dec. 2, 2013, and it's verbatim the text of "Complaint" 1, but it sports both a different "case number" *and* a different "ticket number."

**4.** It's an evil motive and/or ill will and/or gross indifference and/or reckless disregard for rights that motivates STATE to continue with a facially bogus claim, via all those changes, with the clear intent of changing cases without Notice, knowing at least part of the defense by that time, intending via such scheming to cheat NADLER-OLENICK out of her pre-trial opportunity to assert (and preserve) error.

E.    On each of these "complaints," STATE had a deputy clerk serve as the "complainant." That instantly disqualifies *that* court from trying *those* matters.

1.    Clerk as paid, hearsay witness.

a.    The deputy clerk learned of the facts sworn to solely as a by-product of employment with the court.

b.    The deputy clerk, a paid judicial employee, is also serving in the capacity of (paid) witness for STATE.

c.    That effectively renders the *court* the "complainant." Not that courts can't ever be complainants.  It's just that a complainant court is instantly disqualified from trying *that* matter.

d.    It's an evil motive and/or ill will and/or gross indifference and/or reckless disregard for the right of a fair trial that perpetuates this abuse of office and process within the muni. court system STATE-wide.

2.    Clerk as *simultaneous* (A) prosecution witness *and* (B) Custodian of Records.

a.    Whether or not the court is the effective (hearsay) "complainant" where the paid deputy clerk swears out the complaint based on information learned *solely* as a by-product of employment, the deputy clerk is an active witness in a matter for which that very same deputy clerk also serves as Custodian of Records.

b.    As Custodian of Records, such clerk may, of course, testify

as to the *Record*, but in no way *also* on **the merits of the matter**. For a Custodian of Records to be a material fact witness is for the Custodian of Records to engage in an irreconcilable conflict of interest, which effectively disqualifies the trial court (for so long as that Custodian/witness has access to that Record, i.e., remains employed with that court).It's an evil motive and/or ill will and/or gross indifference and/or reckless disregard for the right of a fair trial that perpetuates this abuse of office and process within the muni. court system STATE-wide.

F.    STATE sought multiple, *multiple* financial punishment/gain.

1.    *Doing* repair without this or that credential is something for which the "property management" language may or may not apply, but for which "property management" might at least be *relevant*.

2.    The maximum fine for repair without a license is $500. *See* AUSTIN, § 25-12-213 ¶ 101.

3.    However, not only was OLENICK charged under the Building Code and fined the max of $2,000 but also so was NADLER-OLENICK charged under the Building Code with the intent she also be fined the max of $2,000.

4.    In other words, STATE sought $4,000 instead of $500.

5.    This generates appeal Bond amounts, respectively, of $8,000 versus $1,000. This additional perspective supplements the multiple,

*multiple* punishment concept with the subtle intent of making it "impossible," or at least that much more "expensive," to get appellate review, which intent, in and of itself, bolsters the ill will, evil intent, etc., at the trial level.

38.    For damages, NADLER-OLENICK demands from STATE one hundred thousand dollars ($100,000) actual damages and also one hundred thousand dollars ($100,000) punitive damages.

## CLAIM 10 – M. RAE NADLER-OLENICK's MALICIOUS PROSECUTION CLAIM AGAINST CITY – RE: BUILDING CODE

39.    This claim is in addition to all of the foregoing.

40.    CITY has no immunity.

A.     This was at no time a "criminal" matter but rather was at all times a "civil" matter.  In other words, CITY acted at all times as a commercial player.

B.     CITY, intending at all times to be a real party in interest despite all the statutory language that facially prohibits CITY from being a plaintiff in **any** "criminal" matter, initiated the civil/commercial litigation for its own interests in STATE's name and with STATE's full approval.

1.     "Although the cases are styled in this manner ["The State of Texas v. ['target']"], the State is only a nominal party, and it is the City that

is the real party in interest." *City of El Paso v. Alvarez*, 931 S.W.2d 370, 375 (Tex. App. – El Paso **1996**, no writ). [6]

      **2.**      "Nominal party" has *competent* relevance only in the ***civil*** context. In the ***criminal*** context, the party plaintiff either has a police power to exercise or not. *STATE* has the police power, ***not*** any city. Thus, as one more confirmation that a commercial nexus is indispensable, we find this very curious "nominal party" concept judicially confirmed in what purports to be a criminal context. *Id.* at 374-75. Where STATE is the named party, and where STATE is solely the nominal party, CITY is the party initiating the litigation, the character of which litigation is ***necessarily*** "*civil*."

      **3.**      There is no conceptual, much less legal, concern about there being two parties sued for being the party plaintiff against NADLER-OLENICK. The abuse of STATE's title and authority has been a joint operation between STATE and CITY since 1999. STATE has knowingly and deliberately allowed the false and misleading use of its name in all such "*criminal*"-prosecution-of-alleged-ordinance-violation matters since 1999. The upshot of this "nominal party" game is that there are, in "municipal ordinance"-based matters, ***two*** plaintiffs, not just one. *Id.* at 375.

---

[6] The emphasis on the date highlights the fact that this is a pre-1999 ruling. As discussed in the conspiracy claim, *infra*, while the facially nuts concept of dual plaintiffs for any allegedly "criminal" matter is perfectly sensible to consider as overruled by the systemic statutory changes of 1999, there's also the practical reality that for so long as CITY initiates criminal proceedings ***in STATE's name*** for alleged violations of *CITY's* ordinances, not matter how nuts the concept of dual plaintiffs, that's exactly what exists, for purposes of malicious prosecution claims.

**4.**     CITY's choice of forum isn't to CITY's advantage.  All that this choice of forum proves is just exactly how little CITY understands about the legal mechanism of this present ("funny money" based) system.

**5.**     That CITY just happened to initiate civil litigation in a forum that had no jurisdiction not only for CITY's claim but also for any counter-claim is CITY's problem.

**C.**     CITY acted at all times via officers, agents, or employees within CITY's ATTORNEY's OFFICE.

**41.**   Criminal proceeding against NADLER-OLENICK.

**A.**     CITY commenced a proceeding that CITY intended to be a criminal prosecution against NADLER-OLENICK.

**B.**     CITY charged NADLER-OLENICK for doing roof repair, which allegedly "criminally" violated a municipal ordinance. *See* Exhibits.

**C.**     NADLER-OLENICK defended (vigorously), starting with her Special Appearance, which challenged the muni. court's jurisdiction in all respects.

**42.**   Favorable ruling. The municipal court eventually granted CITY's motion to dismiss, which asserts "IE," which is understood to mean "insufficient evidence." *See* Exhibits.

**43.**   No Probable Cause.  Facially, CITY not only *never* had any evidence but also *never* had Probable Cause to initiate its claim against NADLER-OLENICK.

NADLER-OLENICK reasserts 35.A, 35.B, and 35.C, including all the components and footnotes of each, verbatim.

---

**D.**     No commercial nexus.

1.     As demonstrated by this segment and several that follow, CITY's total lack of Probable Cause is not merely a by-product of CITY's hauling off and filing charges incompetently in a court facially lacking jurisdiction to entertain the claim.  Total lack of Probable Cause is also the by-product of CITY's having no "injury in fact" or "actual grievance," *period*, "criminal" or "civil," to be addressed in **any** court within STATE's or UNITED STATES's jurisdiction.

2.     Ordinance language, generally, and ***especially*** the "thou shalt!" edict-torial language, in particular, and ***all the more especially*** the "thou shalt!" edict-torial language incorporated by reference from some third party, which third-party is under absolutely no control of CITY's, is enforceable, in either context, i.e., whether "civil" or "criminal," if and only if there's a viable commercial nexus.

3.     There is no commercial nexus.  CITY has no commercial nexus with NADLER-OLENICK regarding any ordinance of any city, including all of CITY's ordinances. NADLER-OLENICK has nowhere consented, in any capacity, to being regulated by CITY per ***any*** municipal ordinance, including CITY's.

4.     At the heart of NADLER-OLENICK's defense is her compelling CITY to prove a commercial nexus.  There being no commercial nexus, then, legally speaking, CITY never had any "injury in fact" or any "actual

grievance;" hence, never had standing.

5.      If there's a point that self-proves malice, e.g., callous disregard, deliberate indifference, ill will, evil motive, gross indifference, or reckless disregard of the rights of others, which a facial lack of Probable Cause does prove, it's the fact that CITY proceeded against NADLER-OLENICK, very deliberately, with ***three*** different ordinance-based complaints, never once even alluding to one shred of evidence of <u>**any**</u> viable commercial nexus. Where it's facially obvious that ***no ordinance*** is anything like the equivalent of a Penal Code provision, i.e., subject directly to "criminal" enforcement" solely because words are printed on a page, somewhere, all the *more* obviously "*criminally*" unenforceable as stand alone language where we're talking about "thou shalt!" edict-torial language, all the more especially unenforceable due to the fact of "incorporation by reference," CITY proceeded very intentionally, with ***three*** different  ordinance-based complaints, without one iota of a shred of evidence of anything about <u>**any**</u> viable commercial nexus.  CITY just flat out never cared that CITY had no case.

6.      CITY has no commercial nexus with NADLER-OLENICK, period, *including* any alleged municipal Building Code matter.

7.      Moreover, having already established that the nature of the commercial nexus must sound in trust, that trust would have to be a signed writing, because CITY is complaining about a matter involving land or land use. *See* TEX. PROP. CODE ANN. § 112.004 (trust agreement involving land

must be a signed writing).

8.     Thus, for there to be any *"criminal"* claim against NADLER-OLENICK arising out of **any** ordinance affecting land she owns, NADLER-OLENICK would have to have signed a trust agreement agreeing not only to be a fiduciary with respect to the claimant, here CITY, but also regarding whatever municipal ordinance is at issue.

9.     CITY proffered/tendered no such agreement, because there simply is no such agreement, whether written and signed or otherwise. No such agreement exists.

E.     Double Jeopardy.

1.     OLENICK and NADLER-OLENICK are husband and wife.

2.     The property of focus is community property.

3.     CITY didn't charge all (both) owners in one claim.  CITY charged each owner *separately* for the one (same) alleged matter.

4.     The gravamen, the unit of prosecution, for a "permit" matter is the permit, not the list of owners who might apply for such permit. [7] Therefore, when CITY first charged only OLENICK and tried him and convicted him (which matter is under state appellate review), [8] that ended the matter as far as other owners are concerned and as far as the community

---

[7] *See n.*4, *supra.*
[8] *See n.*5, *supra.*

estate is concerned.

**F.**     Building Code.

**1.**     The municipal ordinances collectively referred to as the Building Code exist to punish those who ***don't*** do repairs.

**2.**     CITY charged both OLENICK and NADLER-OLENICK under the Building Code for *doing* repairs.

**3.**     To assert the obvious conclusion regarding the facial lack of Probable Cause, it's legally impossible for THE OLENICKS, or for anyone else, to violate the Building Code by *doing* repairs.

**G.**     Grandfather Clause.

**1.**     The language.

§ 214.216.  International Building Code

(b) The International Building Code applies to all commercial buildings in a municipality ***for which construction <u>begins</u> on or after January 1, 2006***, and to any alteration, remodeling, enlargement, or repair ***of <u>those</u> commercial buildings***.

Tᴇx. Lᴏᴄᴀʟ Gᴏᴠ'ᴛ Cᴏᴅᴇ Aɴɴ. § 214.216(b) (all emphasis added).

**2.**     The facts.

**a.**     CITY tried OLENICK first.

NADLER-OLENICK reasserts the six components of 35.G.2.a, verbatim.

---

      **b.**    CITY's "evidence" in that first trial, which didn't involve NADLER-OLENICK but only OLENICK, included two satellite pictures: one from 2003, and one from 2006.

      *I.*    By those photographs, CITY intended to prove a change in the roof sometime between 2003 and 2006.

      *II.*    By those very same photographs, CITY effectively confessed/recognized that the roof existed in *2003*; hence, that the building existed (well) before Jan. 1, 2006.

      **c.**    CITY should never have filed any claim, and yet, despite the Grandfather Clause, CITY filed ***three*** complaints against NADLER-OLENICK before unilaterally dismissing.

**H.**    Limitations.

    **1.**    For any misdemeanor, the limitations period is two years.

    **2.**    What CITY alleged in 2013 was activity in 2013, but the actual events of focus, as CITY went to so much trouble to get satellite images to prove, occurred between 2003 and 2006.

    **3.**    The alleged activity in 2013 was an/the "investigation," ***not*** roof repair.

    **4.**    Knowing there was no viable claim due to the long-since expired limitations period, not only did CITY assert stale claims but also CITY asserted those stale claims ***three*** times against NADLER-OLENICK.

**I.**     [Deliberately skipped to avoid possible reference confusion.]

**J.**     CAPACITY/Capacity.

    **1.**     No recognized defendant.

        **a.**     CITY didn't charge "NADLER-OLENICK" but rather "Nadler-Olenick." *See* Exhibits.

        **b.**     No one is liable in "this state" in that capacity for or about *any*thing.  For CITY to assert that capacity is for CITY to assert that there's no expectation of waiver of objection to the debts of the United States, which renders all such commercial matters totally beyond the reach of "this state."

    **2.**     No complainant. The "complaint" is unsigned.  Looking at the very same CAPACITY/Capacity problem, there simply is no complainant.

    **3.**     No verifier. The "complaint" is unverified. Looking at the very same CAPACITY/Capacity problem, there simply is no verification.

    **4.**     Thus, in review, on the face of the inadequate ("complaint only") charging instruments, there is no Defendant, no Complainant, *and* no Verification. Yet, CITY filed ***three*** of those, *see infra*, before finally accepting that NADLER-OLENICK would prevail, i.e., that CITY's persistent, abusive, baseless bluffing simply wasn't going to work.

**K.**     In sum, Probable Cause is facially and legally impossible.

**L.**     Probable Cause being legally impossible on its face, for CITY to charge anyone, including NADLER-OLENICK, "criminally" at **any** time under a municipal ordinance is for CITY to act with malice, as a matter of law.

**44.**     Causation.

**A.**     CITY caused the prosecution to be initiated.

**B.**     Also, on a different type of causation, CITY knowingly provided false information, under oath, three different times, against NADLER-OLENICK.  The complaints were false, in that there was no commercial nexus to enforce.

**45.**     Malice.

**A.**     As just demonstrated, CITY had, very plainly, no Probable Cause.  The absence of Probable Cause is sufficient to establish the element of "malice."

**B.**     In addition to the malice shown by the facial lack of Probable Cause, all of which facts and discussion is intended to be included here for purposes of the element of malice, which is defined as "ill will, evil motive, gross indifference, or reckless disregard of the rights of others," *Gunnels*, malice is self-evident in additional ways.

     **1.**     CITY asserted false information under oath, not only about the substance of the claim against NADLER-OLENICK but also about the timing.  Falsity instantly satisfies "ill will, evil motive, gross difference, or

reckless disregard of the rights of others."

2.      CITY never even *filed* an Information.

NADLER-OLENICK reasserts the seven components of 37.B.2,

verbatim.

3.      CITY alleged an issue arising under a 2003-based code, "as

amended," and a 2009-based International Building Code, in the face of the

CITY's adopting only the 2012 edition of the IBC. AUSTIN, § 25-12-1. It's an

evil motive and/or ill will and/or gross indifference and/or reckless disregard

for rights that spawns this type of misleading *and* backward-looking claim.

4.      Down this same path, CITY hadn't adopted anything in the way

of the Building Code until 2010.

a.      To make this point in yet this additional manner, how is

*any* edition of *any* Building Code, not adopted until 2010, relevant to a

matter that arose, if at all, between 2003 and 2006?

b.      There *is* a way, of course, and that's by means of

commercial consent, which reality takes us right back to the complete

lack of any commercial nexus in the matter from its inception.

c.      The point is that while some might argue an "*ex post

facto*" position, NADLER-OLENICK isn't looking at *ex post facto*,

---

because agreements may be made subject to whatever timing the parties assert.  Even more to the point, "by agreement" is the *only* way CITY or STATE end-runs what would otherwise appear to most to be an *ex post facto* problem. Said still another way, *if* the ordinance language of focus *were* stand-alone, enforceable-solely-because-it's-in-print language, *then* all claims against THE OLENICKs *would* fail, instantly, for *ex post facto* problems.  It's because that language would apply, if at all, only per a viable commercial nexus that *ex post facto* concepts are simply irrelevant.

      **d.**     Since there is no commercial nexus, the only other way to try to crowbar a case into existence is to lie boldly to the muni. court and allege that the facts giving rise to the matter existed in 2013 rather than in their actual time frame, namely between 2003 and 2006. This is the path CITY took.

      **e.**     It's an evil motive and/or ill will and/or gross indifference and/or reckless disregard for rights that motivates CITY to lie about the timing, and that in the face of CITY's very own 2003 and 2006 satellite photos, in order to try to have a case.

**C.**    Robo-signing.

      **1.**     The second of CITY's *three* complaints against NADLER-OLENICK is dated Nov. 29, 2013.

2.      That's a very curious date, given that it was a STATE holiday and that the court wasn't open.

3.      So, how *did* the deputy clerk, "Sierra Ready," actually sign that document?  The only explanation is "robo-signing," which isn't any more legal here than with the mortgage fraud scandal involving "robo-signing."

D.      CITY filed multiple complaints against NADLER-OLENICK.

1.      "Complaint" 1 is dated Jun. 13, 2013, which is the same date as the "complaint" used against OLENICK.

2.      "Complaint" 2 is dated Nov. 29, 2013.

3.      "Complaint" 3 is dated Dec. 2, 2013, and it's verbatim the text of "Complaint" 1, but it sports both a different "case number" *and* a different "ticket number."

4.      It's an evil motive and/or ill will and/or gross indifference and/or reckless disregard for rights that motivates CITY to continue with a facially bogus claim, via all those changes, with the clear intent of changing cases without Notice, knowing at least part of the defense by that time, intending via such scheming to cheat NADLER-OLENICK out of her pre-trial opportunity to assert (and preserve) error.

E.      On each of these "complaints," CITY had a deputy clerk serve as the "complainant."  That instantly disqualifies *that* court from trying *those* matters.

1.      Clerk as paid, hearsay witness.

    a.      The deputy clerk learned of the facts sworn to solely as a by-product of employment with the court.

    b.      The deputy clerk, a paid judicial employee, is also serving in the capacity of (paid) witness for CITY.

    c.      That effectively renders the *court* the "complainant." Not that courts can't ever be complainants.  It's just that a complainant court is instantly disqualified from trying *that* matter.

    d.      It's an evil motive and/or ill will and/or gross indifference and/or reckless disregard for the right of a fair trial that perpetuates this abuse of office and process within the muni. court system STATE-wide.

2.      Clerk as *simultaneous* (A) prosecution witness *and* (B) Custodian of Records.

    NADLER-OLENICK reasserts the four components of 37.E.2, verbatim.

F.      CITY sought multiple, *multiple* financial punishment/gain.

1.      *Doing* repair without this or that credential is something for which the "property management" language may or may not apply, but for which "property management" might at least be *relevant*.

2.      The maximum fine for repair without a license is $500. *See* AUSTIN, § 25-12-213 ¶ 101.

3.      However, not only was OLENICK charged under the Building Code and fined the max of $2,000 but also so was NADLER-OLENICK charged under the Building Code with the intent she also be fined the max of $2,000.

4.      In other words, CITY sought $4,000 instead of $500.

5.      This generates appeal Bond amounts, respectively, of $8,000 versus $1,000. This additional perspective supplements the multiple, *multiple* punishment concept with the subtle intent of making it "impossible," or at least that much more "expensive," to get appellate review, which intent, in and of itself, bolsters the ill will, evil intent, etc., at the trial level.

46.   For damages, NADLER-OLENICK demands from CITY one hundred thousand dollars ($100,000) actual damages and also one hundred thousand dollars ($100,000) punitive damages.

**CLAIM 11 – M. RAE NADLER-OLENICK's MALICIOUS PROSECUTION CLAIM AGAINST ALLISON GARDNER – RE: BUILDING CODE**

**47.**     This claim is in addition to all of the foregoing.

**48.**     ALLISON GARDNER is the deputy clerk and Custodian of Records who also doubled as the (paid) hearsay witness/complainant for the dual plaintiffs in the first of three "complaints" against NADLER-OLENICK. *See* Exhibits.

**49.**     GARDNER has no immunity.

    **A.**     This is a malicious prosecution claim.  GARDNER signed the first of the three "complaints," for which there's no Probable Cause.

    **B.**     Moreover, if she purports to be an officer, agent, or employee of either of the dual plaintiffs, she can't have any more immunity than either of those plaintiffs, which is zero. *See* Claims 9 and 10, supra. When it comes to ordinance enforcement, each of the dual plaintiffs is a commercial player, and each is a civil / commercial litigation initiator.

    **C.**     Additionally, by being a complainant in a matter purportedly arising under one or more municipal ordinances, GARDNER is also a civil / commercial litigation initiator.

        **1.**     GARDNER's choice of forum isn't to GARDNER's advantage. All that this choice of forum proves is just exactly how little GARDNER understands about the legal mechanism of this present ("funny money" based) system.

        **2.**     That GARDNER just happened to initiate civil litigation in a forum that had no jurisdiction not only for GARDNER's claim but also for

any counter-claim is GARDNER's problem.

**50.**   Criminal proceeding against NADLER-OLENICK.

   **A.**   GARDNER signed the "complaint" that initiated the criminal

prosecution against NADLER-OLENICK.

   **B.**   GARDNER charged NADLER-OLENICK for alleged criminal violation

of the CITY's ordinance-based Building Code for *doing* roof repair. *See* Exhibits.

   **C.**   NADLER-OLENICK defended (vigorously), starting with her Special

Appearance, which challenged the muni. court's jurisdiction in all respects.

**51.**   Favorable ruling. The municipal court eventually granted the dual plaintiffs'

motion to dismiss, which asserts "IE," which is understood to mean "insufficient

evidence." *See* Exhibits.

**52.**   No Probable Cause.  Facially, GARDNER not only *never* had any evidence

but also *never* had Probable Cause to initiate her claim against NADLER-

OLENICK.

   NADLER-OLENICK reasserts 35.A, 35.B, and 35.C, including all the

components and footnotes of each, verbatim.

   **D.**   No commercial nexus.

      **1.**   As demonstrated by this segment and several that follow,

   GARDNER's total lack of Probable Cause is not merely a by-product of her

   hauling off and filing charges incompetently in a court facially lacking

   jurisdiction to entertain the claim.  Total lack of Probable Cause is also the

by-product of GARDNER's having no evidence of any "injury in fact" or "actual grievance," *period*, whether "criminal" or "civil," to be addressed in **any** court within STATE's or UNITED STATES's jurisdiction on behalf of either of the dual plaintiffs.

2.      Ordinance language, generally, and ***especially*** the "thou shalt!" edict-torial language, in particular, and ***all the more especially*** the "thou shalt!" edict-torial language incorporated by reference from some third party, which third-party is under absolutely no control of CITY's, is enforceable, in either context, i.e., whether "civil" or "criminal," if and only if there's a viable commercial nexus.

3.      There is no commercial nexus.  Neither one of the dual plaintiffs has any commercial nexus with NADLER-OLENICK regarding any ordinance of any city, including all of CITY's ordinances. NADLER-OLENICK has nowhere consented, in any capacity, to being regulated by either of the dual plaintiffs per ***any*** municipal ordinance, including CITY's.

4.      At the heart of NADLER-OLENICK's defense is her compelling the dual plaintiffs to prove a commercial nexus.  There being no commercial nexus, then, legally speaking, neither CITY nor STATE ever had any "injury in fact" or any "actual grievance;" hence, never had standing.

5.      If there's a point that self-proves malice, e.g., callous disregard, deliberate indifference, ill will, evil motive, gross indifference, or reckless disregard of the rights of others, which a facial lack of Probable Cause does

prove, it's the fact that GARDNER initiated an ordinance-based *criminal* claim against NADLER-OLENICK without even alluding to one shred of evidence of **any** viable commercial nexus.  Where it's facially obvious that *no ordinance* is anything like the equivalent of a Penal Code provision, i.e., subject directly to "criminal" enforcement" solely because words are printed on a page, somewhere, all the *more* obviously *"criminally"* unenforceable as stand alone language where we're talking about "thou shalt!" edict-torial language, all the more especially unenforceable due to the fact of "incorporation by reference," GARDNER initiated this ordinance-based *criminal* proceeding without one iota of a shred of evidence of anything about **any** viable commercial nexus.  GARDNER just flat out never cared that neither dual plaintiff had a case.

6.     Neither CITY nor STATE has **any** commercial nexus with NADLER-OLENICK, period, *including* any alleged municipal Building Code matter.

7.     Moreover, having already established that the nature of the commercial nexus must sound in trust, that trust would have to be a signed writing, because GARDNER complains about a matter involving land or land use. *See* TEX. PROP. CODE ANN. § 112.004 (trust agreement involving land must be a signed writing).

8.     Thus, for there to be any *"criminal"* claim against NADLER-OLENICK arising out of **any** ordinance affecting land she owns, NADLER-

OLENICK would have to have signed a trust agreement agreeing not only to be a fiduciary with respect to each of the dual plaintiffs but also regarding whatever municipal ordinance is at issue.

9.      GARDNER proffered/tendered/included/made-reference-to no such agreement, and there simply is no such agreement, whether written and signed or otherwise. No such agreement exists.

**E.     Double Jeopardy.**

1.      OLENICK and NADLER-OLENICK are husband and wife.

2.      The property of focus is community property.

3.      GARDNER didn't charge all (both) owners in one claim. GARDNER charged each owner *separately* for the one (same) alleged matter.

4.      The gravamen, the unit of prosecution, for a "permit" matter is the permit, not the list of owners who might apply for such permit. [9] Therefore, when GARDNER charged OLENICK and NADLER-OLENICK separately over the same alleged repair work, i.e., the same permit matter, and when the dual plaintiffs tried OLENICK separately and convicted him separately (which matter is under state appellate review), [10] that ended the matter as far as other owners are concerned and as far as the community estate is concerned.

---

[9] *See n.*4, *supra.*
[10] *See n.*5, *supra.*

**F.**     Building Code.

    **1.**     The municipal ordinances collectively referred to as the Building Code exist to punish those who **_don't_** do repairs.

    **2.**     GARDNER charged both OLENICK and NADLER-OLENICK under the Building Code for *doing* repairs.

    **3.**     To assert the obvious conclusion regarding the facial lack of Probable Cause, it's legally impossible for THE OLENICKS, or for anyone else, to violate the Building Code by *doing* repairs.

**G.**     Grandfather Clause.

    **1.**     The language.

§ 214.216.  International Building Code

(b) The International Building Code applies to all commercial buildings in a municipality *for which construction **_begins_** on or after **_January 1, 2006_**,* and to any alteration, remodeling, enlargement, or repair **_of those commercial buildings_**.

TEX. LOCAL GOV'T CODE ANN. § 214.216(b) (all emphasis added).

    **2.**     The facts.

        **a.**     The dual plaintiffs tried OLENICK first.

        NADLER-OLENICK reasserts the six components of 35.G.2.a, verbatim.

        **b.**     The dual plaintiffs' "evidence" in that first trial, which didn't involve NADLER-OLENICK but only OLENICK, included two

satellite pictures: one from 2003, and one from 2006.

   *I.*     By those photographs, the dual plaintiffs intended to prove a change in the roof sometime between 2003 and 2006.

   *II.*     By those very same photographs, the dual plaintiffs effectively confessed/recognized that the roof existed in *2003*; hence, that the building existed (well) before Jan. 1, 2006.

**H.**     Limitations.

   **1.**     For any misdemeanor, the limitations period is two years.

   **2.**     What GARDNER alleged in 2013 was activity in 2013, but the actual events of focus, as the dual plaintiffs went to so much trouble to get satellite images to prove, occurred between 2003 and 2006.

   **3.**     The alleged activity in 2013 was an/the "investigation," ***not*** roof repair.

   **4.**     Knowing there was no viable claim due to the long-since expired limitations period, GARDNER asserted a stale claim against NADLER-OLENICK.

**I.**     [Deliberately skipped to avoid possible reference confusion.]

**J.**     CAPACITY/Capacity.

   **1.**     No recognized defendant.

---

a.    GARDNER didn't charge "NADLER-OLENICK" but rather "Nadler-Olenick." *See* Exhibits.

b.    No one is liable in "this state" in that capacity for or about *any*thing.  For GARDNER to assert that capacity is for GARDNER to assert that there's no expectation of waiver of objection to the debts of the United States, which renders all such commercial matters totally beyond the reach of "this state."

2.    No complainant. GARDNER's "complaint" is unsigned.  Looking at the very same capacity problem, there simply is no complainant.

3.    No verifier. GARDNER's "complaint" is unverified. Looking at the very same CAPACITY/Capacity problem, there simply is no verification.

4.    Thus, in review, on the face of the inadequate ("complaint only") charging instrument, there is no Defendant, no Complainant, *and* no Verification.


K.    In sum, Probable Cause is facially and legally impossible.

L.    Probable Cause being legally impossible on its face, for GARDNER to charge anyone, including NADLER-OLENICK, "criminally" at **any** time under a municipal ordinance is for GARDNER to act with malice, as a matter of law.


53.    GARDNER's lack of "good faith."

A.    In this area of Probable Cause, where both CITY and STATE, being

represented, **must** be held to the full and complete knowledge of the applicable law, thus a relatively high standard for "good faith" analysis, the practical question arises as to whether a non-lawyer, non-represented party gets a break under the concept of "reasonable" or "good faith" belief (that a crime was committed).

      1.      In other words, and this jumps ahead a little bit, does GARDNER get a break based on the plain reality of the total and complete failure to train the clerks?

      2.      In other words, is there any room, here, for an "ignorance of the law" defense?

**B.**      In general, the answer has to be No.

      1.      It's a very plain question – was there Probable Cause to haul off and initiate this ***criminal*** proceeding?

      2.      There is no Probable Cause, here, by any remote stretch of anyone's imagination, and no conceivable amount of "good faith" ignorance changes the fact that there is no Probable Cause.

            a.      Where the party asserting the criminal charge doesn't understand what the party is doing or signing, the party has all the authority and systemic support in the world to obtain legal counsel.

            b.      Where that's impractical, for whatever reason, then the option is not to sign that which one doesn't understand.

            c.      Moreover, in "this state," to sign "anything" is to provide a "certificate" that one understands exactly what one is signing, which is

a rule that applies with *very few* exceptions.

      **d.**    Thus, there just can't be "ignorance"-based leeway on "good faith" as to whether Probable Cause exists.

      **3.**    Additionally, *all* officials are held to know what is and what is not legal within the scope of their respective offices.

      **a.**    Down this path, the very language that authorizes (deputy) clerks as *notaries* for muni. court complaints, Art. 45.019, also very plainly nowhere even *remotely* contemplates "authority" or "duty" to *become* the (hearsay) **complainant** for the dual plaintiffs.

      **b.**    It's *extremely* difficult, in all objective, practical reality and consideration, to provide *any* sort of an "ignorance" defense for clerks who can't figure out that being a *notary* for complaints is a world apart from being the **complainant**.

**C.**    Let's take the other approach and just see where that leads. Let's examine the points that establish the lack of Probable Cause and see if there's practical, objective room for anyone to conclude that "good faith" actually exists.

      **1.**    Regarding the lack of jurisdiction in the muni. court over **any** purported criminal enforcement of **any** city's ordinance due to the inability, by ordinance, to alter the punishment level established by STATE via its Penal Code, we're talking about a pretty technical defense that NADLER-OLENICK expects is relatively new to the discussion, as in "first impression" both STATE- and nation-wide. Therefore, the *pro se* says that we can award

the court official, namely the deputy clerk, who is (mis)trained in job-related legal perspective on a regular basis, an "ignorance" break on this one.

2.    Regarding the fact that "thou shalt!" edict-torial language *proscribes* nothing, and is, therefore, impossible to enforce "criminally" takes us to that level of understanding of the law that is necessarily expected as understood by all members of society.  No one holding a job of deputy clerk can be held to understand that sort of thing as an individual *outside* the job while simultaneously, *inside* the job, receive an "ignorance" defense. This point overtly negates Probable Cause, and there's no pass awarded, here, because this type of error is just too inexcusable.

3.    Regarding the fact that the ordinance language cited and sworn to in the complaint is out-sourced and therefore can't possibly provide Notice for purposes of "criminal" enforcement is another one that is necessarily expected as understood by all members of society.  Why, then, should a trained (and paid to rely on and apply that training) deputy clerk get an "ignorance" pass while those in no other line of work would in any way be afforded that same level of leeway? No pass awarded, here, either. No "good faith" arises for this type of error.

4.    Regarding the lack of commercial nexus, while all members of society are held to comprehend this sort of thing, this one is technical enough that the *pro se* says that we can award the court official, namely the deputy clerk, who is (mis)trained in job-related legal perspective on a regular basis,

an "ignorance" break on this one. (Where the vast majority of lawyers and judges still don't comprehend this aspect of our present system, what chance does a (deputy) clerk have for understanding this sort of thing?)

5.    Regarding Double Jeopardy (an immunity *from suit* level of defense), and the unit of prosecution, and the simultaneity of the original charges against both OLENICK and NADLER-OLENICK, husband and wife, there's simply no conceivable way to extend an "ignorance" pass for this basis for lack of Probable Cause. Absolutely no "good faith" behind this error.

6.    Regarding the fact that the Building Code facially exists to punish *the failure or refusal to do repair*, and given that the Building Code is the "authority" cited as the reason to charge NADLER-OLENICK *criminally* for allegedly *doing* repair, there's absolutely no remotely conceivable way under the heavens to extend an "ignorance" pass for this blatant, flagrant reason as to why there's no Probable Cause.  Absolutely no "good faith" in this sort of error; more like deliberate "bad faith."

7.    Regarding this very same aspect, is there an "ignorance" pass available for confusing the Maintenance Code with the Building Code? Should there be an "ignorance" pass for asserting as authority for a *criminal* charge language that targets conduct that is the *exact anti-thesis* of the conduct cited as *criminal*?  The thought is inconceivable. Again, no pass. Again, absolutely no "good faith" in this sort of error.

8.    Regarding the Grandfather Clause at the heart of the threshold

determination of whether the Building Code even applies, no *remote* possibility of a pass for that. This is flagrant "bad faith."

9.    Regarding the limitations defense.

a.    On the one hand, the fact that a claim is *late* doesn't negate a "good faith" conclusion on the merits that an offense has been committed. So, in general, plainly, there's no Probable Cause where the claim is late, but "late" doesn't imply "*merit-less*."

b.    However, here, the deliberate misrepresentation in the sworn complaint, which misrepresentation very plainly intended to cover for the delay of seven (from 2006) to ten (from 2003) years in initiating a claim that wasn't even possible to bring until 2010 (no Building Code even referred in any ordinance until 2010), i.e., some four to seven years after the alleged roof work, i.e., well beyond the commonly known limitations period, instantly gets into "bad faith." "Bad faith" is all the more self-evident where the dual plaintiffs intended to offer satellite photos from 2003 and 2006.

10.    Regarding CAPACITY/Capacity, that's another basis for lack of Probable Cause that's technical enough and so seldom asserted as to warrant an "ignorance" pass.

D.    On these statistics, six out of nine bases for want of Probable Cause are counted as inexcusable, even "bad faith." One act of "bad faith" would suffice to negate a "good faith"-based attribution of "ignorance," and there are at least six.

Thus, if it were competent policy even to *consider* an "ignorance" defense, so as to have "good faith"-based error substitute for actual Probable Cause, there's still no way around the blatant bad faith behind the assertion of the ***criminal*** charge against NADLER-OLENICK on these facts and circumstances.

**E.**     Robo-signing.

**1.**     There's another point to raise about overt bad faith, which doesn't necessarily fall within the "Probable Cause or lack thereof" analysis but which is plainly "bad faith," gross indifference, and callous, reckless disregard for any respondent's, including NADLER-OLENICK's, right to Due Process, including meaningful Notice and a fair trial.

**2.**     While there's the extremely plain evidence of robo-signing regarding the second of the three complaints against NADLER-OLENICK, which is mentioned, *supra*, and specifically addressed, *infra*, there's also extremely plain evidence of GARDNER's robo-signing, as well.

**a.**     GARDNER "signed" both the first complaint against NADLER-OLENICK and the complaint against OLENICK. *See* Exhibits.

**b.**     Those two complaints are *identical* in all respects, except for the difference in the named target.

**c.**     While two signatures at essentially the same time are expected to be very similar, GARDNER's two signatures (and the notarizing clerk's two signatures) aren't just very similar – they're

---

100% identical.

     **d.**    There's only one way to get 100% identical signatures – robo-signing.

     **3.**    The point is that GARDNER has to know that her signature is being applied electronically, which means that she's knowingly and consciously allowing her signature to be used in this robo-signing manner.

     **4.**    Applying that, it follows that GARDNER all the more doesn't *want* to know and doesn't *care* to know *what* she's "signing." She's abdicated her duty/responsibility to know/review/be-aware-of what she's charging people *criminally* with doing.  She's carte blanche allowing whomever to print out who knows how many of what kind of complaints knowing all the while that it's her signature that's activating the legal proceedings.

     **5.**    If the administrative reality is that there are simply so many complaints to generate that no hearsay complainant could possibly read/ review/understand them all (hence, a practical motive for robo-signing), then that very same administrative reality is the absolute best proof on the planet that the actual complainant, not a hearsay complainant, but the actual complainant, who has something akin to first-hand knowledge of the material facts, is the party to sign the complaint(s).  That way, when they're as bogus as these, it's the "real" complainant, not the no-time-to-review-and-no-interest-in-reviewing-what's-sworn-to deputy clerks, who get sued for malicious prosecution.

**54.**   Causation.

**A.**   GARDNER caused the prosecution to be initiated.

**B.**   Also, on a different type of causation, GARDNER knowingly provided false information, under oath, against NADLER-OLENICK.  The complaint is false, in that there was no commercial nexus to enforce.

**55.**   Malice.

**A.**   As just demonstrated, GARDNER had, very plainly, no Probable Cause.  The absence of Probable Cause is sufficient to establish the element of "malice."

**B.**   In addition to the malice shown by the facial lack of Probable Cause, all of which facts and discussion is intended to be included here for purposes of the element of malice, which is defined as "ill will, evil motive, gross indifference, or reckless disregard of the rights of others," *Gunnels*, malice is self-evident in additional ways.

**1.**   GARDNER asserted false information under oath, not only about the substance of the claim against NADLER-OLENICK but also about the timing.  Falsity instantly satisfies "ill will, evil motive, gross difference, or reckless disregard of the rights of others."

**2.**   GARDNER alleged an issue arising under a 2003-based code, "as amended," and a 2009-based International Building Code, in the face of

the CITY's adopting only the 2012 edition of the IBC. AUSTIN, § 25-12-1. It's an evil motive and/or ill will and/or gross indifference and/or reckless disregard for rights that spawns this type of misleading *and* backward-looking claim.

3.    Down this same path, CITY hadn't adopted anything in the way of the Building Code until 2010.

    a.    To make this point in yet this additional manner, how is *any* edition of *any* Building Code, not adopted until 2010, relevant to a matter that arose, if at all, between 2003 and 2006?

    b.    There *is* a way, of course, and that's by means of commercial consent, which reality takes us right back to the complete lack of any commercial nexus in the matter from its inception.

    c.    The point is that while some might argue an "*ex post facto*" position, NADLER-OLENICK isn't looking at *ex post facto*, because agreements may be made subject to whatever timing the parties assert. Even more to the point, "by agreement" is the *only* way CITY or STATE end-runs what would otherwise appear to most to be an *ex post facto* problem. Said still another way, *if* the ordinance language of focus *were* stand-alone, enforceable-solely-because-it's-in-print language, *then* all claims against THE OLENICKs *would* fail, instantly, for *ex post facto* problems.  It's because that language would

apply, if at all, only per a viable commercial nexus that *ex post facto* concepts are simply irrelevant.

     **d.**     Since there is no commercial nexus, the only other way to try to crowbar a case into existence is to lie boldly to the muni. court and allege that the facts giving rise to the matter existed in 2013 rather than in their actual time frame, namely between 2003 and 2006. This is the path GARDNER took.

     **e.**     It's an evil motive and/or ill will and/or gross indifference and/or reckless disregard for rights that motivates GARDNER to lie about the timing, and that in the face of the dual plaintiffs' very own 2003 and 2006 satellite photos, in order to try to have a case.

     **C.**     GARDNER is a deputy clerk serving also as the "complainant." That instantly disqualifies *that* court from trying *those* matters.

     **1.**     Clerk as paid, hearsay witness.

     **a.**     GARDNER has no first-hand knowledge of anything about this matter.  Hearsay witnesses are perfectly fine for "complaints," but GARDNER learned of the facts sworn to solely as a by-product of employment with the court.

     **b.**     GARDNER, a paid judicial employee, is also serving in the capacity of (paid) witness for the dual plaintiffs.

     **c.**     That effectively renders the *court* the "complainant." Not

---

that courts can't ever be complainants.  It's just that a complainant court is instantly disqualified from trying *that* matter.

      **d.**    It's an evil motive and/or ill will and/or gross indifference and/or reckless disregard for the right of a fair trial that perpetuates this abuse of office and process within the muni. court system STATE-wide.

**2.**    Clerk as *simultaneous* (A) prosecution witness *and* (B) Custodian of Records.

      **a.**    Whether or not the court is the effective "complainant" where GARDNER, the paid deputy clerk, swears out the complaint, GARDNER is an active witness in a matter for which she's also a Custodian of Records.

      **b.**    As Custodian of Records, GARDNER may, of course, testify as to the *Record*, but in no way *also* on **the merits of the matter**. For a Custodian of Records to be a material fact witness is for the Custodian of Records to engage in an irreconcilable conflict of interest, which effectively disqualifies the trial court (for so long as GARDNER, as Custodian/witness, has access to that Record, i.e., remains employed with that court).It's an evil motive and/or ill will and/or gross indifference and/or reckless disregard for the right of a fair trial that perpetuates this abuse of office and process within the muni. court system STATE-wide.

**D.**     GARDNER sought multiple, *multiple* financial punishment/gain.

1.     *Doing* repair without this or that credential is something for which the "property management" language may or may not apply, but for which "property management" might at least be *relevant*.

2.     The maximum fine for repair without a license is $500. *See* AUSTIN, § 25-12-213 ¶ 101.

3.     However, GARDNER charged not only OLENICK under the Building Code, who was fined the max of $2,000, but also NADLER-OLENICK under the Building Code, with the intent she also be fined the max of $2,000.

4.     In other words, GARDNER sought $4,000 instead of $500.

5.     This generates appeal Bond amounts, respectively, of $8,000 versus $1,000. This additional perspective supplements the multiple, *multiple* punishment concept with the subtle intent of making it "impossible," or at least that much more "expensive," to get appellate review, which intent, in and of itself, bolsters the ill will, evil intent, etc., at the trial level.

56.     For damages, NADLER-OLENICK demands from GARDNER one hundred thousand dollars ($100,000) actual damages and also one hundred thousand dollars ($100,000) punitive damages.

**CLAIM 12 – M. RAE NADLER-OLENICK's MALICIOUS PROSECUTION CLAIM AGAINST SIERRA READY – RE: BUILDING CODE**

**57.**    This claim is in addition to all of the foregoing.

**58.**    SIERRA READY is the deputy clerk and Custodian of Records who also doubled as the (paid) hearsay witness/complainant for the dual plaintiffs in the second of three "complaints" against NADLER-OLENICK. *See* Exhibits.

**59.**    READY has no immunity.

    **A.**    This is a malicious prosecution claim.  Having no Probable Cause, READY signed the second of the three "complaints."

    **B.**    Moreover, if she purports to be an officer, agent, or employee of either of the dual plaintiffs, she can't have any more immunity than either of those plaintiffs, which is zero. *See* Claims 9 and 10, supra. When it comes to ordinance enforcement, each of the dual plaintiffs is a commercial player, and each is a civil / commercial litigation initiator.

    **C.**    Additionally, by being a complainant in a matter purportedly arising under one or more municipal ordinances, READY is also a civil / commercial litigation initiator.

        **1.**    READY's choice of forum isn't to READY's advantage.  All that this choice of forum proves is just exactly how little READY understands about the legal mechanism of this present ("funny money" based) system.

        **2.**    That READY just happened to initiate civil litigation in a forum that had no jurisdiction not only for READY's claim but also for any counter-claim is READY's problem.

Original Complaint (OLENICK and NADLER-OLENICK)                    90
**Right Not to Contract, etc.**

**60.**   Criminal proceeding against NADLER-OLENICK.

**A.**   READY signed the second of three "complaints" that asserted a criminal charge against NADLER-OLENICK.

**B.**   READY charged NADLER-OLENICK for alleged criminal violation of the CITY's ordinance-based Building Code for *doing* roof repair. *See* Exhibits.

**C.**   NADLER-OLENICK defended (vigorously), starting with her Special Appearance, which challenged the muni. court's jurisdiction in all respects.

**61.**   Favorable ruling. The municipal court eventually granted the dual plaintiffs' motion to dismiss, which asserts "IE," which is understood to mean "insufficient evidence." *See* Exhibits.

**62.**   No Probable Cause.  Facially, READY not only *never* had any evidence but also *never* had Probable Cause to initiate her claim against NADLER-OLENICK.

NADLER-OLENICK reasserts 35.A, 35.B, and 35.C, including all the components and footnotes of each, verbatim.

**D.**   No commercial nexus.

**1.**   As demonstrated by this segment and several that follow, READY's total lack of Probable Cause is not merely a by-product of her hauling off and filing charges incompetently in a court facially lacking jurisdiction to entertain the claim.  Total lack of Probable Cause is also the by-product of READY's having no evidence of any "injury in fact" or "actual grievance," *period*, whether "criminal" or "civil," to be addressed in **any** court within STATE's or UNITED STATES's jurisdiction on behalf of either of the

dual plaintiffs.

2.    Ordinance language, generally, and *especially* the "thou shalt!" edict-torial language, in particular, and *all the more especially* the "thou shalt!" edict-torial language incorporated by reference from some third party, which third-party is under absolutely no control of CITY's, is enforceable, in either context, i.e., whether "civil" or "criminal," if and only if there's a viable commercial nexus.

3.    There is no commercial nexus.  Neither one of the dual plaintiffs has any commercial nexus with NADLER-OLENICK regarding any ordinance of any city, including all of CITY's ordinances. NADLER-OLENICK has nowhere consented, in any capacity, to being regulated by either of the dual plaintiffs per *any* municipal ordinance, including CITY's.

4.    At the heart of NADLER-OLENICK's defense is her compelling the dual plaintiffs to prove a commercial nexus.  There being no commercial nexus, then, legally speaking, neither CITY nor STATE ever had any "injury in fact" or any "actual grievance;" hence, never had standing.

5.    If there's a point that self-proves malice, e.g., callous disregard, deliberate indifference, ill will, evil motive, gross indifference, or reckless disregard of the rights of others, which a facial lack of Probable Cause does prove, it's the fact that READY asserted an ordinance-based *criminal* claim against NADLER-OLENICK without even alluding to one shred of evidence of <u>any</u> viable commercial nexus.  Where it's facially obvious that *no*

**ordinance** is anything like the equivalent of a Penal Code provision, i.e., subject directly to "criminal" enforcement" solely because words are printed on a page, somewhere, all the *more* obviously *"criminally"* unenforceable as stand alone language where we're talking about "thou shalt!" edict-torial language, all the more especially unenforceable due to the fact of "incorporation by reference," READY asserted this ordinance-based ***criminal*** charge without one iota of a shred of evidence of anything about **any** viable commercial nexus.  READY just flat out never cared that neither dual plaintiff had a case.

6.      Neither CITY nor STATE has **any** commercial nexus with NADLER-OLENICK, period, *including* any alleged municipal Building Code matter.

7.      Moreover, having already established that the nature of the commercial nexus must sound in trust, that trust would have to be a signed writing, because READY complains about a matter involving land or land use. *See* TEX. PROP. CODE ANN. § 112.004 (trust agreement involving land must be a signed writing).

8.      Thus, for there to be any *"criminal"* claim against NADLER-OLENICK arising out of **any** ordinance affecting land she owns, NADLER-OLENICK would have to have signed a trust agreement agreeing not only to be a fiduciary with respect to each of the dual plaintiffs but also regarding whatever municipal ordinance is at issue.

9.      READY proffered/tendered/included/made-reference-to no such agreement, and there simply is no such agreement, whether written and signed or otherwise. No such agreement exists.

**E.    Double Jeopardy.**

1.      OLENICK and NADLER-OLENICK are husband and wife.

2.      The property of focus is community property.

3.      READY joins GARDNER in not charging all (both) owners in one claim. READY charged NADLER-OLENICK *separately* from OLENICK but for the one (same) alleged matter.

4.      The gravamen, the unit of prosecution, for a "permit" matter is the permit, not the list of owners who might apply for such permit. [11] Therefore, when READY charged NADLER-OLENICK separately from OLENICK over the same alleged repair work, i.e., the same permit matter, on Nov. 29, 2013, despite the fact OLENICK had already been tried and convicted, [12] as of Sept. 12, 2013 (which matter is under state appellate review), [13] which proceeding against OLENICK ended the matter as far as other owners are concerned and as far as the community estate is concerned, READY rather blatantly defied Double Jeopardy policy.

---

[11] *See* n.4, *supra.*
[12] *See* n.5, *supra.*
[13] *See* n.5, *supra.*

**F.**    Building Code.

    **1.**    The municipal ordinances collectively referred to as the Building Code exist to punish those who ***don't*** do repairs.

    **2.**    READY charged NADLER-OLENICK under the Building Code for *doing* repairs.

    **3.**    To assert the obvious conclusion regarding the facial lack of Probable Cause, it's legally impossible for THE OLENICKS, or for anyone else, to violate the Building Code by *doing* repairs.

**G.**    Grandfather Clause.

    **1.**    The language.

§ 214.216.  International Building Code

(b) The International Building Code applies to all commercial buildings in a municipality ***for which construction begins on or after January 1, 2006***, and to any alteration, remodeling, enlargement, or repair ***of those commercial buildings***.

TEX. LOCAL GOV'T CODE ANN. § 214.216(b) (all emphasis added).

    **2.**    The facts.

        **a.**    The dual plaintiffs tried OLENICK first.

NADLER-OLENICK reasserts the six components of 35.G.2.a, verbatim.

        **b.**    The dual plaintiffs' "evidence" in that first trial, which didn't involve NADLER-OLENICK but only OLENICK, included two

satellite pictures: one from 2003, and one from 2006.

      *I.*      By those photographs, the dual plaintiffs intended to prove a change in the roof sometime between 2003 and 2006.

      *II.*      By those very same photographs, the dual plaintiffs effectively confessed/recognized that the roof existed in *2003*; hence, that the building existed (well) before Jan. 1, 2006.

**H.**      Limitations.

      **1.**      For any misdemeanor, the limitations period is two years.

      **2.**      What READY alleged in 2013 was activity in 2013, but the actual events of focus, as the dual plaintiffs went to so much trouble to get satellite images to prove, occurred between 2003 and 2006.

      **3.**      The alleged activity in 2013 was an/the "investigation," ***not*** roof repair.

      **4.**      Knowing there was no viable claim due to the long-since expired limitations period, READY asserted a stale claim against NADLER-OLENICK.

**I.**      [Deliberately skipped to avoid possible reference confusion.]

**J.**      CAPACITY/Capacity.

      **1.**      No recognized defendant.

a.    READY didn't charge "NADLER-OLENICK" but rather "Nadler-Olenick." *See* Exhibits.

b.    No one is liable in "this state" in that capacity for or about *any*thing.  For READY to assert that capacity is for READY to assert that there's no expectation of waiver of objection to the debts of the United States, which renders all such commercial matters totally beyond the reach of "this state."

2.    No complainant. READY's "complaint" is unsigned.  Looking at the very same capacity problem, there simply is no complainant.

3.    No verifier. READY's "complaint" is unverified. Looking at the very same CAPACITY/Capacity problem, there simply is no verification.

4.    Thus, in review, on the face of the inadequate ("complaint only") charging instrument, there is no Defendant, no Complainant, *and* no Verification.

K.    In sum, Probable Cause is facially and legally impossible.

L.    Probable Cause being legally impossible on its face, for READY to charge anyone, including NADLER-OLENICK, "criminally" at **any** time under a municipal ordinance is for READY to act with malice, as a matter of law.

63.    READY's lack of "good faith."

A.    In this area of Probable Cause, where both CITY and STATE, being

represented, **must** be held to the full and complete knowledge of the applicable law, thus a relatively high standard for "good faith" analysis, the practical question arises as to whether a non-lawyer, non-represented party gets a break under the concept of "reasonable" or "good faith" belief (that a crime was committed).

      1.    In other words, and this jumps ahead a little bit, does READY get a break based on the plain reality of the total and complete failure to train the clerks?

      2.    In other words, is there any room, here, for an "ignorance of the law" defense?

**B.**    In general, the answer has to be No.

      1.    It's a very plain question – was there Probable Cause to haul off and initiate this ***criminal*** proceeding?

      2.    There is no Probable Cause, here, by any remote stretch of anyone's imagination, and no conceivable amount of "good faith" ignorance changes the fact that there is no Probable Cause.

           **a.**    Where the party asserting the criminal charge doesn't understand what the party is doing or signing, the party has all the authority and systemic support in the world to obtain legal counsel.

           **b.**    Where that's impractical, for whatever reason, then the option is not to sign that which one doesn't understand.

           **c.**    Moreover, in "this state," to sign "anything" is to provide a "certificate" that one understands exactly what one is signing, which is

a rule that applies with *very few* exceptions.

   **d.** Thus, there just can't be "ignorance"-based leeway on "good faith" as to whether Probable Cause exists.

  **3.** Additionally, *all* officials are held to know what is and what is not legal within the scope of their respective offices.

   **a.** Down this path, the very language that authorizes (deputy) clerks as *notaries* for muni. court complaints, Art. 45.019, also very plainly nowhere even *remotely* contemplates "authority" or "duty" to *become* the (hearsay) **complainant** for the dual plaintiffs.

   **b.** It's *extremely* difficult, in all objective, practical reality and consideration, to provide *any* sort of an "ignorance" defense for clerks who can't figure out that being a *notary* for complaints is a world apart from being the *complainant*.

**C.** Let's take the other approach and just see where that leads.  Let's examine the points that establish the lack of Probable Cause and see if there's practical, objective room for anyone to conclude that "good faith" actually exists.

  **1.** Regarding the lack of jurisdiction in the muni. court over **any** purported criminal enforcement of **any** city's ordinance due to the inability, by ordinance, to alter the punishment level established by STATE via its Penal Code, we're talking about a pretty technical defense that NADLER-OLENICK expects is relatively new to the discussion, as in "first impression" both STATE- and nation-wide. Therefore, the *pro se* says that we can award

---

the court official, namely the deputy clerk, who is (mis)trained in job-related legal perspective on a regular basis, an "ignorance" break on this one.

2.     Regarding the fact that "thou shalt!" edict-torial language *proscribes* nothing, and is, therefore, impossible to enforce "criminally" takes us to that level of understanding of the law that is necessarily expected as understood by all members of society.  No one holding a job of deputy clerk can be held to understand that sort of thing as an individual *outside* the job while simultaneously, *inside* the job, receive an "ignorance" defense. This point overtly negates Probable Cause, and there's no pass awarded, here, because this type of error is just too inexcusable.

3.     Regarding the fact that the ordinance language cited and sworn to in the complaint is out-sourced and therefore can't possibly provide Notice for purposes of "criminal" enforcement is another one that is necessarily expected as understood by all members of society.  Why, then, should a trained (and paid to rely on and apply that training) deputy clerk get an "ignorance" pass while those in no other line of work would in any way be afforded that same level of leeway? No pass awarded, here, either. No "good faith" arises for this type of error.

4.     Regarding the lack of commercial nexus, while all members of society are held to comprehend this sort of thing, this one is technical enough that the *pro se* says that we can award the court official, namely the deputy clerk, who is (mis)trained in job-related legal perspective on a regular basis,

---

an "ignorance" break on this one. (Where the vast majority of lawyers and judges still don't comprehend this aspect of our present system, what chance does a (deputy) clerk have for understanding this sort of thing?)

5.      Regarding Double Jeopardy (an immunity *from suit* level of defense), and the unit of prosecution, and the fact that the charge against OLENICK had already been tried and concluded when READY signed this second complaint against NADLER-OLENICK, there's simply no conceivable way to extend an "ignorance" pass for this basis for lack of Probable Cause. Absolutely no "good faith" behind this error.

6.      Regarding the fact that the Building Code facially exists to punish *the failure or refusal to do repair*, and given that the Building Code is the "authority" cited as the reason to charge NADLER-OLENICK *criminally* for allegedly *doing* repair, there's absolutely no remotely conceivable way under the heavens to extend an "ignorance" pass for this blatant, flagrant reason as to why there's no Probable Cause.  Absolutely no "good faith" in this sort of error; more like deliberate "bad faith."

7.      Regarding this very same aspect, is there an "ignorance" pass available for confusing the Maintenance Code with the Building Code? Should there be an "ignorance" pass for asserting as authority for a *criminal* charge language that targets conduct that is the *exact anti-thesis* of the conduct cited as *criminal*?  The thought is inconceivable. Again, no pass. Again, absolutely no "good faith" in this sort of error.

---

Original Complaint (OLENICK and NADLER-OLENICK)                    101
**Right Not to Contract, etc.**

8.      Regarding the Grandfather Clause at the heart of the threshold determination of whether the Building Code even applies, no *remote* possibility of a pass for that.  This is flagrant "bad faith."

9.      Regarding the limitations defense.

a.      On the one hand, the fact that a claim is *late* doesn't negate a "good faith" conclusion on the merits that an offense has been committed.  So, in general, plainly, there's no Probable Cause where the claim is late, but "late" doesn't imply "*merit-less.*"

b.      However, here, the deliberate misrepresentation in the sworn complaint, which misrepresentation very plainly intended to cover for the delay of seven (from 2006) to ten (from 2003) years in initiating a claim that wasn't even possible to bring until 2010 (no Building Code even referred in any ordinance until 2010), i.e., some four to seven years after the alleged roof work, i.e., well beyond the commonly known limitations period, instantly gets into "bad faith." "Bad faith" is all the more self-evident where the dual plaintiffs intended to offer satellite photos from 2003 and 2006.

10.      Regarding CAPACITY/Capacity, that's another basis for lack of Probable Cause that's technical enough and so seldom asserted as to warrant an "ignorance" pass.

D.      On these statistics, six out of nine bases for want of Probable Cause are counted as inexcusable, even "bad faith."  One act of "bad faith" would suffice to

negate a "good faith"-based attribution of "ignorance," and there are at least six.

Thus, if it were competent policy even to *consider* an "ignorance" defense, so as to

have "good faith"-based error substitute for actual Probable Cause, there's still no

way around the blatant bad faith behind the assertion of the ***criminal*** charge

against NADLER-OLENICK on these facts and circumstances.

**E.**     Robo-signing.

**1.**     There's another point to raise about overt bad faith, which

doesn't necessarily fall within the "Probable Cause or lack thereof" analysis

but which is plainly "bad faith," gross indifference, and reckless disregard for

any respondent's, including NADLER-OLENICK's, right to Due Process,

including meaningful Notice and a fair trial.

**2.**     READY's complaint against NADLER-OLENICK is dated Nov.

29, 2013.

**3.**     That's a very curious date, given that it was a STATE holiday

and that the court wasn't open.

**4.**     So, how ***did*** READY actually sign that document?  The only

explanation is "robo-signing," which isn't any more legal here than with the

mortgage fraud scandal involving "robo-signing."

**5.**     Where READY's signature shows up on a date that she's not

even at work, it follows that READY has to know that her signature is being

applied electronically, which means that she's knowingly and consciously

allowing her signature to be used in this robo-signing manner.

6.      Applying that, it follows that READY all the more doesn't *want* to know and doesn't *care* to know ***what*** she's "signing." She's abdicated her duty/responsibility to know/review/be-aware-of what she's charging people ***criminally*** with doing.  She's carte blanche allowing whomever to print out who knows how many of what kind of complaints knowing all the while that it's her signature that's activating the legal proceedings.

7.      If the administrative reality is that there are simply so many complaints to generate that no hearsay complainant could possibly read/ review/understand them all (hence, a practical motive for robo-signing), then that very same administrative reality is the absolute best proof on the planet that the actual complainant, not a hearsay complainant, but the actual complainant, who has something akin to first-hand knowledge of the material facts, is the party to sign the complaint(s).  That way, when they're as bogus as these, it's the "real" complainant, not the no-time-to-review-and-no-interest-in-reviewing-what's-sworn-to deputy clerks, who get sued for malicious prosecution.

64.   Causation.

A.      READY asserted the criminal claim.

B.      Also, on a different type of causation, READY knowingly provided false information, under oath, against NADLER-OLENICK.  The complaint is false, in that there was no commercial nexus to enforce.

**65.**   Malice.

**A.**   As just demonstrated, READY had, very plainly, no Probable Cause. The absence of Probable Cause is sufficient to establish the element of "malice."

**B.**   In addition to the malice shown by the facial lack of Probable Cause, all of which facts and discussion is intended to be included here for purposes of the element of malice, which is defined as "ill will, evil motive, gross indifference, or reckless disregard of the rights of others," *Gunnels*, malice is self-evident in additional ways.

**1.**   READY asserted false information under oath, not only about the substance of the claim against NADLER-OLENICK but also about the timing.  Falsity instantly satisfies "ill will, evil motive, gross difference, or reckless disregard of the rights of others."

**2.**   READY alleged an issue arising under a 2003-based code, "as amended," and a 2009-based International Building Code, in the face of the CITY's adopting only the 2012 edition of the IBC. AUSTIN, § 25-12-1. It's an evil motive and/or ill will and/or gross indifference and/or reckless disregard for rights that spawns this type of misleading *and* backward-looking claim.

**3.**   Down this same path, CITY hadn't adopted anything in the way of the Building Code until 2010.

**a.**   To make this point in yet this additional manner, how is

---

Original Complaint (OLENICK and NADLER-OLENICK)               105
**Right Not to Contract, etc.**

*any* edition of *any* Building Code, not adopted until 2010, relevant to a matter that arose, if at all, between 2003 and 2006?

      **b.**     There *is* a way, of course, and that's by means of commercial consent, which reality takes us right back to the complete lack of any commercial nexus in the matter from its inception.

      **c.**     The point is that while some might argue an "*ex post facto*" position, NADLER-OLENICK isn't looking at *ex post facto*, because agreements may be made subject to whatever timing the parties assert.  Even more to the point, "by agreement" is the *only* way CITY or STATE end-runs what would otherwise appear to most to be an *ex post facto* problem. Said still another way, *if* the ordinance language of focus *were* stand-alone, enforceable-solely-because-it's-in-print language, *then* all claims against THE OLENICKs *would* fail, instantly, for *ex post facto* problems.  It's because that language would apply, if at all, only per a viable commercial nexus that *ex post facto* concepts are simply irrelevant.

      **d.**     Since there is no commercial nexus, the only other way to try to crowbar a case into existence is to lie boldly to the muni. court and allege that the facts giving rise to the matter existed in 2013 rather than in their actual time frame, namely between 2003 and 2006. This is the path READY took.

      **e.**     It's an evil motive and/or ill will and/or gross indifference

and/or reckless disregard for rights that motivates READY to lie about the timing, and that in the face of the dual plaintiffs' very own 2003 and 2006 satellite photos, in order to try to have a case.

C.     READY is a deputy clerk serving also as the "complainant."  That instantly disqualifies *that* court from trying *those* matters.

1.     Clerk as paid, hearsay witness.

a.     READY has no first-hand knowledge of anything about this matter.  Hearsay witnesses are perfectly fine for "complaints," but READY learned of the facts sworn to solely as a by-product of employment with the court.

b.     READY, a paid judicial employee, is also serving in the capacity of (paid) witness for the dual plaintiffs.

c.     That effectively renders the *court* the "complainant." Not that courts can't ever be complainants.  It's just that a complainant court is instantly disqualified from trying *that* matter.

d.     It's an evil motive and/or ill will and/or gross indifference and/or reckless disregard for the right of a fair trial that perpetuates this abuse of office and process within the muni. court system STATE-wide.

2.     Clerk as *simultaneous* (A) prosecution witness *and* (B) Custodian of Records.

    **a.**    Whether or not the court is the effective "complainant" where READY, the paid deputy clerk, swears out the complaint, READY is an active witness in a matter for which she's also a Custodian of Records.

    **b.**    As Custodian of Records, READY may, of course, testify as to the *Record*, but in no way *also* on **the merits of the matter**. For a Custodian of Records to be a material fact witness is for the Custodian of Records to engage in an irreconcilable conflict of interest, which effectively disqualifies the trial court (for so long as READY, as Custodian/witness, has access to that Record, i.e., remains employed with that court).It's an evil motive and/or ill will and/or gross indifference and/or reckless disregard for the right of a fair trial that perpetuates this abuse of office and process within the muni. court system STATE-wide.

**D.**    READY sought excessive financial punishment/gain.

    **1.**    *Doing* repair without this or that credential is something for which the "property management" language may or may not apply, but for which "property management" might at least be *relevant*.

    **2.**    The maximum fine for repair without a license is $500. *See* Austin, § 25-12-213 ¶ 101.

    **3.**    However, READY, knowing that OLENICK had already been fined the max of $2,000, and following GARDNER's lead, charged NADLER-

OLENICK under the Building Code with the intent NADLER-OLENICK also be fined the max of $2,000.

      4.      In other words, READY sought to make it $4,000.

      5.      This generates an appeal Bond amount of $8,000. This additional perspective supplements the excessive punishment concept with the subtle intent of making it "impossible," or at least that much more "expensive," to get appellate review, which intent, in and of itself, bolsters the ill will, evil intent, etc., at the trial level.

66.      For damages, NADLER-OLENICK demands from READY one hundred thousand dollars ($100,000) actual damages and also one hundred thousand dollars ($100,000) punitive damages.

## CLAIM 13 – M. RAE NADLER-OLENICK's MALICIOUS PROSECUTION CLAIM AGAINST DIANE MONTOYA – RE: BUILDING CODE

67.      This claim is in addition to all of the foregoing.

68.      DIANE MONTOYA is the deputy clerk and Custodian of Records who also doubled as the (paid) hearsay witness/complainant for the dual plaintiffs in the third of three "complaints" against NADLER-OLENICK. *See* Exhibits.

69.      MONTOYA has no immunity.

**A.**     This is a malicious prosecution claim. Having no Probable Cause,

MONTOYA signed the third of the three "complaints."

**B.**     Moreover, if she purports to be an officer, agent, or employee of either

of the dual plaintiffs, she can't have any more immunity than either of those

plaintiffs, which is zero. *See* Claims 9 and 10, *supra*. When it comes to ordinance

enforcement, each of the dual plaintiffs is a commercial player, and each is a civil /

commercial litigation initiator.

**C.**     Additionally, by being a complainant in a matter purportedly arising

under one or more municipal ordinances, MONTOYA is also a civil / commercial

litigation initiator.

**1.**     MONTOYA's choice of forum isn't to MONTOYA's advantage.

All that this choice of forum proves is just exactly how little MONTOYA

understands about the legal mechanism of this present ("funny money"

based) system.

**2.**     That MONTOYA just happened to initiate civil litigation in a

forum that had no jurisdiction not only for MONTOYA's claim but also for

any counter-claim is MONTOYA's problem.

**70.**   Criminal proceeding against NADLER-OLENICK.

**A.**     MONTOYA signed the third of three "complaints" that asserted a

criminal charge against NADLER-OLENICK.

**B.**     MONTOYA charged NADLER-OLENICK for alleged criminal violation

of CITY's ordinance-based Building Code for *doing* roof repair. *See* Exhibits.

      **C.**    NADLER-OLENICK defended (vigorously), starting with her Special Appearance, which challenged the muni. court's jurisdiction in all respects.

**71.**    Favorable ruling. The municipal court eventually granted the dual plaintiffs' motion to dismiss, which asserts "IE," which is understood to mean "insufficient evidence." *See* Exhibits.

**72.**    No Probable Cause.  Facially, MONTOYA not only *never* had any evidence but also *never* had Probable Cause to initiate her claim against NADLER-OLENICK.

      NADLER-OLENICK reasserts 35.A, 35.B, and 35.C, including all the components and footnotes of each, verbatim.

      **D.**    No commercial nexus.

          **1.**    As demonstrated by this segment and several that follow, MONTOYA's total lack of Probable Cause is not merely a by-product of her hauling off and filing charges incompetently in a court facially lacking jurisdiction to entertain the claim.  Total lack of Probable Cause is also the by-product of MONTOYA's having no evidence of any "injury in fact" or "actual grievance," *period*, whether "criminal" or "civil," to be addressed in **any** court within STATE's or UNITED STATES's jurisdiction on behalf of either of the dual plaintiffs.

2.      Ordinance language, generally, and ***especially*** the "thou shalt!" edict-torial language, in particular, and ***all the more especially*** the "thou shalt!" edict-torial language incorporated by reference from some third party, which third-party is under absolutely no control of CITY's, is enforceable, in either context, i.e., whether "civil" or "criminal," if and only if there's a viable commercial nexus.

3.      There is no commercial nexus.  Neither one of the dual plaintiffs has any commercial nexus with NADLER-OLENICK regarding any ordinance of any city, including all of CITY's ordinances. NADLER-OLENICK has nowhere consented, in any capacity, to being regulated by either of the dual plaintiffs per ***any*** municipal ordinance, including CITY's.

4.      At the heart of NADLER-OLENICK's defense is her compelling the dual plaintiffs to prove a commercial nexus.  There being no commercial nexus, then, legally speaking, neither CITY nor STATE ever had any "injury in fact" or any "actual grievance;" hence, never had standing.

5.      If there's a point that self-proves malice, e.g., callous disregard, deliberate indifference, ill will, evil motive, gross indifference, or reckless disregard of the rights of others, which a facial lack of Probable Cause does prove, it's the fact that MONTOYA asserted an ordinance-based ***criminal*** claim against NADLER-OLENICK without even alluding to one shred of evidence of **any** viable commercial nexus.  Where it's facially obvious that ***no ordinance*** is anything like the equivalent of a Penal Code provision, i.e.,

subject directly to "criminal" enforcement" solely because words are printed on a page, somewhere, all the *more* obviously *"criminally"* unenforceable as stand alone language where we're talking about "thou shalt!" edict-torial language, all the more especially unenforceable due to the fact of "incorporation by reference," MONTOYA asserted this ordinance-based *criminal* charge without one iota of a shred of evidence of anything about **any** viable commercial nexus. MONTOYA just flat out never cared that neither dual plaintiff had a case.

6.    Neither CITY nor STATE has **any** commercial nexus with NADLER-OLENICK, period, *including* any alleged municipal Building Code matter.

7.    Moreover, having already established that the nature of the commercial nexus must sound in trust, that trust would have to be a signed writing, because MONTOYA complains about a matter involving land or land use. *See* TEX. PROP. CODE ANN. § 112.004 (trust agreement involving land must be a signed writing).

8.    Thus, for there to be any *"criminal"* claim against NADLER-OLENICK arising out of **any** ordinance affecting land she owns, NADLER-OLENICK would have to have signed a trust agreement agreeing not only to be a fiduciary with respect to each of the dual plaintiffs but also regarding whatever municipal ordinance is at issue.

9.    MONTOYA proffered/tendered/included/made-reference-to no

such agreement, and there simply is no such agreement, whether written and signed or otherwise. No such agreement exists.

**E.**    Double Jeopardy.

**1.**    OLENICK and NADLER-OLENICK are husband and wife.

**2.**    The property of focus is community property.

**3.**    MONTOYA joins GARDNER and READY in not charging all (both) owners in one claim. MONTOYA charged NADLER-OLENICK *separately* from OLENICK but for the one (same) alleged matter.

**4.**    The gravamen, the unit of prosecution, for a "permit" matter is the permit, not the list of owners who might apply for such permit. [14] Therefore, when MONTOYA charged NADLER-OLENICK separately from OLENICK over the same alleged repair work, i.e., the same permit matter, on Dec. 2, 2013, despite the fact OLENICK had already been tried and convicted, [15] as of Sept. 12, 2013 (which matter is under state appellate review), [16] which proceeding against OLENICK ended the matter as far as other owners are concerned and as far as the community estate is concerned, MONTOYA rather blatantly defied Double Jeopardy policy.

---

[14] *See* n.4, *supra.*
[15] *See* n.5, *supra.*
[16] *See* n.5, *supra.*

**F.** Building Code.

**1.** The municipal ordinances collectively referred to as the Building Code exist to punish those who ***don't*** do repairs.

**2.** MONTOYA charged NADLER-OLENICK under the Building Code for *doing* repairs.

**3.** To assert the obvious conclusion regarding the facial lack of Probable Cause, it's legally impossible for THE OLENICKS, or for anyone else, to violate the Building Code by *doing* repairs.

**G.** Grandfather Clause.

1. The language.

§ 214.216.  International Building Code

(b) The International Building Code applies to all commercial buildings in a municipality ***for which construction <u>begins</u> on or after January 1, 2006***, and to any alteration, remodeling, enlargement, or repair ***of <u>those</u> commercial buildings***.

TEX. LOCAL GOV'T CODE ANN. § 214.216(b) (all emphasis added).

2. The facts.

a. The dual plaintiffs tried OLENICK first.

NADLER-OLENICK reasserts the six components of 35.G.2.a, verbatim.

b. The dual plaintiffs' "evidence" in that first trial, which didn't involve NADLER-OLENICK but only OLENICK, included two

satellite pictures: one from 2003, and one from 2006.

     *I.*       By those photographs, the dual plaintiffs intended to prove a change in the roof sometime between 2003 and 2006.

     *II.*      By those very same photographs, the dual plaintiffs effectively confessed/recognized that the roof existed in *2003*; hence, that the building existed (well) before Jan. 1, 2006.

**H.**    Limitations.

    **1.**    For any misdemeanor, the limitations period is two years.

    **2.**    What MONTOYA alleged in 2013 was activity in 2013, but the actual events of focus, as the dual plaintiffs went to so much trouble to get satellite images to prove, occurred between 2003 and 2006.

    **3.**    The alleged activity in 2013 was an/the "investigation," ***not*** roof repair.

    **4.**    Knowing there was no viable claim due to the long-since expired limitations period, MONTOYA asserted a stale claim against NADLER-OLENICK.

**I.**    [Deliberately skipped to avoid possible reference confusion.]

**J.**    CAPACITY/Capacity.

    **1.**    No recognized defendant.

     **a.**     MONTOYA didn't charge "NADLER-OLENICK" but rather "Nadler-Olenick." *See* Exhibits.

     **b.**     No one is liable in "this state" in that capacity for or about *any*thing.  For MONTOYA to assert that capacity is for MONTOYA to assert that there's no expectation of waiver of objection to the debts of the United States, which renders all such commercial matters totally beyond the reach of "this state."

     **2.**     No complainant. MONTOYA's "complaint" is unsigned.  Looking at the very same capacity problem, there simply is no complainant.

     **3.**     No verifier. MONTOYA's "complaint" is unverified. Looking at the very same CAPACITY/Capacity problem, there simply is no verification.

     **4.**     Thus, in review, on the face of the inadequate ("complaint only") charging instrument, there is no Defendant, no Complainant, *and* no Verification.

     **K.**     In sum, Probable Cause is facially and legally impossible.

     **L.**     Probable Cause being legally impossible on its face, for MONTOYA to charge anyone, including NADLER-OLENICK, "criminally" at **any** time under a municipal ordinance is for MONTOYA to act with malice, as a matter of law.

**73.**     MONTOYA's lack of "good faith."

     **A.**     In this area of Probable Cause, where both CITY and STATE, being

represented, **must** be held to the full and complete knowledge of the applicable law, thus a relatively high standard for "good faith" analysis, the practical question arises as to whether a non-lawyer, non-represented party gets a break under the concept of "reasonable" or "good faith" belief (that a crime was committed).

      1.      In other words, and this jumps ahead a little bit, does MONTOYA get a break based on the plain reality of the total and complete failure to train the clerks?

      2.      In other words, is there any room, here, for an "ignorance of the law" defense?

**B.**      In general, the answer has to be No.

      1.      It's a very plain question – was there Probable Cause to haul off and initiate this **criminal** proceeding?

      2.      There is no Probable Cause, here, by any remote stretch of anyone's imagination, and no conceivable amount of "good faith" ignorance changes the fact that there is no Probable Cause.

            a.      Where the party asserting the criminal charge doesn't understand what the party is doing or signing, the party has all the authority and systemic support in the world to obtain legal counsel.

            b.      Where that's impractical, for whatever reason, then the option is not to sign that which one doesn't understand.

            c.      Moreover, in "this state," to sign "anything" is to provide a "certificate" that one understands exactly what one is signing, which is

a rule that applies with *very few* exceptions.

  **d.** Thus, there just can't be "ignorance"-based leeway on "good faith" as to whether Probable Cause exists.

  **3.** Additionally, *all* officials are held to know what is and what is not legal within the scope of their respective offices.

  **a.** Down this path, the very language that authorizes (deputy) clerks as *notaries* for muni. court complaints, Art. 45.019, also very plainly nowhere even *remotely* contemplates "authority" or "duty" to *become* the (hearsay) **complainant** for the dual plaintiffs.

  **b.** It's *extremely* difficult, in all objective, practical reality and consideration, to provide *any* sort of an "ignorance" defense for clerks who can't figure out that being a *notary* for complaints is a world apart from being the **complainant**.

**C.** Let's take the other approach and just see where that leads.  Let's examine the points that establish the lack of Probable Cause and see if there's practical, objective room for anyone to conclude that "good faith" actually exists.

  **1.** Regarding the lack of jurisdiction in the muni. court over **any** purported criminal enforcement of **any** city's ordinance due to the inability, by ordinance, to alter the punishment level established by STATE via its Penal Code, we're talking about a pretty technical defense that NADLER-OLENICK expects is relatively new to the discussion, as in "first impression" both STATE- and nation-wide. Therefore, the *pro se* says that we can award

the court official, namely the deputy clerk, who is (mis)trained in job-related

legal perspective on a regular basis, an "ignorance" break on this one.

2.    Regarding the fact that "thou shalt!" edict-torial language

*proscribes* nothing, and is, therefore, impossible to enforce "criminally"

takes us to that level of understanding of the law that is necessarily expected

as understood by all members of society.  No one holding a job of deputy clerk

can be held to understand that sort of thing as an individual *outside* the job

while simultaneously, *inside* the job, receive an "ignorance" defense. This

point overtly negates Probable Cause, and there's no pass awarded, here,

because this type of error is just too inexcusable.

3.    Regarding the fact that the ordinance language cited and sworn

to in the complaint is out-sourced and therefore can't possibly provide Notice

for purposes of "criminal" enforcement is another one that is necessarily

expected as understood by all members of society.  Why, then, should a

trained (and paid to rely on and apply that training) deputy clerk get an

"ignorance" pass while those in no other line of work would in any way be

afforded that same level of leeway? No pass awarded, here, either. No "good

faith" arises for this type of error.

4.    Regarding the lack of commercial nexus, while all members of

society are held to comprehend this sort of thing, this one is technical enough

that the *pro se* says that we can award the court official, namely the deputy

clerk, who is (mis)trained in job-related legal perspective on a regular basis,

an "ignorance" break on this one. (Where the vast majority of lawyers and judges still don't comprehend this aspect of our present system, what chance does a (deputy) clerk have for understanding this sort of thing?)

5.      Regarding Double Jeopardy (an immunity *from suit* level of defense), and the unit of prosecution, and the fact that the charge against OLENICK had already been tried and concluded when MONTOYA signed this third complaint against NADLER-OLENICK, there's simply no conceivable way to extend an "ignorance" pass for this basis for lack of Probable Cause. Absolutely no "good faith" behind this error.

6.      Regarding the fact that the Building Code facially exists to punish *the failure or refusal to do repair*, and given that the Building Code is the "authority" cited as the reason to charge NADLER-OLENICK *criminally* for allegedly *doing* repair, there's absolutely no remotely conceivable way under the heavens to extend an "ignorance" pass for this blatant, flagrant reason as to why there's no Probable Cause.  Absolutely no "good faith" in this sort of error; more like deliberate "bad faith."

7.      Regarding this very same aspect, is there an "ignorance" pass available for confusing the Maintenance Code with the Building Code? Should there be an "ignorance" pass for asserting as authority for a *criminal* charge language that targets conduct that is the *exact anti-thesis* of the conduct cited as *criminal*?  The thought is inconceivable. Again, no pass. Again, absolutely no "good faith" in this sort of error.

8.     Regarding the Grandfather Clause at the heart of the threshold determination of whether the Building Code even applies, no *remote* possibility of a pass for that.  This is flagrant "bad faith."

9.     Regarding the limitations defense.

a.     On the one hand, the fact that a claim is *late* doesn't negate a "good faith" conclusion on the merits that an offense has been committed.  So, in general, plainly, there's no Probable Cause where the claim is late, but "late" doesn't imply "*merit-less.*"

b.     However, here, the deliberate misrepresentation in the sworn complaint, which misrepresentation very plainly intended to cover for the delay of seven (from 2006) to ten (from 2003) years in initiating a claim that wasn't even possible to bring until 2010 (no Building Code even referred in any ordinance until 2010), i.e., some four to seven years after the alleged roof work, i.e., well beyond the commonly known limitations period, instantly gets into "bad faith."  "Bad faith" is all the more self-evident where the dual plaintiffs intended to offer satellite photos from 2003 and 2006.

10.     Regarding CAPACITY/Capacity, that's another basis for lack of Probable Cause that's technical enough and so seldom asserted as to warrant an "ignorance" pass.

D.     On these statistics, six out of nine bases for want of Probable Cause are counted as inexcusable, even "bad faith."  One act of "bad faith" would suffice to

negate a "good faith"-based attribution of "ignorance," and there are at least six. Thus, if it were competent policy even to *consider* an "ignorance" defense, so as to have "good faith"-based error substitute for actual Probable Cause, there's still no way around the blatant bad faith behind the assertion of the ***criminal*** charge against NADLER-OLENICK on these facts and circumstances.

**E.**     Robo-signing.

1.     There's another point to raise about overt bad faith, which doesn't necessarily fall within the "Probable Cause or lack thereof" analysis but which is plainly "bad faith," gross indifference, and reckless disregard for any respondent's, including NADLER-OLENICK's, right to Due Process, including meaningful Notice and a fair trial.

2.     There's the extremely plain evidence of robo-signing regarding READY's complaint, the second of the three complaints against NADLER-OLENICK, and there's also very plain evidence of GARDNER's robo-signing the first of the three complaints, as well.

3.     In that context, we find that Kimberly Juarez's signature as the notary on the third complaint, for which MONTOYA is the complainant, is identical to Juarez's signature on GARDNER's complaint.

4.     Since the only way Juarez's signature can be identical is robo-signing, it follows that MONTOYA's signature isn't applied in person, either, but rather is robo-signed.

5.     Where MONTOYA's signature is plainly robo-signed

electronically, it follows that MONTOYA has to know that her signature is being applied electronically, which means that she's knowingly and consciously allowing her signature to be used in this robo-signing manner.

6. Applying that, it follows that MONTOYA all the more doesn't *want* to know and doesn't *care* to know *what* she's "signing." She's abdicated her duty/responsibility to know/review/be-aware-of what she's charging people *criminally* with doing. She's carte blanche allowing whomever to print out who knows how many of what kind of complaints knowing all the while that it's her signature that's activating the legal proceedings.

7. If the administrative reality is that there are simply so many complaints to generate that no hearsay complainant could possibly read/ review/understand them all (hence, a practical motive for robo-signing), then that very same administrative reality is the absolute best proof on the planet that the actual complainant, not a hearsay complainant, but the actual complainant, who has something akin to first-hand knowledge of the material facts, is the party to sign the complaint(s). That way, when they're as bogus as these, it's the "real" complainant, not the no-time-to-review-and-no-interest-in-reviewing-what's-sworn-to deputy clerks, who get sued for malicious prosecution.


74.  Causation.

A.   MONTOYA asserted the criminal claim.

**B.**     Also, on a different type of causation, MONTOYA knowingly provided false information, under oath, against NADLER-OLENICK.  The complaint is false, in that there was no commercial nexus to enforce.

**75.**     Malice.

**A.**     As just demonstrated, MONTOYA had, very plainly, no Probable Cause.  The absence of Probable Cause is sufficient to establish the element of "malice."

**B.**     In addition to the malice shown by the facial lack of Probable Cause, all of which facts and discussion is intended to be included here for purposes of the element of malice, which is defined as "ill will, evil motive, gross indifference, or reckless disregard of the rights of others," *Gunnels*, malice is self-evident in additional ways.

    **1.**     MONTOYA asserted false information under oath, not only about the substance of the claim against NADLER-OLENICK but also about the timing.  Falsity instantly satisfies "ill will, evil motive, gross difference, or reckless disregard of the rights of others."

    **2.**     MONTOYA alleged an issue arising under a 2003-based code, "as amended," and a 2009-based International Building Code, in the face of the CITY's adopting only the 2012 edition of the IBC. AUSTIN, § 25-12-1. It's an evil motive and/or ill will and/or gross indifference and/or reckless

disregard for rights that spawns this type of misleading *and* backward-looking claim.

3.    Down this same path, CITY hadn't adopted anything in the way of the Building Code until 2010.

     a.    To make this point in yet this additional manner, how is *any* edition of *any* Building Code, not adopted until 2010, relevant to a matter that arose, if at all, between 2003 and 2006?

     b.    There *is* a way, of course, and that's by means of commercial consent, which reality takes us right back to the complete lack of any commercial nexus in the matter from its inception.

     c.    The point is that while some might argue an "*ex post facto*" position, NADLER-OLENICK isn't looking at *ex post facto*, because agreements may be made subject to whatever timing the parties assert.  Even more to the point, "by agreement" is the *only* way CITY or STATE end-runs what would otherwise appear to most to be an *ex post facto* problem. Said still another way, *if* the ordinance language of focus *were* stand-alone, enforceable-solely-because-it's-in-print language, *then* all claims against THE OLENICKs *would* fail, instantly, for *ex post facto* problems.  It's because that language would apply, if at all, only per a viable commercial nexus that *ex post facto* concepts are simply irrelevant.

**d.**    Since there is no commercial nexus, the only other way to try to crowbar a case into existence is to lie boldly to the muni. court and allege that the facts giving rise to the matter existed in 2013 rather than in their actual time frame, namely between 2003 and 2006. This is the path MONTOYA took.

**e.**    It's an evil motive and/or ill will and/or gross indifference and/or reckless disregard for rights that motivates MONTOYA to lie about the timing, and that in the face of the dual plaintiffs' very own 2003 and 2006 satellite photos, in order to try to have a case.

**C.**    MONTOYA is a deputy clerk serving also as the "complainant." That instantly disqualifies *that* court from trying *those* matters.

**1.**    Clerk as paid, hearsay witness.

**a.**    MONTOYA has no first-hand knowledge of anything about this matter.  Hearsay witnesses are perfectly fine for "complaints," but MONTOYA learned of the facts sworn to solely as a by-product of employment with the court.

**b.**    MONTOYA, a paid judicial employee, is also serving in the capacity of (paid) witness for the dual plaintiffs.

**c.**    That effectively renders the *court* the "complainant." Not that courts can't ever be complainants.  It's just that a complainant court is instantly disqualified from trying *that* matter.

     **d.**    It's an evil motive and/or ill will and/or gross indifference and/or reckless disregard for the right of a fair trial that perpetuates this abuse of office and process within the muni. court system STATE-wide.

    **2.**    Clerk as *simultaneous* (A) prosecution witness *and* (B) Custodian of Records.

     **a.**    Whether or not the court is the effective "complainant" where MONTOYA, the paid deputy clerk, swears out the complaint, MONTOYA is an active witness in a matter for which she's also a Custodian of Records.

     **b.**    As Custodian of Records, MONTOYA may, of course, testify as to the *Record*, but in no way *also* on **the merits of the matter**. For a Custodian of Records to be a material fact witness is for the Custodian of Records to engage in an irreconcilable conflict of interest, which effectively disqualifies the trial court (for so long as MONTOYA, as Custodian/witness, has access to that Record, i.e., remains employed with that court).

     **d.**    It's an evil motive and/or ill will and/or gross indifference and/or reckless disregard for the right of a fair trial that perpetuates this abuse of office and process within the muni. court system STATE-wide.

**D.**     MONTOYA sought excessive financial punishment/gain.

1.     *Doing* repair without this or that credential is something for which the "property management" language may or may not apply, but for which "property management" might at least be *relevant*.

2.     The maximum fine for repair without a license is $500. *See* AUSTIN, § 25-12-213 ¶ 101.

3.     However, MONTOYA, knowing that OLENICK had already been fined the max of $2,000, and following GARDNER's lead, and READY's, charged NADLER-OLENICK under the Building Code with the intent NADLER-OLENICK also be fined the max of $2,000.

4.     In other words, MONTOYA sought to make it $4,000.

5.     This generates an appeal Bond amount of $8,000. This additional perspective supplements the excessive punishment concept with the subtle intent of making it "impossible," or at least that much more "expensive," to get appellate review, which intent, in and of itself, bolsters the ill will, evil intent, etc., at the trial level.


**76.**     For damages, NADLER-OLENICK demands from MONTOYA one hundred thousand dollars ($100,000) actual damages and also one hundred thousand dollars ($100,000) punitive damages.

**CLAIM 14 – M. RAE NADLER-OLENICK's MALICIOUS PROSECUTION CLAIM AGAINST THE CONSPIRATORS, INCLUDING STATE, CITY, GARDNER, READY, MONTOYA, and KIMBERLY JUAREZ – RE: BUILDING CODE**

77.    This claim is in addition to all of the foregoing.

78.    Combination of two or more persons.

    A.    As just detailed in the preceding five claims, there are at least two persons who have combined or worked together toward the same, common goal or end result of initiating a criminal charge against NADLER-OLENICK.

    B.    There are, in fact, five persons directly involved, and there's a sixth who is necessarily involved, as well.

    C.    The conspirators named for this claim are as follows:

        1.    STATE, one of the two dual plaintiffs;

        2.    CITY, the other of the two dual plaintiffs;

        3.    GARDNER, the first of three complainants;

        4.    READY, the second of three complainants;

        5.    MONTOYA, the third of three complainants; and

        6.    KIMBERLY JUAREZ, the notarizing (deputy) clerk who has allowed her signature to be used in the robo-signing scheme or process.

    D.    A note about others involved not (yet) named as conspirators. [17]

        1.    While NADLER-OLENICK reserves the opportunity to amend this claim as further information is made available, she finds value in fully disclosing her perspective about malicious prosecution claims, generally.

---

[17] Grammatically, "co-conspirator" is "repetitive and redundant."

2.      Clearly, there are others involved in this matter, including prosecutors and judicial officers.

3.      Prosecutors.

a.      So far, prosecutors are not named.  This is despite the fact that there's no practical conclusion other than realizing that the prosecutors employed in/by CITY's Attorney's Office are involved up to their eyeballs in generating these multiple, robo-signed complaints. They pressed this to the point of generating *three* totally bogus complaints, the third one, being identical to the first, existing for purposes including "re-starting" the matter (new case number, etc.), without Notice of any type, kind, or nature, midway through the then-existing matter so as to attempt to defeat later review of the points NADLER-OLENICK had raised pre-trial.

b.      The prosecutors ultimately stopped this totally baseless matter prior to any *second* trial, i.e., before trial of NADLER-OLENICK.  For that reason, prosecutors and the relevant administrative chain of command leading all the way to the City Attorney are not (yet) named as malicious prosecution conspirators.

c.      Another point needs to be made, and this is the perfect context.

I.      THE OLENICKS fully expect that there's political/commercial pressure by developers, at least one in particular,

to have CITY use the appearance of authority to harass THE

OLENICKs into selling their property. [18]

      *II.*     The neighborhood is near Cameron Road and IH

35, i.e., just south of Capital Plaza and just north of what used to be

CITY's Municipal Airport, now a commercial development.

      *III.*    To motivate resisting that political/commercial

pressure, here's the point to keep in mind.  There's no prosecutorial

immunity where there's no "prosecution," and there's no "prosecution"

of "*civil*" matters.

    4.     Judicial Officers.

---

[18] Here's the irony.  THE OLENICKS, both in their retirement years, had prepared to sell early on during the shock of the very initial blitzkrieg, which included the utter lawlessness of the blatant railroad job against OLENICK in that very first "criminal" trial in muni. court.  That sale was rendered impossible due to the existence of some purported "lien" or other filed under the "authority" of the B.S. Comm'n, which lawless, factless "lien" clouded the title enough that standard, routine financing for the sale could not be arranged.

Epilog.  Due to the continued, incessant barrage of purely political/commercial harassment activity by "code inspection," research into the status of the title was compelled.  THE OLENICKS have been unable to find in the property records that original "lien" that so clouded title as to prevent financing for that sale.

Notice to all who may be interested:  There will be no sale.  All that this barrage of lawless harassment is going to generate is more lawsuits of this very nature.

Notice to insurance companies who may be interested:  Keep your investigators in the loop.  Maybe it's just an "ignorance of the law" problem, but any *more* shenanigans related to this property, and we could be talking specific (criminal) intent to compel a change in perspective by THE OLENICKS. Another possible explanation is that there's a huge project in the works, because, in addition to various muni. court judges, segments of "code enforcement," the police, and the fire department sure seem to prefer lawless harassment to following/applying the applicable law. Perhaps they'll have more respect for the law once this matter takes its course. At least until then, keep the investigators in the loop.

a.    No trial judge has immunity where there's no subject matter jurisdiction. *See, e.g., Stump v. Sparkman*, 435 U.S. 349 (1978).

b.    This time, the judge saw value in granting *CITY/STATE*'s motion to dismiss.

c.    Next time, the court may find all the more value in granting any similarly situated *respondent*'s Special Appearance.

d.    By whatever method, including *sua sponte* activity, for dismissing facially meritless future claims against NADLER-OLENICK, *nothing* about **any** "*criminal*" charge arising from **any** ordinance will *ever* generate subject matter jurisdiction in **any** muni. court sitting in TEXAS. "*Criminal*" charges arising from alleged *ordinance* violations *can* exist, fully legitimately, *but* they're state jail felony level offenses. No municipality has authority by ordinance to alter a punishment level established by STATE's legislature. *See* n.2, *supra*. "Criminal" charges filed in muni. courts based on alleged ordinance violations are facially meritless; hence, facially malicious.

e.    Further, 1999 was several years ago, now, and yet there's an addiction for continuing with these facially lawless "complaint only" proceedings in muni. courts throughout TEXAS. This lawlessness must stop, immediately if not sooner. To cure this problem is also to cure the extremely diabolical problem arising from having (deputy) clerks, who are Custodians of the Records, simultaneously serving as

complainants, i.e., *merits* witnesses, which flagrant conflict of interest instantly disqualifies such courts from presiding over such matters.

      **f.**     A court always has authority to determine its authority, and the correct decision was made (dismissal) in the matter(s) initiated against NADLER-OLENICK; hence, no judge is sued regarding *this* malicious prosecution matter.

**79.**    Unlawful purpose.

    **A.**     Malicious prosecution is an unlawful purpose.

    **B.**     Initiating or assisting with the initiation of totally meritless "criminal" claims, whether all the elements of malicious prosecution are present for each conspirator or not, is an unlawful purpose.

    **C.**     Even if there were ever a *legit* basis for *one* claim, which there never was, here (there being no commercial nexus), *doubling* that claim is an unlawful purpose. The unit of prosecution for a permit matter is the permit, **not** the number of people "authorized" to apply for said (irrelevant, **not** required) permit. Both the second and third "complaints" against NADLER-OLENICK are dated (well) after the completion of the first trial, which named only OLENICK.

    **D.**     Harassing someone (under color) in response to his/her plain and clear assertion of the right not to contract is an unlawful purpose.

    **E.**     At least one of these conspirators has acted on at least one of these stated unlawful purposes from the very outset.

**80.** Acts in furtherance of the conspiracy.

**A.** Five of the named conspirators have each acted quite overtly in furtherance of the conspiracy against NADLER-OLENICK. Each is sued individually for those independently complete acts of malicious prosecution. For those details, see NADLER-OLENICK's malicious prosecution claims, *supra*, against STATE, CITY, GARDNER, READY, and MONTOYA.

**B.** The sixth named conspirator is KIMBERLY JUAREZ.

**1.** JUAREZ is the notarizing clerk for GARDNER's complaint and MONTOYA's complaint. (READY's is not notarized.) *See* Exhibits.

**2.** JUAREZ's notarizing signature is very plainly robo-signed. It is identical on multiple documents. *See* Exhibits.

**3.** JUAREZ has to know that her signature is being applied electronically, which means that she's knowingly and consciously allowing her signature to be used in this robo-signing manner. She knows that she is not personally taking any oaths or witnessing any signatures, as is the standard expectation, by law, for *any* notarial act.

**4.** Applying that, it follows that JUAREZ all the more doesn't *want* to know and doesn't *care* to know *what* she's "signing" or in what capacity. She's abdicated her duty/responsibility to know/review/be-aware-of whose signature she's notarizing and for what purpose. She's carte blanche allowing whomever to print out who knows how many notarizations knowing all the while that it's her signature that's intended to help activate *"criminal"*

legal proceedings.

5.    By this means and in this manner, JUAREZ is a direct and active participant in the conspiracy against NADLER-OLENICK.

6.    As for the typical qualified immunity for a notary, a *non*-robo-signing notarizing clerk is expected to have some level of qualified immunity.

7.    But, a robo-signing notarizing clerk can expect no such protection, at all, given that such robo-signing notarial act is totally beyond the authority of the office.

81.    For damages, NADLER-OLENICK demands from the named conspirators, jointly and severally, one hundred thousand dollars ($100,000) actual damages and also one hundred thousand dollars ($100,000) punitive damages.

## CLAIM 15 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST STATE – BUILDING CODE CHARGE(S) VIOLATE(S) RIGHT NOT TO CONTRACT

**82.**   Every person.  STATE is a legal person.

**83.**   Under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia.  The basis for STATE's "criminal" charge against NADLER-OLENICK is language attributed to one or more of CITY's ordinances.

**84.**   Any citizen of the United States or other person within the jurisdiction thereof.  NADLER-OLENICK is a citizen and a person within the jurisdiction of the United States.

**85.**   Subjects [that citizen/person] or causes [that citizen/person] to be subjected to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

    **A.**   Any municipal ordinance applies, if at all, only where there's a viable commercial nexus.

    **B.**   Moreover, for there to be a "criminal" charge arising from a non-Penal-Code provision, that commercial nexus must sound in trust, for there simply is no "criminal" sanction for (mere) breach of contract but only for (mere) breach of trust.

    **C.**   Further, to make the point about the indispensable nature of the commercial nexus, since STATE complains of a matter involving land or land use, that trust must be a signed writing.  TEX. PROP. CODE ANN. § 112.004.

    **D.**   NADLER-OLENICK has a general right not to contract, which she exercised by not agreeing to CITY's ordinance provision(s).  In response, STATE

charged her "criminally," depriving her of her right not to contract.

86.    STATE has no immunity.

    **A.**    Ordinance enforcement is necessarily commercial (civil) in nature. Thus, only commercial players engage in ordinance enforcement activity.  In short, by enforcing any ordinance, STATE renders itself a commercial player.

    **B.**    STATE started the litigation.

    **C.**    On top of that, as detailed in the malicious prosecution claim against STATE, there's no probable cause and no good faith to excuse the total lack of probable cause.

    **D.**    The 11th Amendment applies conditionally.  Where a STATE has immunity to assert, then the 11th Amendment is at least still in the discussion. Nothing about the 11th Amendment provides immunity that STATE has already waived.  STATE, having waived immunity, by acting as a commercial player that initiated litigation, has no 11th Amendment position remaining to assert.

87.    For damages, NADLER-OLENICK demands from STATE one million dollars ($1,000,000) actual damages and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard for her right not to contract.

**CLAIM 16 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST STATE – ALLOWING (STATE-WIDE) (LONG-STANDING) PRACTICE OF SIMULTANEOUS ROLES OF CUSTODIAN OF RECORD AND COMPLAINING WITNESS VIOLATES RIGHT TO FAIR TRIAL**

**88.**   Every person.  STATE is a legal person.

**89.**   Under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia.  The basis for STATE's "criminal" charge against NADLER-OLENICK is language attributed to one or more of CITY's ordinances.

**90.**   Any citizen of the United States or other person within the jurisdiction thereof.  NADLER-OLENICK is a citizen and a person within the jurisdiction of the United States.

**91.**   Subjects [that citizen/person] or causes [that citizen/person] to be subjected to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

**A.**   Everyone throughout "this state," including NADLER-OLENICK, is afforded the right to a fair trial.

**B.**   Key to the evaluation of fair trial is the trial Record.

**C.**   To maintain the integrity of trial Records, clerks have the authority of Custodian of Records, and all the duties and responsibilities that necessarily go with that authority.

**D.**   While serving as Custodian of Records, all of GARDNER, READY, and MONTOYA simultaneously also asserted themselves as the dual plaintiffs' complaining (hearsay) witnesses.

E.     As complaining witness, GARDNER, READY, and MONTOYA aren't testifying about business record evidence of the court's Record but rather as to material facts in support of the claim/charge. In the role of complaining witness, GARDNER, READY, and MONTOYA have an interest in the outcome of the litigation.

F.     As Custodians of Records, GARDNER, READY, and MONTOYA have constant access to the trial Record which no other (paid) (direct or hearsay) complaining witness has.

G.     STATE violates NADLER-OLENICK's right to a fair trial by allowing or encouraging muni. court clerks also to be complaining, hearsay witnesses.

92.     STATE has no immunity.

A.     Ordinance enforcement is necessarily commercial (civil) in nature. Thus, only commercial players engage in ordinance enforcement activity.  In short, by enforcing any ordinance, STATE renders itself a commercial player.

B.     STATE started the litigation.

C.     On top of that, as detailed in the malicious prosecution claim against STATE, there's no probable cause and no good faith to excuse the total lack of probable cause.

D.     The 11th Amendment applies conditionally.  Where a STATE has immunity to assert, then the 11th Amendment is at least still in the discussion. Nothing about the 11th Amendment provides immunity that STATE has already waived.  STATE, having waived immunity, by acting as a commercial player that

initiated litigation, has no 11th Amendment position remaining to assert.

**93.**    For damages, NADLER-OLENICK demands from STATE one million dollars ($1,000,000) actual damages and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard for her right to a fair trial.

## CLAIM 17 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST CITY – BUILDING CODE CHARGE(S) VIOLATE(S) RIGHT NOT TO CONTRACT

**94.**    Every person.  CITY is a legal person.

**95.**    Under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia.  The basis for CITY's "criminal" charge against NADLER-OLENICK is language attributed to one or more of CITY's ordinances.

**96.**    Any citizen of the United States or other person within the jurisdiction thereof.  NADLER-OLENICK is a citizen and a person within the jurisdiction of the United States.

**97.**    Subjects [that citizen/person] or causes [that citizen/person] to be subjected to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

    **A.**    Any municipal ordinance applies, if at all, only where there's a viable commercial nexus.

    **B.**    Moreover, for there to be a "criminal" charge arising from a non-Penal-

**Right Not to Contract, etc.**

Code provision, that commercial nexus must sound in trust, for there simply is no "criminal" sanction for (mere) breach of contract but only for (mere) breach of trust.

    **C.**      Further, to make the point about the indispensable nature of the commercial nexus, since CITY complains of a matter involving land or land use, that trust must be a signed writing. TEX. PROP. CODE ANN. § 112.004.

    **D.**      NADLER-OLENICK has a general right not to contract, which she exercised by not agreeing to CITY's ordinance provision(s). In response, CITY charged her "criminally," depriving her of her right not to contract.

**98.**    CITY has no immunity.

    **A.**      Clearly, CITY is enforcing policy by enforcing an ordinance.

    **B.**      Moreover, ordinance enforcement is necessarily commercial (civil) in nature. Thus, only commercial players engage in ordinance enforcement activity. In short, by enforcing any ordinance, CITY renders itself a commercial player.

    **C.**      On top of that, CITY started the litigation.

    **D.**      Further, as detailed in the malicious prosecution claim against CITY, there's no probable cause and no good faith to excuse the total lack of probable cause.

**99.**    For damages, NADLER-OLENICK demands from CITY one million dollars ($1,000,000) actual damages and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard for her right not to contract.

**CLAIM 18 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST CITY – ALLOWING (LONG-STANDING) PRACTICE OF SIMULTANEOUS ROLES OF CUSTODIAN OF RECORD AND COMPLAINING WITNESS VIOLATES RIGHT TO FAIR TRIAL**

**100.**   Every person.  CITY is a legal person.

**101.**   Under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia.  The basis for CITY's "criminal" charge against NADLER-OLENICK is language attributed to one or more of CITY's ordinances.

**102.**   Any citizen of the United States or other person within the jurisdiction thereof.  NADLER-OLENICK is a citizen and a person within the jurisdiction of the United States.

**103.**   Subjects [that citizen/person] or causes [that citizen/person] to be subjected to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

**A.**   Everyone throughout "this state," including NADLER-OLENICK, is afforded the right to a fair trial.

**B.**   Key to the evaluation of fair trial is the trial Record.

**C.**   To maintain the integrity of trial Records, clerks have the authority of Custodian of Records, and all the duties and responsibilities that necessarily go with that authority.

**D.**   While serving as Custodian of Records, all of GARDNER, READY, and MONTOYA simultaneously also asserted themselves as the dual plaintiffs' complaining (hearsay) witnesses.

**E.**     As complaining witness, GARDNER, READY, and MONTOYA aren't testifying about business record evidence of the court's Record but rather as to material facts in support of the claim/charge. In the role of complaining witness, GARDNER, READY, and MONTOYA have an interest in the outcome of the litigation.

**F.**     As Custodians of Records, GARDNER, READY, and MONTOYA have constant access to the trial Record which no other (paid) (direct or hearsay) complaining witness has.

**G.**     CITY violates NADLER-OLENICK's right to a fair trial by allowing or encouraging muni. court clerks also to be complaining, hearsay witnesses.

**104.**   CITY has no immunity.

**A.**     Clearly, CITY is enforcing policy by enforcing an ordinance.

**B.**     Additionally, this dual-role Custodian/Witness approach for the clerks is a long-standing practice in the muni. courts sitting in AUSTIN.

**C.**     Moreover, ordinance enforcement is necessarily commercial (civil) in nature.  Thus, only commercial players engage in ordinance enforcement activity. In short, by enforcing any ordinance, CITY renders itself a commercial player.

**D.**     On top of that, CITY started the litigation.

**E.**     Further, as detailed in the malicious prosecution claim against CITY, there's no probable cause and no good faith to excuse the total lack of probable cause.

**105.**   For damages, NADLER-OLENICK demands from CITY one million dollars

---

Original Complaint (OLENICK and NADLER-OLENICK)                              144
**Right Not to Contract, etc.**

($1,000,000) actual damages and also one million dollars ($1,000,000) punitive

damages, for the wanton, malicious, grossly indifferent, callous disregard for her

right to a fair trial.

## CLAIM 19 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST GARDNER –BUILDING CODE CHARGE(S) VIOLATE(S) RIGHT NOT TO CONTRACT

**106.**   Every person.  GARDNER is a person.

**107.**   Under color of any statute, ordinance, regulation, custom, or usage, of any

State or Territory or the District of Columbia.  The basis for GARDNER's "criminal"

charge against NADLER-OLENICK is language attributed to one or more of CITY's

ordinances.

**108.**   Any citizen of the United States or other person within the jurisdiction

thereof.  NADLER-OLENICK is a citizen and a person within the jurisdiction of the

United States.

**109.**   Subjects [that citizen/person] or causes [that citizen/person] to be subjected to

the deprivation of any rights, privileges, or immunities secured by the Constitution

and laws.

    **A.**   Any municipal ordinance applies, if at all, only where there's a viable

commercial nexus.

    **B.**   Moreover, for there to be a "criminal" charge arising from a non-Penal-

Code provision, that commercial nexus must sound in trust, for there simply is no

"criminal" sanction for (mere) breach of contract but only for (mere) breach of trust.

    **C.**    Further, to make the point about the indispensable nature of the commercial nexus, since GARDNER complains of a matter involving land or land use, that trust must be a signed writing. TEX. PROP. CODE ANN. § 112.004.

    **D.**    NADLER-OLENICK has a general right not to contract, which she exercised by not agreeing to CITY's ordinance provision(s). In response, GARDNER charged her "criminally," depriving her of her right not to contract.

**110.**  GARDNER has no immunity.

    **A.**    Ordinance enforcement is necessarily commercial (civil) in nature. Thus, only commercial players engage in ordinance enforcement activity. In short, by enforcing any ordinance, GARDNER renders herself a commercial player.

    **B.**    On top of that, GARDNER started the litigation.

    **C.**    In the event GARDNER is somehow viewed as a generic citizen filing a complaint (based incompetently on hearsay), as opposed to a clerk filing a complaint as part and parcel of that job, then we still have the robo-signing problem.

    **D.**    On top of that, as detailed in the malicious prosecution claim against GARDNER, there's no probable cause and no good faith to excuse the absence of that total lack of probable cause.

**111.**  For damages, NADLER-OLENICK demands from GARDNER one million dollars ($1,000,000) actual damages and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard for her right not to contract.

**CLAIM 20 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST GARDNER – SIMULTANEOUS ROLES OF CUSTODIAN OF RECORD AND COMPLAINING WITNESS VIOLATES RIGHT TO FAIR TRIAL**

**112.**   Every person.  GARDNER is a person.

**113.**   Under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia.  The basis for GARDNER's "criminal" charge against NADLER-OLENICK is language attributed to one or more of CITY's ordinances.

**114.**   Any citizen of the United States or other person within the jurisdiction thereof.  NADLER-OLENICK is a citizen and a person within the jurisdiction of the United States.

**115.**   Subjects [that citizen/person] or causes [that citizen/person] to be subjected to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

   **A.**   Everyone throughout "this state," including NADLER-OLENICK, is afforded the right to a fair trial.

   **B.**   Key to the evaluation of fair trial is the trial Record.

   **C.**   To maintain the integrity of trial Records, clerks have the authority of Custodian of Records, and all the duties and responsibilities that necessarily go with that authority.

   **D.**   While serving as Custodian of Records, GARDNER simultaneously also asserted herself as the dual plaintiffs' (paid) complaining (hearsay) witness.

   **E.**   As a complaining witness, GARDNER isn't testifying about business

record evidence of the court's Record but rather as to material facts in support of the claim/charge. In the role of complaining witness, GARDNER has an interest in the outcome of the litigation.

F.     As Custodian of Records, GARDNER has constant access to the trial Record that no other (paid) (direct or hearsay) complaining witness has.

G.     GARDNER violates NADLER-OLENICK's right to a fair trial by serving as complaining witness, i.e., a party with an interest in the litigation, while simultaneously serving as Custodian of Records, having constant access to the Record.

116.   GARDNER has no immunity.

A.     Ordinance enforcement is necessarily commercial (civil) in nature. Thus, only commercial players engage in ordinance enforcement activity.  In short, by enforcing any ordinance, GARDNER renders herself a commercial player.

B.     On top of that, GARDNER started the litigation.

C.     As a material fact witness, GARDNER is not even close to acting within the scope of the office of Custodian of Records.

D.     On top of that, as detailed in the malicious prosecution claim against GARDNER, there's no probable cause and no good faith to excuse the absence of that total lack of probable cause.

117.   For damages, NADLER-OLENICK demands from GARDNER one million dollars ($1,000,000) actual damages and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard

for her right to a fair trial.

## CLAIM 21 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST READY – BUILDING CODE CHARGE(S) VIOLATE(S) RIGHT NOT TO CONTRACT

**118.**   Every person.  READY is a person.

**119.**   Under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia.  The basis for READY's "criminal" charge against NADLER-OLENICK is language attributed to one or more of CITY's ordinances.

**120.**   Any citizen of the United States or other person within the jurisdiction thereof.  NADLER-OLENICK is a citizen and a person within the jurisdiction of the United States.

**121.**   Subjects [that citizen/person] or causes [that citizen/person] to be subjected to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

**A.**   Any municipal ordinance applies, if at all, only where there's a viable commercial nexus.

**B.**   Moreover, for there to be a "criminal" charge arising from a non-Penal-Code provision, that commercial nexus must sound in trust, for there simply is no "criminal" sanction for (mere) breach of contract but only for (mere) breach of trust.

**C.**   Further, to make the point about the indispensable nature of the commercial nexus, since READY complains of a matter involving land or land use,

that trust must be a signed writing.  TEX. PROP. CODE ANN. § 112.004.

     **D.**     NADLER-OLENICK has a general right not to contract, which she exercised by not agreeing to CITY's ordinance provision(s).  In response, READY charged her "criminally," depriving her of her right not to contract.

**122.**  READY has no immunity.

     **A.**     Ordinance enforcement is necessarily commercial (civil) in nature.  Thus, only commercial players engage in ordinance enforcement activity.  In short, by enforcing any ordinance, READY renders herself a commercial player.

     **B.**     On top of that, READY aligned herself with the dual plaintiffs and other complainants in starting the litigation.

     **C.**     In the event READY is somehow viewed as a generic citizen filing a complaint (based incompetently on hearsay), as opposed to a clerk filing a complaint as part and parcel of that job, then we still have the robo-signing problem.

     **D.**     On top of that, as detailed in the malicious prosecution claim against READY, there's no probable cause and no good faith to excuse the absence of that total lack of probable cause.

**123.**  For damages, NADLER-OLENICK demands from READY one million dollars ($1,000,000) actual damages and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard for her right not to contract.

**CLAIM 22 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST READY – SIMULTANEOUS ROLES OF CUSTODIAN OF RECORD AND COMPLAINING WITNESS VIOLATES RIGHT TO FAIR TRIAL**

**124.**   Every person.  READY is a person.

**125.**   Under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia.  The basis for READY's "criminal" charge against NADLER-OLENICK is language attributed to one or more of CITY's ordinances.

**126.**   Any citizen of the United States or other person within the jurisdiction thereof.  NADLER-OLENICK is a citizen and a person within the jurisdiction of the United States.

**127.**   Subjects [that citizen/person] or causes [that citizen/person] to be subjected to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

    **A.**   Everyone throughout "this state," including NADLER-OLENICK, is afforded the right to a fair trial.

    **B.**   Key to the evaluation of fair trial is the trial Record.

    **C.**   To maintain the integrity of trial Records, clerks have the authority of Custodian of Records, and all the duties and responsibilities that necessarily go with that authority.

    **D.**   While serving as Custodian of Records, READY simultaneously also asserted herself as a complaining (hearsay) witness for the dual plaintiffs.

    **E.**   As a complaining witness, READY isn't testifying about business

record evidence of the court's Record but rather as to material facts in support of the claim/charge. In the role of complaining witness, READY has an interest in the outcome of the litigation.

    **F.**    As Custodian of Records, READY has constant access to the trial Record that no other (paid) (direct or hearsay) complaining witness has.

    **G.**    READY violates NADLER-OLENICK's right to a fair trial by serving as complaining witness, i.e., a party with an interest in the litigation, while simultaneously serving as Custodian of Records, having constant access to the Record.

**128.**  READY has no immunity.

    **A.**    Ordinance enforcement is necessarily commercial (civil) in nature. Thus, only commercial players engage in ordinance enforcement activity.  In short, by enforcing any ordinance, READY renders herself a commercial player.

    **B.**    On top of that, READY participated in the initiation of litigation.

    **C.**    As a material fact witness, READY is not even close to acting within the scope of the office of Custodian of Records.

    **D.**    On top of that, as detailed in the malicious prosecution claim against READY, there's no probable cause and no good faith to excuse the absence of that total lack of probable cause.

**129.**  For damages, NADLER-OLENICK demands from READY one million dollars ($1,000,000) actual damages and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard for her

right to a fair trial.

## CLAIM 23 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST MONTOYA –BUILDING CODE CHARGE(S) VIOLATE(S) RIGHT NOT TO CONTRACT

**130.**   Every person.  MONTOYA is a person.

**131.**   Under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia.  The basis for MONTOYA's "criminal" charge against NADLER-OLENICK is language attributed to one or more of CITY's ordinances.

**132.**   Any citizen of the United States or other person within the jurisdiction thereof.  NADLER-OLENICK is a citizen and a person within the jurisdiction of the United States.

**133.**   Subjects [that citizen/person] or causes [that citizen/person] to be subjected to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

    **A.**   Any municipal ordinance applies, if at all, only where there's a viable commercial nexus.

    **B.**   Moreover, for there to be a "criminal" charge arising from a non-Penal-Code provision, that commercial nexus must sound in trust, for there simply is no "criminal" sanction for (mere) breach of contract but only for (mere) breach of trust.

    **C.**   Further, to make the point about the indispensable nature of the

commercial nexus, since MONTOYA complains of a matter involving land or land use, that trust must be a signed writing. TEX. PROP. CODE ANN. § 112.004.

    **D.**    NADLER-OLENICK has a general right not to contract, which she exercised by not agreeing to CITY's ordinance provision(s). In response, MONTOYA charged her "criminally," depriving her of her right not to contract.

**134.**  MONTOYA has no immunity.

    **A.**    Ordinance enforcement is necessarily commercial (civil) in nature. Thus, only commercial players engage in ordinance enforcement activity. In short, by enforcing any ordinance, MONTOYA renders herself a commercial player.

    **B.**    On top of that, MONTOYA aligned herself with the dual plaintiffs and other complainants in starting the litigation.

    **C.**    In the event MONTOYA is somehow viewed as a generic citizen filing a complaint (based incompetently on hearsay), as opposed to a clerk filing a complaint as part and parcel of that job, then we still have the robo-signing problem.

    **D.**    On top of that, as detailed in the malicious prosecution claim against MONTOYA, there's no probable cause and no good faith to excuse the absence of that total lack of probable cause.

**135.**  For damages, NADLER-OLENICK demands from MONTOYA one million dollars ($1,000,000) actual damages and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard for her right not to contract.

---

**CLAIM 24 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST MONTOYA – SIMULTANEOUS ROLES OF CUSTODIAN OF RECORD AND COMPLAINING WITNESS VIOLATES RIGHT TO FAIR TRIAL**

**136.**   Every person.  MONTOYA is a person.

**137.**   Under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia.  The basis for MONTOYA's "criminal" charge against NADLER-OLENICK is language attributed to one or more of CITY's ordinances.

**138.**   Any citizen of the United States or other person within the jurisdiction thereof.  NADLER-OLENICK is a citizen and a person within the jurisdiction of the United States.

**139.**   Subjects [that citizen/person] or causes [that citizen/person] to be subjected to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

**A.**   Everyone throughout "this state," including NADLER-OLENICK, is afforded the right to a fair trial.

**B.**   Key to the evaluation of fair trial is the trial Record.

**C.**   To maintain the integrity of trial Records, clerks have the authority of Custodian of Records, and all the duties and responsibilities that necessarily go with that authority.

**D.**   While serving as Custodian of Records, MONTOYA simultaneously also asserted herself as a complaining (hearsay) witness for the dual plaintiffs.

**E.**   As a complaining witness, MONTOYA isn't testifying about business

record evidence of the court's Record but rather as to material facts in support of the claim/charge. In the role of complaining witness, MONTOYA has an interest in the outcome of the litigation.

      **F.**    As Custodian of Records, MONTOYA has constant access to the trial Record that no other (paid) (direct or hearsay) complaining witness has.

      **G.**    MONTOYA violates NADLER-OLENICK's right to a fair trial by serving as complaining witness, i.e., a party with an interest in the litigation, while simultaneously serving as Custodian of Records, having constant access to the Record.

**140.**    MONTOYA has no immunity.

      **A.**    Ordinance enforcement is necessarily commercial (civil) in nature. Thus, only commercial players engage in ordinance enforcement activity.  In short, by enforcing any ordinance, MONTOYA renders herself a commercial player.

      **B.**    On top of that, MONTOYA participated in the initiation of litigation.

      **C.**    As a material fact witness, MONTOYA is not even close to acting within the scope of the office of Custodian of Records.

      **D.**    On top of that, as detailed in the malicious prosecution claim against MONTOYA, there's no probable cause and no good faith to excuse the absence of that total lack of probable cause.

**141.**    For damages, NADLER-OLENICK demands from MONTOYA one million dollars ($1,000,000) actual damages and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard

for her right to a fair trial.

### CLAIM 25 – M. RAE NADLER-OLENICK's § 1983 CONSPIRACY CLAIM AGAINST STATE, CITY, GARDNER, READY, MONTOYA, and JUAREZ – BUILDING CODE CHARGE(S) VIOLATE(S) RIGHT NOT TO CONTRACT

**142.**   On the facts and circumstances of this matter, it's clear that a plan existed, that each participant named shared in the general objective to deprive NADLER-OLENICK of her right not to contract, and that at least one overt act was committed in furtherance of the conspiracy that violated NADLER-OLENICK's right not to contract.

**143.**   Every person.

**A.**   Each participant in the acts in concert, league, combination, and/or conspiracy against NADLER-OLENICK, namely STATE, CITY, GARDNER, READY, MONTOYA, and JUAREZ, is a legal person.

**B.**   Each participant has committed at least one overt act in furtherance of the conspiracy, as detailed above in the malicious prosecution claims, including the malicious prosecution conspiracy claim.

**144.**   Under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia.  The basis for the "criminal" charge against NADLER-OLENICK is language attributed to one or more of CITY's ordinances.

**145.**   Any citizen of the United States or other person within the jurisdiction

thereof.  NADLER-OLENICK is a citizen and a person within the jurisdiction of the United States.

**146.**    Subjects [that citizen/person] or causes [that citizen/person] to be subjected to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

    **A.**    Any municipal ordinance applies, if at all, only where there's a viable commercial nexus.

    **B.**    Moreover, for there to be a "criminal" charge arising from a non-Penal-Code provision, that commercial nexus must sound in trust, for there simply is no "criminal" sanction for (mere) breach of contract but only for (mere) breach of trust.

    **C.**    Further, to make the point about the indispensable nature of the commercial nexus, since the conspirators complain of a matter involving land or land use, that trust must be a signed writing. TEX. PROP. CODE ANN. § 112.004.

    **D.**    NADLER-OLENICK has a general right not to contract, which she exercised by not agreeing to CITY's ordinance provision(s).  In response, the conspirators charged her and participated in the charging of her "criminally," depriving her of her right not to contract.

    **E.**    JUAREZ participated by allowing robo-signing of the notarial acts under her name and office.

**147.**    No conspirator has immunity.

    **A.**    The details asserted above regarding absence of immunity for STATE, CITY, GARDNER, READY, and MONTOYA are reasserted here verbatim.

**B.**   JUAREZ has no immunity, either.

    **1.**   No objective perspective considers for a moment as legit the toleration of the use of one's robo-signature for notarial acts, which acts require, by law, a personal administrative of oath and a personal witnessing of the actual autograph of the party doing the swearing/signing.

    **2.**   Robo-signing in no way comes within the scope of the work/job of notarizing signatures for complaints.

**148.**   For damages, NADLER-OLENICK demands from the named conspirators, jointly and severally, one million dollars ($1,000,000) actual damages and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard for her right not to contract.


**CLAIM 26 – M. RAE NADLER-OLENICK's § 1983 CONSPIRACY CLAIM AGAINST STATE, CITY, GARDNER, READY, MONTOYA, and JUAREZ – (STATE-WIDE) (LONG-STANDING) PRACTICE OF SIMULTANEOUS ROLES OF CUSTODIAN OF RECORD AND COMPLAINING WITNESS VIOLATES RIGHT TO FAIR TRIAL**

**149.**   On the facts and circumstances of this matter, it's clear that a plan existed, that each participant named shared in the general objective to deprive NADLER-OLENICK of her right not to contract, and that at least one overt act was committed in furtherance of the conspiracy that violated NADLER-OLENICK's right not to contract.

**150.**   Every person.

    **A.**   Each participant in the acts in concert, league, combination, and/or

conspiracy against NADLER-OLENICK, namely STATE, CITY, GARDNER, READY, MONTOYA, and JUAREZ, is a legal person.

**B.**    Each participant has committed at least one overt act in furtherance of the conspiracy, as detailed above in the malicious prosecution claims, including the malicious prosecution conspiracy claim.

**151.**   Under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia. The basis for the "criminal" charge against NADLER-OLENICK is language attributed to one or more of CITY's ordinances.

**152.**   Any citizen of the United States or other person within the jurisdiction thereof.  NADLER-OLENICK is a citizen and a person within the jurisdiction of the United States.

**153.**   Subjects [that citizen/person] or causes [that citizen/person] to be subjected to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

**A.**    Everyone throughout "this state," including NADLER-OLENICK, is afforded the right to a fair trial.

**B.**    Key to the evaluation of fair trial is the trial Record.

**C.**    To maintain the integrity of trial Records, clerks have the authority of Custodian of Records, and all the duties and responsibilities that necessarily go with that authority.

**D.**    While serving as Custodian of Records, all of GARDNER, READY, and

MONTOYA simultaneously also asserted themselves as the dual plaintiffs'
complaining (hearsay) witnesses.

    **E.**    As complaining witness, GARDNER, READY, and MONTOYA aren't
testifying about business record evidence of the court's Record but rather as to
material facts in support of the claim/charge. In the role of complaining witness,
GARDNER, READY, and MONTOYA have an interest in the outcome of the
litigation.

    **F.**    As Custodians of Records, GARDNER, READY, and MONTOYA have
constant access to the trial Record which no other (paid) (direct or hearsay)
complaining witness has.

    **G.**    The conspirators violated NADLER-OLENICK's right to a fair trial by
allowing or encouraging muni. court clerks also to be complaining, hearsay
witnesses.

**154.**   No conspirator has immunity.

    **A.**    The details asserted above regarding absence of immunity for STATE,
CITY, GARDNER, READY, and MONTOYA is reasserted here verbatim.

    **B.**    JUAREZ has no immunity, either.

        **1.**    No objective perspective considers for a moment as legit the
toleration of the use of one's robo-signature for notarial acts, which acts
require, by law, a personal administrative of oath and a personal witnessing
of the actual autograph of the party doing the swearing/signing.

        **2.**    Robo-signing in no way comes within the scope of the work/job of

notarizing signatures for complaints.

**155.**   For damages, NADLER-OLENICK demands from the named conspirators, jointly and severally, one million dollars ($1,000,000) actual damages and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard for her right to a fair trial.

### CLAIM 27 – M. RAE NADLER-OLENICK's § 1985(3) CONSPIRACY CLAIM AGAINST STATE, CITY, GARDNER, READY, MONTOYA, and JUAREZ – BUILDING CODE CHARGE(S) VIOLATE(S) RIGHT NOT TO CONTRACT

**156.**   On the facts and circumstances of this matter, it's clear that a plan existed, that each participant named shared in the general objective to deprive NADLER-OLENICK of her right not to contract, and that at least one overt act was committed in furtherance of the conspiracy that violated NADLER-OLENICK's right not to contract.

**157.**   Two or more persons.   Each participant in the acts in concert, league, combination, and/or conspiracy against NADLER-OLENICK, namely STATE, CITY, GARDNER, READY, MONTOYA, and JUAREZ, is a legal person.

**158.**   In any State or Territory.

    **A.**   All overt acts, some overt acts, or at least one overt act of the conspiracy occurred within TEXAS.

    **B.**   All acts and objectives of the conspiracy were directed against

NADLER-OLENICK, who was at all relevant times within TEXAS.

      **C.**     All acts and objectives of the conspiracy related to land or land use, which land is within TEXAS.

**159.**   Conspire. Each participant has committed at least one overt act in furtherance of the conspiracy, as detailed above in the malicious prosecution claims, including the malicious prosecution conspiracy claim.

**160.**   For the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws.

      **A.**     Any person or class of persons.

           **1.**     NADLER-OLENICK is a person.

           **2.**     NADLER-OLENICK is a member of that class of persons who assert his/her/their right not to contract regarding municipal ordinances. There are at least two members of this class: NADLER-OLENICK and OLENICK.

      **B.**     Purpose of depriving equal protection, directly or indirectly.

           **1.**     Since each conspirator, directly or indirectly, has charged NADLER-OLENICK criminally for what is essentially NADLER-OLENICK's assertion and exercise of her right not to contract, it follows that at least one purpose of the conspiracy is to deprive NADLER-OLENICK of equal protection regarding the right not to contract.

           **2.**     If the law were applied equally, NADLER-OLENICK's right not to contract would be just as respected as everyone else's right not to contract.

3. Here, due at least in part to the location of NADLER-OLENICK's land, NADLER-OLENICK's right not to contract has in no way received equal protection by any of these conspirators.

161. Any act in furtherance of the conspiracy where another is deprived of having and exercising any right.

A. NADLER-OLENICK has the right not to contract.

B. The act or acts in furtherance of the conspiracy to deny equal protection include the swearing out and filing of three "criminal" complaints, without Probable Cause *and* in/with bad faith, as detailed in the foregoing malicious prosecution Claims, against NADLER-OLENICK for an alleged act of roof repair without a permit in alleged violation of one or more of CITY's ordinances, not one of which of such ordinances applies due to failure of any viable commercial nexus.

C. In short, the act or acts in furtherance of the conspiracy include baseless criminal charges as the response to NADLER-OLENICK's assertion of her right not to contract.

162. No conspirator has immunity. The details asserted in preceding Claims regarding absence of immunity for STATE, CITY, GARDNER, READY, MONTOYA, and JUAREZ is reasserted here verbatim.

163. For damages, NADLER-OLENICK demands from the named conspirators, jointly and severally, one million dollars ($1,000,000) actual damages and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard for her right not to contract.

**CLAIM 28 – M. RAE NADLER-OLENICK's § 1985(3) CONSPIRACY CLAIM AGAINST STATE, CITY, GARDNER, READY, MONTOYA, and JUAREZ – (STATE-WIDE) (LONG-STANDING) PRACTICE OF SIMULTANEOUS ROLES OF CUSTODIAN OF RECORD AND COMPLAINING WITNESS VIOLATES RIGHT TO FAIR TRIAL**

**164.** On the facts and circumstances of this matter, it's clear that a plan existed, that each participant named shared in the general objective to deprive NADLER-OLENICK of her right not to contract, and that at least one overt act was committed in furtherance of the conspiracy that violated NADLER-OLENICK's right not to contract.

**165.** Two or more persons.  Each participant in the acts in concert, league, combination, and/or conspiracy against NADLER-OLENICK, namely STATE, CITY, GARDNER, READY, MONTOYA, and JUAREZ, is a legal person.

**166.** In any State or Territory.

    **A.**    All overt acts, some overt acts, or at least one overt act of the conspiracy occurred within TEXAS.

    **B.**    All acts and objectives of the conspiracy were directed against NADLER-OLENICK, who was at all relevant times within TEXAS.

    **C.**    All acts and objectives of the conspiracy related to land or land use, which land is within TEXAS.

**167.** Conspire.  Each participant has committed at least one overt act in furtherance of the conspiracy, as detailed above in the malicious prosecution claims, including the malicious prosecution conspiracy claim.

**168.** For the purpose of depriving, either directly or indirectly, any person or class

of persons of the equal protection of the laws.

**A.**     Any person or class of persons.

    **1.**     NADLER-OLENICK is a person.

    **2.**     NADLER-OLENICK is a member of that class of persons who assert his/her/their right not to contract regarding municipal ordinances. There are at least two members of this class: NADLER-OLENICK and OLENICK.

    **3.**     NADLER-OLENICK is also a member of that class of persons who, being charged criminally, has and asserts his/her/its right to a fair trial.

**B.**     Purpose of depriving equal protection, directly or indirectly.

    **1.**     Since each conspirator, directly or indirectly, has charged NADLER-OLENICK criminally for what is essentially NADLER-OLENICK's assertion and exercise of her right not to contract, it follows that at least one purpose of the conspiracy is to deprive NADLER-OLENICK of equal protection regarding the right not to contract.

    **2.**     Custodians of Records simultaneously merits witnesses.

        **a.**     Moreover, each conspirator, directly or indirectly, has participated in or encouraged the practice by which the muni. court clerks, who are Custodians of Records for that court, simultaneously, unilaterally, and voluntarily assert themselves as hearsay complainant/witnesses, i.e., witnesses on the merits.

        **b.**     As a witness on the merits, the clerk, while also

pretending to be and paid to be an impartial Custodian of the trial
Record, on which trial Record any and all issues of fair trial depend,
and by which Record any and all issues of a fair trial are evaluated, the
clerks assert a material interest in the outcome of the litigation.

      c.     NADLER-OLENICK's right to a fair trial, thus to a
Record maintained at all times by impartial Custodian(s) of that
Record, cannot abide that rather flagrant conflict of interest.

      3.     If the law were applied equally, NADLER-OLENICK's right not
to contract would be just as respected as everyone else's right not to contract.

      4.     If the law were applied equally, NADLER-OLENICK's right to a
fair trial would be just as protected and respected as everyone else's right to a
fair trial.

      5.     Here, due at least in part to the (long-standing) practice in this
muni. court (which practice is also STATE-wide) of allowing/encouraging
clerks to double as complainants, and here, not only compromise their
impartiality as Custodians of Record but also to do so by means of automated
robo-signing, NADLER-OLENICK's right to a fair trial has in no way
received equal protection by any of these conspirators.

**169.**    Any act in furtherance of the conspiracy where another is deprived of having
and exercising any right.

      **A.**     NADLER-OLENICK has the right not to contract.

      **B.**     NADLER-OLENICK also has the right to a fair trial, which includes

the right to have only impartial Custodians of Records serving in that role.

      **C.**    The act or acts in furtherance of the conspiracy to deny equal protection include the allowance and/or encouragement of the clerks, who are paid, in part, to be Custodians of those trial Records, to double simultaneously as complaining witnesses, thereby violating NADLER-OLENICK's right to a fair trial.

**170.** No conspirator has immunity. The details asserted in preceding Claims regarding absence of immunity for STATE, CITY, GARDNER, READY, MONTOYA, and JUAREZ is reasserted here verbatim.

**171.** For damages, NADLER-OLENICK demands from the named conspirators, jointly and severally, one million dollars ($1,000,000) actual damages and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard for her right to a fair trial.

## CLAIM 29 – M. RAE NADLER-OLENICK's § 1986 CLAIM AGAINST STATE's ATTORNEY GENERAL FOR FAILURE TO PREVENT THE CONSPIRACY TO VIOLATE THE RIGHT NOT TO CONTRACT

**172.** This cause of action accrued as of the date of the "favorable ruling," namely Jan. 6, 2014.

**173.** Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed.

      **A.**    STATE's ATTORNEY GENERAL is a person.

**B.**   STATE's ATTORNEY GENERAL knows the following:

1.   That CITY, in particular, and various cities throughout TEXAS, charge people "criminally" for alleged ordinance violations all the time;

2.   That enforcement of ordinances is a "civil" matter sounding in trust;

3.   That trusts involving land or land use must be in writing and signed (by the party to be charged);

4.   That *STATE* has no standing, due to no "injury in fact," no "actual grievance," to assert **any** civil claim *in STATE's name*, arising from an alleged violation of a municipal ordinance;

5.   That while "criminal" enforcement *in STATE's name* of any ordinance, whether CITY's or any other city's, is possible, it's also a matter over which no muni. court in TEXAS has subject matter jurisdiction, given that such charges assert a state jail felony punishment level;

6.   That CITY, in particular, and cities throughout TEXAS, in general, regularly assert in the various muni. courts such ordinance-based "criminal" charges *in STATE's name*;

7.   That per the 1999 statutory changes, by which TEX. CODE CRIM. PROC. art. 45.01 was very overtly repealed, no misdemeanor charge in **any** trial court sitting in TRAVIS COUNTY may be initiated without an Information;

8.   That CITY, in particular, and cities throughout TEXAS, in

general, persist with the "complaint only" charging process, despite the 1999 statutory amendments that render that process a violation of Due Process and render the muni. courts without subject matter jurisdiction;

9.    That per that "complaint only" process, CITY, in particular, and cities throughout TEXAS, in general, allow and even encourage the muni. court's clerks to serve as the complaining witness for matters filed in the courts in which those clerks work as Custodians of Records; and

10.    That such charging process, where the clerks double as complaining witnesses, at least per *CITY*'s practices, involves robo-signing.

11.    In general, then, STATE's ATTORNEY GENERAL knows that conspiracies in violation of 42 U.S.C. § 1985 go on all the time, i.e., "are about to be committed," in the muni. court(s) sitting in AUSTIN and sitting in cities throughout TEXAS.

12.    Therefore, STATE's ATTORNEY GENERAL knew that the conspiracy involving NADLER-OLENICK was about to be committed, as just one more of that very type of matters with that set of facts and circumstances.

174.    With reasonable diligence, has power to prevent or aid in preventing the commission of the violations mentioned in section 1985.

A.    STATE's ATTORNEY GENERAL has the power to prevent or aid in the preventing of the acts by which these conspirators engaged and committed this conspiracy.

1.      STATE's ATTORNEY GENERAL has the power by means of a letter to document STATE's non-consent to CITY's acting as agent for STATE in any matter, civil or criminal, allegedly arising from an alleged violation of a municipal ordinance.

2.      STATE's ATTORNEY GENERAL has the power by means of a formal Opinion or a letter to confirm and reassert that CITY, in particular, and cities in TEXAS, generally, have only civil/commercial means to enforce municipal ordinances.

3.      STATE's ATTORNEY GENERAL has the power by means of a formal Opinion or a letter to confirm and reassert that no misdemeanor charge is within the jurisdiction of any trial court in TRAVIS COUNTY [19] unless there's also in Information signed by either the County Attorney's Office or the District Attorney's Office.

4.      STATE's ATTORNEY GENERAL has the power by means of a formal Opinion or letter to confirm that robo-signing is not a viable notarial act in TEXAS.

5.      STATE's ATTORNEY GENERAL has the power by means of a formal Opinion or letter to confirm that Custodians of Record must remain impartial, and that a matter for which the complainant is also a Custodian of Record must either be (A) transferred to a traveling judge and clerk, who

---

[19] The AG's Office could even do a STATE-wide study/survey and list the Counties in which "complaint only" is still a viable charging process.

come to the forum in which the matter was filed, or else (B) dismissed, if that clerk/Custodian is still employed in/with that court.

6.    STATE's ATTORNEY GENERAL has the power by means of a formal Opinion or letter to confirm that TEX. CODE CRIM. PROC. art. 45.019 never intended to allow, much less encourage, much less authorize, any clerk to become the/a hearsay complainant but rather only to authorize (deputy) clerks as Notaries regarding such complaints.

7.    In general, STATE's ATTORNEY GENERAL has the power to end the practices by which this situation against NADLER-OLENICK has developed.  STATE's ATTORNEY GENERAL has the power to stop "complaint only" processes in TRAVIS COUNTY (and in all Counties for which "complaint only" is no longer viable), to stop the practice of clerks acting as complainants, generally, to stop the charging as "criminal" matters alleged violations of municipal ordinances (without participation by either the DA's Office or the County Attorney's Office), and to stop robo-signing.

8.    By these means, and perhaps by other equally effective means, via reasonable diligence, STATE's ATTORNEY GENERAL could prevent or aid in the prevention of several of the component steps and acts that are part and parcel of this conspiracy against NADLER-OLENICK.

175.  STATE's ATTORNEY GENERAL, whether through negligence or refusal, has done nothing to stop any of the practices that are involved in the conspiracy against NADLER-OLENICK.

176.   For damages, since negligence or refusal to prevent is tantamount to direct participation in the conspiracy, NADLER-OLENICK demands from STATE's ATTORNEY GENERAL one million dollars ($1,000,000) actual damages and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard in the refusal or negligence to prevent the § 1985 conspiracy by which NADLER-OLENICK's right not to contract has been violated.

177.   In the event damages are unavailable for this claim, NADLER-OLENICK demands equitable relief, whether sounding in injunction or mandamus, that prevents STATE's ATTORNEY GENERAL from continuing to remain silent, whether due to refusal or negligence, regarding preventing § 1985 conspiracies by which NADLER-OLENICK's right not to contract has been violated.

## CLAIM 30 – M. RAE NADLER-OLENICK's § 1986 CLAIM AGAINST TRAVIS COUNTY's COUNTY ATTORNEY FOR FAILURE TO PREVENT THE CONSPIRACY TO VIOLATE THE RIGHT NOT TO CONTRACT

178.   This cause of action accrued as of the date of the "favorable ruling," namely Jan. 6, 2014.

179.   Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed.

A.   TRAVIS COUNTY's COUNTY ATTORNEY is a person.

B.   TRAVIS COUNTY's COUNTY ATTORNEY knows the following:

1.      That CITY, in particular, and various cities throughout TEXAS, charge people "criminally" for alleged ordinance violations all the time;

2.      That enforcement of ordinances is a "civil" matter sounding in trust;

3.      That trusts involving land or land use must be in writing and signed (by the party to be charged);

4.      That *STATE* has no standing, due to no "injury in fact," no "actual grievance," to assert **any** civil claim *in STATE's name*, arising from an alleged violation of a municipal ordinance;

5.      That while "criminal" enforcement *in STATE's name* of any ordinance, whether CITY's or any other city's, is possible, it's also a matter over which no muni. court in TEXAS has subject matter jurisdiction, given that such charges assert a state jail felony punishment level;

6.      That CITY, in particular, and cities throughout TEXAS, in general, regularly assert in the various muni. courts such ordinance-based "criminal" charges *in STATE's name*;

7.      That per the 1999 statutory changes, by which TEX. CODE CRIM. PROC. art. 45.01 was very overtly repealed, no misdemeanor charge in **any** trial court sitting in TRAVIS COUNTY may be initiated without an Information;

8.      That CITY, in particular, and cities throughout TEXAS, in general, persist with the "complaint only" charging process, despite the 1999

statutory amendments that render that process a violation of Due Process and render the muni. courts without subject matter jurisdiction;

      **9.**     That per that "complaint only" process, CITY, in particular, and cities throughout TEXAS, in general, allow and even encourage the muni. court's clerks to serve as the complaining witness for matters filed in the courts in which those clerks work as Custodians of Records; and

      **10.**    That such charging process, where the clerks double as complaining witnesses, at least per *CITY*'s practices, involves robo-signing.

      **11.**    In general, then, TRAVIS COUNTY's COUNTY ATTORNEY knows that conspiracies in violation of 42 U.S.C. § 1985 go on all the time, i.e., "are about to be committed," in the muni. court(s) sitting in AUSTIN and sitting in cities throughout TEXAS.

      **12.**    Therefore, TRAVIS COUNTY's COUNTY ATTORNEY knew that the conspiracy involving NADLER-OLENICK was about to be committed, as just one more of that very type of matters with that set of facts and circumstances.

**180.** With reasonable diligence, has power to prevent or aid in preventing the commission of the violations mentioned in section 1985.

**A.**     TRAVIS COUNTY's COUNTY ATTORNEY has the power to prevent or aid in the preventing of the acts by which these conspirators engaged and committed this conspiracy.

      **1.**     TRAVIS COUNTY's COUNTY ATTORNEY has the power by

means of a letter to document STATE's non-consent to CITY's acting as agent for STATE in any matter, civil or criminal, allegedly arising from an alleged violation of a municipal ordinance.

2.   TRAVIS COUNTY's COUNTY ATTORNEY has the power by means of a letter to confirm and reassert that CITY, in particular, has only civil/commercial means to enforce municipal ordinances.

3.   TRAVIS COUNTY's COUNTY ATTORNEY has the power by means of a letter to confirm and reassert that no misdemeanor charge is within the jurisdiction of any trial court in TRAVIS COUNTY unless there's also in Information signed by either the County Attorney's Office or the District Attorney's Office.

4.   TRAVIS COUNTY's COUNTY ATTORNEY has the power by means of a letter to confirm that robo-signing is not a viable notarial act in TEXAS.

5.   TRAVIS COUNTY's COUNTY ATTORNEY has the power by means of a letter to confirm that Custodians of Record must remain impartial, and that a matter for which the complainant is also a Custodian of Record must either be (A) transferred to a traveling judge and clerk, who come to the forum in which the matter was filed, or else (B) dismissed, if that clerk/Custodian is still employed in/with that court.

6.   TRAVIS COUNTY's COUNTY ATTORNEY has the power by means of a letter to confirm that TEX. CODE CRIM. PROC. art. 45.019 never

intended to allow, much less encourage, much less authorize, any clerk to become the/a hearsay complainant but rather only to authorize (deputy) clerks as Notaries regarding such complaints.

7.     In general, TRAVIS COUNTY's COUNTY ATTORNEY has the power to end the practices by which this situation against NADLER-OLENICK has developed. TRAVIS COUNTY's COUNTY ATTORNEY has the power to stop "complaint only" processes in TRAVIS COUNTY (thereby setting the example for all Counties for which "complaint only" is no longer viable), to stop the practice of clerks acting as complainants, generally, to stop the charging as "criminal" matters alleged violations of municipal ordinances (without participation by either the DA's Office or the County Attorney's Office), and to stop robo-signing.

8.     By these means, and perhaps by other equally effective means, via reasonable diligence, TRAVIS COUNTY's COUNTY ATTORNEY could prevent or aid in the prevention of several of the component steps and acts that are part and parcel of this conspiracy against NADLER-OLENICK.

181.   TRAVIS COUNTY's COUNTY ATTORNEY, whether through negligence or refusal, has done nothing to stop any of the practices that are involved in the conspiracy against NADLER-OLENICK.

182.   For damages, since negligence or refusal to prevent is tantamount to direct participation in the conspiracy, NADLER-OLENICK demands from TRAVIS COUNTY's COUNTY ATTORNEY one million dollars ($1,000,000) actual damages

and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard in the refusal or negligence to prevent the § 1985 conspiracy by which NADLER-OLENICK's right not to contract has been violated.

**183.**   In the event damages are unavailable for this claim, NADLER-OLENICK demands equitable relief, whether sounding in injunction or mandamus, that prevents TRAVIS COUNTY's COUNTY ATTORNEY from continuing to remain silent, whether due to refusal or negligence, regarding preventing § 1985 conspiracies by which NADLER-OLENICK's right not to contract has been violated.

### CLAIM 31 – M. RAE NADLER-OLENICK's § 1986 CLAIM AGAINST AUSTIN's CITY ATTORNEY FOR FAILURE TO PREVENT THE CONSPIRACY TO VIOLATE THE RIGHT NOT TO CONTRACT

**184.**   This cause of action accrued as of the date of the "favorable ruling," namely Jan. 6, 2014.

**185.**   Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed.

    **A.**   AUSTIN's CITY ATTORNEY is a person.

    **B.**   AUSTIN's CITY ATTORNEY knows the following:

        **1.**   That CITY, in particular, and various cities throughout TEXAS, charge people "criminally" for alleged ordinance violations all the time;

        **2.**   That enforcement of ordinances is a "civil" matter sounding in

trust;

3.     That trusts involving land or land use must be in writing and signed (by the party to be charged);

4.     That *STATE* has no standing, due to no "injury in fact," no "actual grievance," to assert **any** civil claim *in STATE's name*, arising from an alleged violation of a municipal ordinance;

5.     That while "criminal" enforcement *in STATE's name* of any ordinance, whether CITY's or any other city's, is possible, it's also a matter over which no muni. court in TEXAS has subject matter jurisdiction, given that such charges assert a state jail felony punishment level;

6.     That CITY, in particular, and cities throughout TEXAS, in general, regularly assert in the various muni. courts such ordinance-based "criminal" charges *in STATE's name*;

7.     That per the 1999 statutory changes, by which TEX. CODE CRIM. PROC. art. 45.01 was very overtly repealed, no misdemeanor charge in **any** trial court sitting in TRAVIS COUNTY may be initiated without an Information;

8.     That CITY, in particular, and cities throughout TEXAS, in general, persist with the "complaint only" charging process, despite the 1999 statutory amendments that render that process a violation of Due Process and render the muni. courts without subject matter jurisdiction;

9.     That per that "complaint only" process, CITY, in particular, and

---

cities throughout TEXAS, in general, allow and even encourage the muni. court's clerks to serve as the complaining witness for matters filed in the courts in which those clerks work as Custodians of Records; and

      **10.**    That such charging process, where the clerks double as complaining witnesses, at least per *CITY*'s practices, involves robo-signing.

      **11.**    In general, then, AUSTIN's CITY ATTORNEY knows that conspiracies in violation of 42 U.S.C. § 1985 go on all the time, i.e., "are about to be committed," in the muni. court(s) sitting in AUSTIN and sitting in cities throughout TEXAS.

      **12.**    Therefore, AUSTIN's CITY ATTORNEY knew that the conspiracy involving NADLER-OLENICK was about to be committed, as just one more of that very type of matters with that set of facts and circumstances.

      **13.**    In the practical sense that all the activity in the generation of the paperwork was engaged in the Offices of AUSTIN's CITY ATTORNEY by employees of said Office, AUSTIN's CITY ATTORNEY may be viewed as knowing best among all involved that the conspiracy against NADLER-OLENICK was about to be committed.

**186.**  With reasonable diligence, has power to prevent or aid in preventing the commission of the violations mentioned in section 1985.

      **A.**    AUSTIN's CITY ATTORNEY has the power to prevent or aid in the preventing of the acts by which these conspirators engaged and committed this

conspiracy.

1.    It would be a bold act, but, just the same, AUSTIN's CITY ATTORNEY *has the power* by means of a letter to document *STATE*'s non-consent to *CITY*'s acting as agent for STATE in any matter, civil or criminal, allegedly arising from an alleged violation of a municipal ordinance.

2.    AUSTIN's CITY ATTORNEY has the power by means of a letter to confirm and reassert that CITY, in particular, has only civil/commercial means to enforce municipal ordinances.

3.    AUSTIN's CITY ATTORNEY has the power by means of a letter to confirm and reassert that no misdemeanor charge is within the jurisdiction of any trial court in TRAVIS COUNTY unless there's also in Information signed by either the County Attorney's Office or the District Attorney's Office.

4.    AUSTIN's CITY ATTORNEY has the power by means of a letter to confirm that robo-signing is not a viable notarial act in TEXAS.

5.    AUSTIN's CITY ATTORNEY has the power by means of a letter to confirm that Custodians of Record must remain impartial, and that a matter for which the complainant is also a Custodian of Record must either be (A) transferred to a traveling judge and clerk, who come to the forum in which the matter was filed, or else (B) dismissed, if that clerk/Custodian is still employed in/with that court.

6.    AUSTIN's CITY ATTORNEY has the power by means of a letter to confirm that TEX. CODE CRIM. PROC. art. 45.019 never intended to allow,

much less encourage, much less authorize, any clerk to become the/a hearsay complainant but rather only to authorize (deputy) clerks as Notaries regarding such complaints.

      7.    In general, AUSTIN's CITY ATTORNEY has the power to end the practices by which this situation against NADLER-OLENICK has developed. AUSTIN's CITY ATTORNEY has the power to stop "complaint only" processes in AUSTIN (thereby setting the example for all cities in TRAVIS COUNTY, and perhaps also then for cities STATE-wide for which "complaint only" is no longer viable), to stop the practice of clerks acting as complainants, generally, to stop the charging as "criminal" matters alleged violations of municipal ordinances (without participation by either the DA's Office or the County Attorney's Office), and to stop robo-signing.

      8.    By these means, and perhaps by other equally effective means, via reasonable diligence, AUSTIN's CITY ATTORNEY could prevent or aid in the prevention of several of the component steps and acts that are part and parcel of this conspiracy against NADLER-OLENICK.

**187.**  AUSTIN's CITY ATTORNEY, whether through negligence or refusal, has done nothing to stop any of the practices that are involved in the conspiracy against NADLER-OLENICK.

**188.**  For damages, since negligence or refusal to prevent is tantamount to direct participation in the conspiracy, NADLER-OLENICK demands from AUSTIN's CITY ATTORNEY one million dollars ($1,000,000) actual damages and also one

million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly

indifferent, callous disregard in the refusal or negligence to prevent the § 1985

conspiracy by which NADLER-OLENICK's right not to contract has been violated.

**189.**   In the event damages are unavailable for this claim, NADLER-OLENICK

demands equitable relief, whether sounding in injunction or mandamus, that

prevents AUSTIN's CITY ATTORNEY from continuing to remain silent, whether

due to refusal or negligence, regarding preventing § 1985 conspiracies by which

NADLER-OLENICK's right not to contract has been violated.

**CLAIM 32 – M. RAE NADLER-OLENICK's § 1986 CLAIM AGAINST THE
MUNI. COURT's CLERK OF COURT FOR FAILURE TO PREVENT THE
CONSPIRACY TO VIOLATE THE RIGHT NOT TO CONTRACT**

**190.**   This cause of action accrued as of the date of the "favorable ruling," namely

Jan. 6, 2014.

**191.**   Every person who, having knowledge that any of the wrongs conspired to be

done, and mentioned in section 1985 of this title, are about to be committed.

    **A.**    AUSTIN's MUNI. COURT CLERK is a person.

    **B.**    AUSTIN's MUNI. COURT CLERK knows the following:

        **1.**    That CITY, in particular, and various cities throughout TEXAS,

charge people "criminally" for alleged ordinance violations all the time;

        **2.**    That CITY, in particular, and cities throughout TEXAS, in

general, regularly assert in the various muni. courts such ordinance-based

"criminal" charges *in STATE's name*;

3.    That STATE has no standing, no "injury in fact," no "actual grievence," to assert claims arising from alleged ordinance violations;

4.    That per the 1999 statutory changes, by which TEX. CODE CRIM. PROC. art. 45.01 was very overtly repealed, no misdemeanor charge in **any** trial court sitting in TRAVIS COUNTY may be initiated without an Information;

5.    That CITY, in particular, and cities throughout TEXAS, in general, persist with the "complaint only" charging process, despite the 1999 statutory amendments that render that process a violation of Due Process and render the muni. courts without subject matter jurisdiction;

6.    That per that "complaint only" process, CITY, in particular, and cities throughout TEXAS, in general, allow and even encourage the muni. court's clerks to serve as the complaining witness for matters filed in the courts in which those clerks work as Custodians of Records; and

7.    That such charging process, where the clerks double as complaining witnesses, at least per *CITY*'s practices, involves robo-signing.

8.    In general, then, AUSTIN's MUNI. COURT CLERK knows that conspiracies in violation of 42 U.S.C. § 1985 go on all the time, i.e., "are about to be committed," in the muni. court(s) sitting in AUSTIN.

9.    Therefore, AUSTIN's MUNI. COURT CLERK knew that the conspiracy involving NADLER-OLENICK was about to be committed, as just

---

Original Complaint (OLENICK and NADLER-OLENICK)        184
**Right Not to Contract, etc.**

one more of that very type of matters with that set of facts and circumstances.

      **10.**    In the practical sense that the complaining witnesses are employees within the muni. court of which AUSTIN's MUNI. COURT CLERK is also employed, AUSTIN's MUNI. COURT CLERK may be viewed as knowing equally well as AUSTIN's CITY ATTORNEY among all involved that the conspiracy against NADLER-OLENICK was about to be committed.

**192.**  With reasonable diligence, has power to prevent or aid in preventing the commission of the violations mentioned in section 1985.

      **A.**    AUSTIN's MUNI. COURT CLERK has the power to prevent or aid in the preventing of the acts by which these conspirators engaged and committed this conspiracy.

          **1.**    AUSTIN's MUNI. COURT CLERK has the power by means of a letter to confirm and reassert that no misdemeanor charge is procedurally complete for muni. court purposes unless there's also in Information signed by either the County Attorney's Office or the District Attorney's Office.

          **2.**    AUSTIN's MUNI. COURT CLERK has the power by means of a letter to confirm that robo-signing is not a viable notarial act in TEXAS.

          **3.**    AUSTIN's MUNI. COURT CLERK has the power by means of a letter to confirm that Custodians of Record must remain impartial, and that by becoming the complainant in any "criminal" matter, the Custodian of Records must be dismissed from that employment, unless the matter is (A)

transferred to a traveling judge and clerk, who come to the forum in which the matter was filed, or else (B) dismissed, because the party with an interest in the matter and who has constant direct access to that Record simply cannot be in the same place as the Record, and the Record has to stay.

     **4.**    AUSTIN's MUNI. COURT CLERK has the power by means of a letter to confirm that TEX. CODE CRIM. PROC. art. 45.019 never intended to allow, much less encourage, much less authorize, any clerk to become the/a hearsay complainant but rather only to authorize (deputy) clerks as Notaries regarding such complaints.

     **5.**    In general, AUSTIN's MUNI. COURT CLERK has the power to end at least some of the practices by which this situation against NADLER-OLENICK has developed. AUSTIN's MUNI. COURT CLERK has the power to stop "complaint only" processes in AUSTIN (thereby setting the example for all cities in TRAVIS COUNTY, and perhaps also then for cities STATE-wide for which "complaint only" is no longer viable), to stop the practice of clerks acting as complainants, generally, and to stop robo-signing in the muni. court for which she's employed.

     **6.**    By these means, and perhaps by other equally effective means, via reasonable diligence, AUSTIN's MUNI. COURT CLERK could prevent or aid in the prevention of several of the component steps and acts that are part and parcel of this conspiracy against NADLER-OLENICK.

**193.**   AUSTIN's MUNI. COURT CLERK, whether through negligence or refusal,

has done nothing to stop any of the practices that are involved in the conspiracy against NADLER-OLENICK.

194.   For damages, since negligence or refusal to prevent is tantamount to direct participation in the conspiracy, NADLER-OLENICK demands from AUSTIN's MUNI. COURT CLERK one million dollars ($1,000,000) actual damages and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard in the refusal or negligence to prevent the § 1985 conspiracy by which NADLER-OLENICK's right not to contract has been violated.

195.   In the event damages are unavailable for this claim, NADLER-OLENICK demands equitable relief, whether sounding in injunction or mandamus, that prevents AUSTIN's MUNI. COURT CLERK from continuing to remain silent, whether due to refusal or negligence, regarding preventing § 1985 conspiracies by which NADLER-OLENICK's right not to contract has been violated.


**CLAIM 33 – M. RAE NADLER-OLENICK's § 1986 CLAIM AGAINST STATE's ATTORNEY GENERAL FOR FAILURE TO PREVENT THE CONSPIRACY TO VIOLATE HER RIGHT TO FAIR TRIAL**

196.   This cause of action accrued as of the date of the "favorable ruling," namely Jan. 6, 2014.

197.   Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed.

---

Original Complaint (OLENICK and NADLER-OLENICK)                187
**Right Not to Contract, etc.**

**A.**     STATE's ATTORNEY GENERAL is a person.

**B.**     STATE's ATTORNEY GENERAL knows the following:

     **1.**     That CITY, in particular, and various cities throughout TEXAS, charge people "criminally" for alleged ordinance violations all the time;

     **2.**     That per the 1999 statutory changes, by which TEX. CODE CRIM. PROC. art. 45.01 was very overtly repealed, no misdemeanor charge in **any** trial court sitting in TRAVIS COUNTY may be initiated without an Information;

     **3.**     That CITY, in particular, and cities throughout TEXAS, in general, persist with the "complaint only" charging process, despite the 1999 statutory amendments that render that process a violation of Due Process and render the muni. courts without subject matter jurisdiction;

     **4.**     That per that "complaint only" process, CITY, in particular, and cities throughout TEXAS, in general, allow and even encourage the muni. court's clerks to serve as the complaining witness for matters filed in the courts in which those clerks work as Custodians of Records;

     **5.**     That Custodians of Record must be and remain impartial in all matters pending before the court for which they're employed;

     **6.**     That a complaining witness has an interest in the outcome of the litigation;

     **7.**     That active fact witnesses, especially those initiating the claim in the first place, should never have constant, direct access to the Record;

8.     That clerks paid to provide Custodian of Record services have an instant, material, and irreconcilable conflict of interest with that duty when they become complaining witnesses;

9.     That the Record exists in order that the issue of "fair trial" may be evaluated for all purposes; and

10.     That any defendant's, including NADLER-OLENICK's, right to a fair trial is violated where the integrity of the Record is jeopardized, which happens here the instant the Record is started.

11.     In general, then, STATE's ATTORNEY GENERAL knows that conspiracies in violation of 42 U.S.C. § 1985 go on all the time, i.e., "are about to be committed," in the muni. court(s) sitting in AUSTIN and sitting in cities throughout TEXAS.

12.     Therefore, STATE's ATTORNEY GENERAL knew that the conspiracy involving NADLER-OLENICK was about to be committed, as just one more of that very type of matters with that set of facts and circumstances.

198.   With reasonable diligence, has power to prevent or aid in preventing the commission of the violations mentioned in section 1985.

A.     STATE's ATTORNEY GENERAL has the power to prevent or aid in the preventing of the acts by which these conspirators engaged and committed this conspiracy.

1.     STATE's ATTORNEY GENERAL has the power by means of a

formal Opinion or a letter to confirm and reassert that no misdemeanor charge is within the jurisdiction of any trial court in TRAVIS COUNTY [20] unless there's also in Information signed by either the County Attorney's Office or the District Attorney's Office.

2.      STATE's ATTORNEY GENERAL has the power by means of a formal Opinion or letter to confirm that Custodians of Record must remain impartial, and that a matter for which the complainant is also a Custodian of Record must either be (A) transferred to a traveling judge and clerk, who come to the forum in which the matter was filed, or else (B) dismissed, if that clerk/Custodian is still employed in/with that court.

3.      STATE's ATTORNEY GENERAL has the power by means of a formal Opinion or letter to confirm that TEX. CODE CRIM. PROC. art. 45.019 never intended to allow, much less encourage, much less authorize, any clerk to become the/a hearsay complainant but rather only to authorize (deputy) clerks as Notaries regarding such complaints.

4.      In general, STATE's ATTORNEY GENERAL has the power to end the practices by which this situation against NADLER-OLENICK has developed.  STATE's ATTORNEY GENERAL has the power to stop "complaint only" processes in TRAVIS COUNTY (and in all Counties for which "complaint only" is no longer viable), and to stop the practice of clerks

---

[20] The AG's Office could even do a STATE-wide study/survey and list the Counties in which "complaint only" is still a viable charging process.

acting as complainants, generally.

     **5.**    By these means, and perhaps by other equally effective means, via reasonable diligence, STATE's ATTORNEY GENERAL could prevent or aid in the prevention of several of the component steps and acts that are part and parcel of this conspiracy against NADLER-OLENICK.

**199.**  STATE's ATTORNEY GENERAL, whether through negligence or refusal, has done nothing to stop any of the practices that are involved in the conspiracy against NADLER-OLENICK.

**200.**  For damages, since negligence or refusal to prevent is tantamount to direct participation in the conspiracy, NADLER-OLENICK demands from STATE's ATTORNEY GENERAL one million dollars ($1,000,000) actual damages and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard in the refusal or negligence to prevent the § 1985 conspiracy by which NADLER-OLENICK's right to a fair trial has been violated.

**201.**  In the event damages are unavailable for this claim, NADLER-OLENICK demands equitable relief, whether sounding in injunction or mandamus, that prevents STATE's ATTORNEY GENERAL from continuing to remain silent, whether due to refusal or negligence, regarding preventing § 1985 conspiracies by which NADLER-OLENICK's right to a fair trial has been violated.

**CLAIM 34 – M. RAE NADLER-OLENICK's § 1986 CLAIM AGAINST TRAVIS COUNTY's COUNTY ATTORNEY FOR FAILURE TO PREVENT THE CONSPIRACY TO VIOLATE HER RIGHT TO FAIR TRIAL**

**202.** This cause of action accrued as of the date of the "favorable ruling," namely Jan. 6, 2014.

**203.** Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed.

    **A.**     TRAVIS COUNTY's COUNTY ATTORNEY is a person.

    **B.**     TRAVIS COUNTY's COUNTY ATTORNEY knows the following:

        **1.**     That CITY, in particular, and various cities throughout TEXAS, charge people "criminally" for alleged ordinance violations all the time;

        **2.**     That per the 1999 statutory changes, by which TEX. CODE CRIM. PROC. art. 45.01 was very overtly repealed, no misdemeanor charge in **any** trial court sitting in TRAVIS COUNTY may be initiated without an Information;

        **3.**     That CITY, in particular, and cities throughout TEXAS, in general, persist with the "complaint only" charging process, despite the 1999 statutory amendments that render that process a violation of Due Process and render the muni. courts without subject matter jurisdiction;

        **4.**     That per that "complaint only" process, CITY, in particular, and cities throughout TEXAS, in general, allow and even encourage the muni. court's clerks to serve as the complaining witness for matters filed in the courts in which those clerks work as Custodians of Records;

5. That Custodians of Record must be and remain impartial in all matters pending before the court for which they're employed;

6. That a complaining witness has an interest in the outcome of the litigation;

7. That active fact witnesses, especially those initiating the claim in the first place, should never have constant, direct access to the Record;

8. That clerks paid to provide Custodian of Record services have an instant, material, and irreconcilable conflict of interest with that duty when they become complaining witnesses;

9. That the Record exists in order that the issue of "fair trial" may be evaluated for all purposes; and

10. That any defendant's, including NADLER-OLENICK's, right to a fair trial is violated where the integrity of the Record is jeopardized, which happens here the instant the Record is started.

11. In general, then, TRAVIS COUNTY's COUNTY ATTORNEY knows that conspiracies in violation of 42 U.S.C. § 1985 go on all the time, i.e., "are about to be committed," in the muni. court(s) sitting in AUSTIN and sitting in cities throughout TEXAS.

12. Therefore, TRAVIS COUNTY's COUNTY ATTORNEY knew that the conspiracy involving NADLER-OLENICK was about to be committed, as just one more of that very type of matters with that set of facts and circumstances.

---

**204.** With reasonable diligence, has power to prevent or aid in preventing the commission of the violations mentioned in section 1985.

    **A.**    TRAVIS COUNTY's COUNTY ATTORNEY has the power to prevent or aid in the preventing of the acts by which these conspirators engaged and committed this conspiracy.

        **1.**    TRAVIS COUNTY's COUNTY ATTORNEY has the power by means of a letter to confirm and reassert that no misdemeanor charge is within the jurisdiction of any trial court in TRAVIS COUNTY unless there's also in Information signed by either the County Attorney's Office or the District Attorney's Office.

        **2.**    TRAVIS COUNTY's COUNTY ATTORNEY has the power by means of a letter to confirm that Custodians of Record must remain impartial, and that a matter for which the complainant is also a Custodian of Record must either be (A) transferred to a traveling judge and clerk, who come to the forum in which the matter was filed, or else (B) dismissed, if that clerk/Custodian is still employed in/with that court.

        **3.**    TRAVIS COUNTY's COUNTY ATTORNEY has the power by means of a letter to confirm that TEX. CODE CRIM. PROC. art. 45.019 never intended to allow, much less encourage, much less authorize, any clerk to become the/a hearsay complainant but rather only to authorize (deputy) clerks as Notaries regarding such complaints.

        **4.**    In general, TRAVIS COUNTY's COUNTY ATTORNEY has the

power to end the practices by which this situation against NADLER-OLENICK has developed. TRAVIS COUNTY's COUNTY ATTORNEY has the power to stop "complaint only" processes in TRAVIS COUNTY (thereby setting the example for all Counties for which "complaint only" is no longer viable), and to stop the practice of clerks acting as complainants, generally.

     **5.**    By these means, and perhaps by other equally effective means, via reasonable diligence, TRAVIS COUNTY's COUNTY ATTORNEY could prevent or aid in the prevention of several of the component steps and acts that are part and parcel of this conspiracy against NADLER-OLENICK.

**205.** TRAVIS COUNTY's COUNTY ATTORNEY, whether through negligence or refusal, has done nothing to stop any of the practices that are involved in the conspiracy against NADLER-OLENICK.

**206.** For damages, since negligence or refusal to prevent is tantamount to direct participation in the conspiracy, NADLER-OLENICK demands from TRAVIS COUNTY's COUNTY ATTORNEY one million dollars ($1,000,000) actual damages and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard in the refusal or negligence to prevent the § 1985 conspiracy by which NADLER-OLENICK's right to a fair trial has been violated.

**207.** In the event damages are unavailable for this claim, NADLER-OLENICK demands equitable relief, whether sounding in injunction or mandamus, that prevents TRAVIS COUNTY's COUNTY ATTORNEY from continuing to remain

silent, whether due to refusal or negligence, regarding preventing § 1985

conspiracies by which NADLER-OLENICK's right to a fair trial has been violated.


**CLAIM 35 – M. RAE NADLER-OLENICK's § 1986 CLAIM AGAINST AUSTIN's CITY ATTORNEY FOR FAILURE TO PREVENT THE CONSPIRACY TO VIOLATE HER RIGHT TO FAIR TRIAL**

**208.**   This cause of action accrued as of the date of the "favorable ruling," namely

Jan. 6, 2014.

**209.**   Every person who, having knowledge that any of the wrongs conspired to be

done, and mentioned in section 1985 of this title, are about to be committed.

    **A.**   AUSTIN's CITY ATTORNEY is a person.

    **B.**   AUSTIN's CITY ATTORNEY knows the following:

        **1.**   That CITY, in particular, and various cities throughout TEXAS,

charge people "criminally" for alleged ordinance violations all the time;

        **2.**   That per the 1999 statutory changes, by which TEX. CODE CRIM.

PROC. art. 45.01 was very overtly repealed, no misdemeanor charge in **any**

trial court sitting in TRAVIS COUNTY may be initiated without an

Information;

        **3.**   That CITY, in particular, and cities throughout TEXAS, in

general, persist with the "complaint only" charging process, despite the 1999

statutory amendments that render that process a violation of Due Process

and render the muni. courts without subject matter jurisdiction;

4.      That per that "complaint only" process, CITY, in particular, and cities throughout TEXAS, in general, allow and even encourage the muni. court's clerks to serve as the complaining witness for matters filed in the courts in which those clerks work as Custodians of Records;

5.      That Custodians of Record must be and remain impartial in all matters pending before the court for which they're employed;

6.      That a complaining witness has an interest in the outcome of the litigation;

7.      That active fact witnesses, especially those initiating the claim in the first place, should never have constant, direct access to the Record;

8.      That clerks paid to provide Custodian of Record services have an instant, material, and irreconcilable conflict of interest with that duty when they become complaining witnesses;

9.      That the Record exists in order that the issue of "fair trial" may be evaluated for all purposes; and

10.      That any defendant's, including NADLER-OLENICK's, right to a fair trial is violated where the integrity of the Record is jeopardized, which happens here the instant the Record is started.

11.      In general, then, AUSTIN's CITY ATTORNEY knows that conspiracies in violation of 42 U.S.C. § 1985 go on all the time, i.e., "are about to be committed," in the muni. court(s) sitting in AUSTIN and sitting in cities throughout TEXAS.

---

12.     Therefore, AUSTIN's CITY ATTORNEY knew that the conspiracy involving NADLER-OLENICK was about to be committed, as just one more of that very type of matters with that set of facts and circumstances.

13.     In the practical sense that all the activity in the generation of the paperwork was engaged in the Offices of AUSTIN's CITY ATTORNEY by employees of said Office, AUSTIN's CITY ATTORNEY may be viewed as knowing best among all involved that the conspiracy against NADLER-OLENICK was about to be committed.

210.   With reasonable diligence, has power to prevent or aid in preventing the commission of the violations mentioned in section 1985.

A.     AUSTIN's CITY ATTORNEY has the power to prevent or aid in the preventing of the acts by which these conspirators engaged and committed this conspiracy.

1.     AUSTIN's CITY ATTORNEY has the power by means of a letter to confirm and reassert that no misdemeanor charge is within the jurisdiction of any trial court in TRAVIS COUNTY unless there's also in Information signed by either the County Attorney's Office or the District Attorney's Office.

2.     AUSTIN's CITY ATTORNEY has the power by means of a letter to confirm that Custodians of Record must remain impartial, and that a matter for which the complainant is also a Custodian of Record must either be (A) transferred to a traveling judge and clerk, who come to the forum in

which the matter was filed, or else (B) dismissed, if that clerk/Custodian is still employed in/with that court.

        3.     AUSTIN's CITY ATTORNEY has the power by means of a letter to confirm that TEX. CODE CRIM. PROC. art. 45.019 never intended to allow, much less encourage, much less authorize, any clerk to become the/a hearsay complainant but rather only to authorize (deputy) clerks as Notaries regarding such complaints.

        4.     In general, AUSTIN's CITY ATTORNEY has the power to end the practices by which this situation against NADLER-OLENICK has developed. AUSTIN's CITY ATTORNEY has the power to stop "complaint only" processes in AUSTIN (thereby setting the example for all cities in TRAVIS COUNTY, and perhaps also then for cities STATE-wide for which "complaint only" is no longer viable), and to stop the practice of clerks acting as complainants, generally.

        5.     By these means, and perhaps by other equally effective means, via reasonable diligence, AUSTIN's CITY ATTORNEY could prevent or aid in the prevention of several of the component steps and acts that are part and parcel of this conspiracy against NADLER-OLENICK.

211.  AUSTIN's CITY ATTORNEY, whether through negligence or refusal, has done nothing to stop any of the practices that are involved in the conspiracy against NADLER-OLENICK.

212.  For damages, since negligence or refusal to prevent is tantamount to direct

participation in the conspiracy, NADLER-OLENICK demands from AUSTIN's CITY ATTORNEY one million dollars ($1,000,000) actual damages and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard in the refusal or negligence to prevent the § 1985 conspiracy by which NADLER-OLENICK's right to a fair trial has been violated.

**213.** In the event damages are unavailable for this claim, NADLER-OLENICK demands equitable relief, whether sounding in injunction or mandamus, that prevents AUSTIN's CITY ATTORNEY from continuing to remain silent, whether due to refusal or negligence, regarding preventing § 1985 conspiracies by which NADLER-OLENICK's right to a fair trial has been violated.

**CLAIM 36 – M. RAE NADLER-OLENICK's § 1986 CLAIM AGAINST THE MUNI. COURT's CLERK OF COURT FOR FAILURE TO PREVENT THE CONSPIRACY TO VIOLATE HER RIGHT TO FAIR TRIAL**

**214.** This cause of action accrued as of the date of the "favorable ruling," namely Jan. 6, 2014.

**215.** Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed.

    **A.** AUSTIN's MUNI. COURT CLERK is a person.

    **B.** AUSTIN's MUNI. COURT CLERK knows the following:

        **1.** That CITY, in particular, and various cities throughout TEXAS, charge people "criminally" for alleged ordinance violations all the time;

2.      That per the 1999 statutory changes, by which TEX. CODE CRIM. PROC. art. 45.01 was very overtly repealed, no misdemeanor charge in **any** trial court sitting in TRAVIS COUNTY may be initiated without an Information;

3.      That CITY, in particular, and cities throughout TEXAS, in general, persist with the "complaint only" charging process, despite the 1999 statutory amendments that render that process a violation of Due Process and render the muni. courts without subject matter jurisdiction;

4.      That per that "complaint only" process, CITY, in particular, and cities throughout TEXAS, in general, allow and even encourage the muni. court's clerks to serve as the complaining witness for matters filed in the courts in which those clerks work as Custodians of Records;

5.      That Custodians of Record must be and remain impartial in all matters pending before the court for which they're employed;

6.      That a complaining witness has an interest in the outcome of the litigation;

7.      That active fact witnesses, especially those initiating the claim in the first place, should never have constant, direct access to the Record;

8.      That clerks paid to provide Custodian of Record services have an instant, material, and irreconcilable conflict of interest with that duty when they become complaining witnesses;

9.      That the Record exists in order that the issue of "fair trial" may

Original Complaint (OLENICK and NADLER-OLENICK)                    201
**Right Not to Contract, etc.**

be evaluated for all purposes; and

      **10.**    That any respondent's, including NADLER-OLENICK's, right to a fair trial is violated where the integrity of the Record is jeopardized, which happens here the instant the Record is started.

      **11.**    In general, then, AUSTIN's MUNI. COURT CLERK knows that conspiracies in violation of 42 U.S.C. § 1985 go on all the time, i.e., "are about to be committed," in the muni. court(s) sitting in AUSTIN and sitting in cities throughout TEXAS.

      **12.**    Therefore, AUSTIN's MUNI. COURT CLERK knew that the conspiracy involving NADLER-OLENICK was about to be committed, as just one more of that very type of matters with that set of facts and circumstances.

      **13.**    In the practical sense that the complaining witnesses are employees within the muni. court of which AUSTIN's MUNI. COURT CLERK is also employed, AUSTIN's MUNI. COURT CLERK may be viewed as knowing equally well as AUSTIN's CITY ATTORNEY among all involved that the conspiracy against NADLER-OLENICK was about to be committed.

**216.**  With reasonable diligence, has power to prevent or aid in preventing the commission of the violations mentioned in section 1985.

      **A.**    AUSTIN's MUNI. COURT CLERK has the power to prevent or aid in the preventing of the acts by which these conspirators engaged and committed this conspiracy.

1.     AUSTIN's MUNI. COURT CLERK has the power by means of a letter to confirm and reassert that no misdemeanor charge is procedurally complete for muni. court purposes unless there's also in Information signed by either the County Attorney's Office or the District Attorney's Office.

2.     AUSTIN's MUNI. COURT CLERK has the power by means of a letter to confirm that Custodians of Record must remain impartial, and that by becoming the complainant in any "criminal" matter, the Custodian of Records must be dismissed from that employment, unless the matter is (A) transferred to a traveling judge and clerk, who come to the forum in which the matter was filed, or else (B) dismissed, because the party with an interest in the matter and who has constant direct access to that Record simply cannot be in the same place as the Record, and the Record has to stay.

3.     AUSTIN's MUNI. COURT CLERK has the power by means of a letter to confirm that TEX. CODE CRIM. PROC. art. 45.019 never intended to allow, much less encourage, much less authorize, any clerk to become the/a hearsay complainant but rather only to authorize (deputy) clerks as Notaries regarding such complaints.

4.     In general, AUSTIN's MUNI. COURT CLERK has the power to end at least some of the practices by which this situation against NADLER-OLENICK has developed. AUSTIN's MUNI. COURT CLERK has the power to stop "complaint only" processes in AUSTIN (thereby setting the example for all cities in TRAVIS COUNTY, and perhaps also then for cities STATE-

wide for which "complaint only" is no longer viable), and to stop the practice of clerks acting as complainants, generally, in the court for which she's employed.

5.     By these means, and perhaps by other equally effective means, via reasonable diligence, AUSTIN's MUNI. COURT CLERK could prevent or aid in the prevention of several of the component steps and acts that are part and parcel of this conspiracy against NADLER-OLENICK.

217.   AUSTIN's MUNI. COURT CLERK, whether through negligence or refusal, has done nothing to stop any of the practices that are involved in the conspiracy against NADLER-OLENICK.

218.   For damages, since negligence or refusal to prevent is tantamount to direct participation in the conspiracy, NADLER-OLENICK demands from AUSTIN's MUNI. COURT CLERK one million dollars ($1,000,000) actual damages and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard in the refusal or negligence to prevent the § 1985 conspiracy by which NADLER-OLENICK's right to a fair trial has been violated.

219.   In the event damages are unavailable for this claim, NADLER-OLENICK demands equitable relief, whether sounding in injunction or mandamus, that prevents AUSTIN's MUNI. COURT CLERK from continuing to remain silent, whether due to refusal or negligence, regarding preventing § 1985 conspiracies by which NADLER-OLENICK's right to a fair trial has been violated.

**CLAIM 37 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST TMCEC FOR FAILURE TO TRAIN – VIOLATION OF RIGHT TO FAIR TRIAL**

**220.**   Right clearly established.

  **A.**   The right to a fair trial is clearly established.

  **B.**   It should be clear to a reasonable (deputy) clerk that evaluation of "fair trial" depends completely on the integrity of the Record.

  **C.**   It should be clear to a reasonable (deputy) clerk that also taking on the role of (hearsay) complainant against a respondent is unlawful, given that witnesses cannot also be Custodians of Record for the same Record.

  **D.**   It should be clear to a reasonable (deputy) clerk that by serving in both roles simultaneously, the integrity of the Record is instantly compromised.

  **E.**   It should also be clear to a reasonable (deputy) clerk that robo-signing a complaint is unlawful under all circumstances.

  **F.**   Further, it should be clear to a reasonable (deputy) clerk that robo-signing as the notary is unlawful under all circumstances.

**221.**   Violation of right.

  **A.**   Each member of any court's clerical staff, which job duties include Custodian of Record duties, owes a duty to every party involved in every matter before the court to remain an impartial Custodian so as to maintain the integrity of the Record, for purposes of preserving each party's right to a fair trial.

  **B.**   By impugning the integrity of the trial Record, by serving as complainant against NADLER-OLENICK which instantly and irretrievably gives the clerk/Custodian an interest in the outcome of the matter, and as Custodian of

that Record, simultaneously, each clerk/Custodian/complainant violated NADLER-OLENICK's right to a fair trial.

**222.** Usual and recurring circumstances.

    **A.** Every single matter, or an extremely high percentage of the matters, initiated in this muni. court for the past several years has been initiated by a clerk/Custodian/complainant.

    **B.** This clerk/Custodian/complainant practice is found STATE-wide; it's not limited to this one muni. court.

**223.** Inadequate training or inadequate supervision. Either each member of the clerical staff understands the role of Custodian of Records or not. If each clerk doesn't understand that role, then there's at least a training problem. If each clerk understands the role and is as deliberately indifferent as is found in this matter, then there's (also) a supervision problem (or a problem with training for the supervisor, etc.).

**224.** Deliberate indifference is cause of inadequate training.

    **A.** TMCEC trains both judges and clerks.

    **B.** TMCEC has been aware of this clerical conflict of interest issue for a number of years, and yet the problem still exists, STATE-wide. The risk of harm of violation of a right to a fair trial is substantial, because those serving as Custodians acquire an interest in the outcome of the matter, having assumed the role of complaining witness. There being, so far, no formal ruling holding clerks accountable, TMCEC just doesn't care that the right to a fair trial is being so

systemically, so fundamentally, so habitually compromised.

   **C.**   TMCEC's policy of failing or refusing to provide training on the significance of the problem that arises when the integrity of a trial Record is compromised is maintained with deliberate indifference not only to the inevitability of but also the commission of a violation of the right to a fair trial in every Record where a clerk/Custodian is also the complainant.

**225.**   Lack of training causes the rights violation.

   **A.**   Clerks are not attorneys.  They depend on training to understand the duties and limits of their office.

   **B.**   It's well beyond an administrative task or duty to assume the (robo-signed) role of active witness against the respondent.

   **C.**   Since a reasonable (deputy) clerk wouldn't assume the active role of witness in a matter for which s/he is the (deputy) Custodian of Records, it follows that the training fails to inform the (deputy) clerk of the consequences, including direct violations of rights of the respondents, of assuming the role of active witness against a respondent.

**226.**   For damages, since failure to train due to deliberate indifference is tantamount to direct participation in the conspiracy, NADLER-OLENICK demands from TMCEC one million dollars ($1,000,000) actual damages and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard, deliberately indifferent failure or refusal to train clerks (and judges) on the consequences of impugning the integrity of the trial

Record.

**227.** In the event damages are unavailable for this claim, NADLER-OLENICK demands equitable relief, whether sounding in injunction or mandamus, that prevents TMCEC from continuing to remain silent, whether due to refusal or negligence, regarding teaching clerks that assuming the role of complainant for matters filed in the court in/for which they work impugns the integrity of the Record which violates the respondent's, here NADLER-OLENICK's, fundamental and clearly established right to a fair trial.


**CLAIM 38 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST AUSTIN's CITY ATTORNEY FOR FAILURE TO TRAIN**

**228.** Right clearly established.

    **A.** The right to a fair trial is clearly established.

    **B.** It should be clear to a reasonable (deputy) clerk that evaluation of "fair trial" depends completely on the integrity of the Record.

    **C.** It should be clear to a reasonable (deputy) clerk that also taking on the role of (hearsay) complainant against a respondent is unlawful, given that witnesses cannot also be Custodians of Record for the same Record.

    **D.** It should be clear to a reasonable (deputy) clerk that by serving in both roles simultaneously, the integrity of the Record is instantly compromised.

    **E.** It should also be clear to a reasonable (deputy) clerk that robo-signing a complaint is unlawful under all circumstances.

    **F.** Further, it should be clear to a reasonable (deputy) clerk that robo-

signing as the notary is unlawful under all circumstances.

**229.**   Violation of right.

    **A.**    Each member of any court's clerical staff, which job duties include Custodian of Record duties, owes a duty to every party involved in every matter before the court to remain an impartial Custodian so as to maintain the integrity of the Record, for purposes of preserving each party's right to a fair trial.

    **B.**    By impugning the integrity of the trial Record, by serving as complainant against NADLER-OLENICK which instantly and irretrievably gives the clerk/Custodian an interest in the outcome of the matter, and as Custodian of that Record, simultaneously, each clerk/Custodian/complainant violated NADLER-OLENICK's right to a fair trial.

**230.**   Usual and recurring circumstances.

    **A.**    Every single matter, or an extremely high percentage of the matters, initiated in this muni. court for the past several years has been initiated by a clerk/Custodian/complainant.

    **B.**    This clerk/Custodian/complainant practice is found STATE-wide; it's not limited to this one muni. court.

**231.**   Inadequate training or inadequate supervision.  Either each member of the clerical staff understands the role of Custodian of Records or not.  If each clerk doesn't understand that role, then there's at least a training problem.  If each clerk understands the role and is as deliberately indifferent as is found in this matter, then there's (also) a supervision problem (or a problem with training for the

supervisor, etc.).

**232.**   Deliberate indifference is cause of inadequate training.

**A.**   AUSTIN's CITY ATTORNEY trains or should train both judges and clerks.

**B.**   Where AUSTIN's CITY ATTORNEY comes across a gap like this one, which is wider than the Pacific Ocean, in the training of the muni. court's clerical staff, the duty arises to address the problem.

**C.**   Where AUSTIN's CITY ATTORNEY is as fully aware not only of the conflict of interest between simultaneously being a clerk/Custodian *and* the complaining witness, and perpetuates the practice rather than ending it, all the more so with the full awareness, or intent to depend on, robo-signing, then the deliberate indifference to the rights of the defendants becomes indelibly unmistakable.

**D.**   By this practice of having the clerk/Custodians also serve as complainants, the risk of harm of violation of a right to a fair trial is substantial, because those serving as Custodians acquire an interest in the outcome of the matter, having assumed the role of complaining witness.

**E.**   Since no formal ruling exists that holds clerks accountable, AUSTIN's CITY ATTORNEY just doesn't care that the right to a fair trial is being so systemically, so fundamentally, so habitually compromised.

**F.**   AUSTIN's CITY ATTORNEY's policy of failing or refusing to provide training on the significance of the problem that arises when the integrity of a trial

Record is compromised is maintained with deliberate indifference not only to the inevitability of but also the commission of a violation of the right to a fair trial in every Record where a clerk/Custodian is also the complainant.

**233.**   Lack of training causes the rights violation.

      **A.**   Clerks are not attorneys.  They depend on training to understand the duties and limits of their office.

      **B.**   It's well beyond an administrative task or duty to assume the (robo-signed) role of active witness against the respondent.

      **C.**   Since a reasonable (deputy) clerk wouldn't assume the active role of witness in a matter for which s/he is the (deputy) Custodian of Records, it follows that the training fails to inform the (deputy) clerk of the consequences, including direct violations of rights of the respondents, of assuming the role of active witness against a respondent.

**234.**   For damages, since failure to train due to deliberate indifference is tantamount to direct participation in the conspiracy, NADLER-OLENICK demands from AUSTIN's CITY ATTORNEY one million dollars ($1,000,000) actual damages and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard, deliberately indifferent failure or refusal to train clerks (and judges) on the consequences of impugning the integrity of the trial Record.

**235.**   In the event damages are unavailable for this claim, NADLER-OLENICK demands equitable relief, whether sounding in injunction or mandamus, that

prevents AUSTIN's CITY ATTORNEY from continuing to remain silent, whether due to refusal or negligence, regarding teaching clerks that assuming the role of complainant for matters filed in the court in/for which they work impugns the integrity of the Record which violates the respondent's, here NADLER-OLENICK's, fundamental and clearly established right to a fair trial.

## CLAIM 39 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST AUSTIN's MUNICIPAL COURT FOR FAILURE TO TRAIN

**236.**   Right clearly established.

   **A.**   The right to a fair trial is clearly established.

   **B.**   It should be clear to a reasonable (deputy) clerk that evaluation of "fair trial" depends completely on the integrity of the Record.

   **C.**   It should be clear to a reasonable (deputy) clerk that also taking on the role of (hearsay) complainant against a respondent is unlawful, given that witnesses cannot also be Custodians of Record for the same Record.

   **D.**   It should be clear to a reasonable (deputy) clerk that by serving in both roles simultaneously, the integrity of the Record is instantly compromised.

   **E.**   It should also be clear to a reasonable (deputy) clerk that robo-signing a complaint is unlawful under all circumstances.

   **F.**   Further, it should be clear to a reasonable (deputy) clerk that robo-signing as the notary is unlawful under all circumstances.

**237.**   Violation of right.

A.      Each member of any court's clerical staff, which job duties include Custodian of Record duties, owes a duty to every party involved in every matter before the court to remain an impartial Custodian so as to maintain the integrity of the Record, for purposes of preserving each party's right to a fair trial.

B.      By impugning the integrity of the trial Record, by serving as complainant against NADLER-OLENICK which instantly and irretrievably gives the clerk/Custodian an interest in the outcome of the matter, and as Custodian of that Record, simultaneously, each clerk/Custodian/complainant violated NADLER-OLENICK's right to a fair trial.

238.    Usual and recurring circumstances.

A.      Every single matter, or an extremely high percentage of the matters, initiated in this muni. court for the past several years has been initiated by a clerk/Custodian/complainant.

B.      This clerk/Custodian/complainant practice is found STATE-wide; it's not limited to this one muni. court.

239.    Inadequate training or inadequate supervision.  Either each member of the clerical staff understands the role of Custodian of Records or not.  If each clerk doesn't understand that role, then there's at least a training problem.  If each clerk understands the role and is as deliberately indifferent as is found in this matter, then there's (also) a supervision problem (or a problem with training for the supervisor, etc.).

240.    Deliberate indifference is cause of inadequate training.

**A.**     AUSTIN's MUNI. COURT trains or should train both judges and clerks.

**B.**     Where AUSTIN's MUNI. COURT comes across a gap like this one, which is wider than the Pacific Ocean, in the training of the muni. court's clerical staff, the duty arises to address the problem.

**C.**     Where AUSTIN's MUNI. COURT is as fully aware not only of the conflict of interest between simultaneously being a clerk/Custodian *and* the complaining witness, and perpetuates the practice rather than ending it, all the more so with the full awareness, or intent to depend on, robo-signing, then the deliberate indifference to the rights of the defendants becomes indelibly unmistakable.

**D.**     By this practice of having the clerk/Custodians also serve as complainants, the risk of harm of violation of a right to a fair trial is substantial, because those serving as Custodians acquire an interest in the outcome of the matter, having assumed the role of complaining witness.

**E.**     Since no formal ruling exists that holds clerks accountable, AUSTIN's MUNI. COURT just doesn't care that the right to a fair trial is being so systemically, so fundamentally, so habitually compromised.

**F.**     AUSTIN's MUNI. COURT policy of failing or refusing to provide training on the significance of the problem that arises when the integrity of a trial Record is compromised is maintained with deliberate indifference not only to the inevitability of but also the commission of a violation of the right to a fair trial in

every Record where a clerk/Custodian is also the complainant.

**241.**   Lack of training causes the rights violation.

    **A.**   Clerks are not attorneys.  They depend on training to understand the duties and limits of their office.

    **B.**   It's well beyond an administrative task or duty to assume the (robo-signed) role of active witness against the respondent.

    **C.**   Since a reasonable (deputy) clerk wouldn't assume the active role of witness in a matter for which s/he is the (deputy) Custodian of Records, it follows that the training fails to inform the (deputy) clerk of the consequences, including direct violations of rights of the respondents, of assuming the role of active witness against a respondent.

**242.**   For damages, since failure to train due to deliberate indifference is tantamount to direct participation in the conspiracy, NADLER-OLENICK demands from AUSTIN's MUNI. COURT one million dollars ($1,000,000) actual damages and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard, deliberately indifferent failure or refusal to train clerks (and judges) on the consequences of impugning the integrity of the trial Record.

**243.**   In the event damages are unavailable for this claim, NADLER-OLENICK demands equitable relief, whether sounding in injunction or mandamus, that prevents AUSTIN's MUNI. COURT from continuing to remain silent, whether due to refusal or negligence, regarding teaching clerks that assuming the role of

complainant for matters filed in the court in/for which they work impugns the integrity of the Record which violates the respondent's, here NADLER-OLENICK's, fundamental and clearly established right to a fair trial.

## CLAIM 40 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST THE MUNICIPAL COURT's CLERK OF COURT FOR FAILURE TO TRAIN

**244.**   Right clearly established.

    **A.**   The right to a fair trial is clearly established.

    **B.**   It should be clear to a reasonable (deputy) clerk that evaluation of "fair trial" depends completely on the integrity of the Record.

    **C.**   It should be clear to a reasonable (deputy) clerk that also taking on the role of (hearsay) complainant against a respondent is unlawful, given that witnesses cannot also be Custodians of Record for the same Record.

    **D.**   It should be clear to a reasonable (deputy) clerk that by serving in both roles simultaneously, the integrity of the Record is instantly compromised.

    **E.**   It should also be clear to a reasonable (deputy) clerk that robo-signing a complaint is unlawful under all circumstances.

    **F.**   Further, it should be clear to a reasonable (deputy) clerk that robo-signing as the notary is unlawful under all circumstances.

**245.**   Violation of right.

    **A.**   Each member of any court's clerical staff, which job duties include Custodian of Record duties, owes a duty to every party involved in every matter

before the court to remain an impartial Custodian so as to maintain the integrity of the Record, for purposes of preserving each party's right to a fair trial.

**B.** By impugning the integrity of the trial Record, by serving as complainant against NADLER-OLENICK which instantly and irretrievably gives the clerk/Custodian an interest in the outcome of the matter, and as Custodian of that Record, simultaneously, each clerk/Custodian/complainant violated NADLER-OLENICK's right to a fair trial.

**246.** Usual and recurring circumstances.

**A.** Every single matter, or an extremely high percentage of the matters, initiated in this muni. court for the past several years has been initiated by a clerk/Custodian/complainant.

**B.** This clerk/Custodian/complainant practice is found STATE-wide; it's not limited to this one muni. court.

**247.** Inadequate training or inadequate supervision. Either each member of the clerical staff understands the role of Custodian of Records or not. If each clerk doesn't understand that role, then there's at least a training problem. If each clerk understands the role and is as deliberately indifferent as is found in this matter, then there's (also) a supervision problem (or a problem with training for the supervisor, etc.).

**248.** Deliberate indifference is cause of inadequate training.

**A.** The MUNI. COURT's CLERK trains or should train his/her employees.

**B.** Where the MUNI. COURT's CLERK comes across a gap like this one,

which is wider than the Pacific Ocean, in the training of the muni. court's clerical staff, the duty arises to address the problem.

C.      Where the MUNI. COURT's CLERK is as fully aware not only of the conflict of interest between simultaneously being a clerk/Custodian *and* the complaining witness, and perpetuates the practice rather than ending it, all the more so with the full awareness, or intent to depend on, robo-signing, then the deliberate indifference to the rights of the defendants becomes indelibly unmistakable.

D.      By this practice of having the clerk/Custodians also serve as complainants, the risk of harm of violation of a right to a fair trial is substantial, because those serving as Custodians acquire an interest in the outcome of the matter, having assumed the role of complaining witness.

E.      Since no formal ruling exists that holds clerks accountable, the MUNI. COURT's CLERK just doesn't care that the right to a fair trial is being so systemically, so fundamentally, so habitually compromised.

F.      The MUNI. COURT's CLERK's policy of failing or refusing to provide training on the significance of the problem that arises when the integrity of a trial Record is compromised is maintained with deliberate indifference not only to the inevitability of but also the commission of a violation of the right to a fair trial in every Record where a clerk/Custodian is also the complainant.

249.    Lack of training causes the rights violation.

A.      Clerks are not attorneys.  They depend on training to understand the

duties and limits of their office.

**B.**   It's well beyond an administrative task or duty to assume the (robo-signed) role of active witness against the respondent.

**C.**   Since a reasonable (deputy) clerk wouldn't assume the active role of witness in a matter for which s/he is the (deputy) Custodian of Records, it follows that the training fails to inform the (deputy) clerk of the consequences, including direct violations of rights of the respondents, of assuming the role of active witness against a respondent.

**250.**   For damages, since failure to train due to deliberate indifference is tantamount to direct participation in the conspiracy, NADLER-OLENICK demands from the MUNI. COURT's CLERK one million dollars ($1,000,000) actual damages and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard, deliberately indifferent failure or refusal to train clerks (and, indirectly, then, as a result, the judges) on the consequences of impugning the integrity of the trial Record.

**251.**   In the event damages are unavailable for this claim, NADLER-OLENICK demands equitable relief, whether sounding in injunction or mandamus, that prevents the MUNI. COURT's CLERK from continuing to remain silent, whether due to refusal or negligence, regarding teaching clerks that assuming the role of complainant for matters filed in the court in/for which they work impugns the integrity of the Record which violates the respondent's, here NADLER-OLENICK's, fundamental and clearly established right to a fair trial.

**CLAIM 41 – M. RAE NADLER-OLENICK's § 1983 CLAIM AGAINST CITY FOR FAILURE TO TRAIN**

**252.**   Right clearly established.

  **A.**   The right to a fair trial is clearly established.

  **B.**   It should be clear to a reasonable (deputy) clerk that evaluation of "fair trial" depends completely on the integrity of the Record.

  **C.**   It should be clear to a reasonable (deputy) clerk that also taking on the role of (hearsay) complainant against a respondent is unlawful, given that witnesses cannot also be Custodians of Record for the same Record.

  **D.**   It should be clear to a reasonable (deputy) clerk that by serving in both roles simultaneously, the integrity of the Record is instantly compromised.

  **E.**   It should also be clear to a reasonable (deputy) clerk that robo-signing a complaint is unlawful under all circumstances.

  **F.**   Further, it should be clear to a reasonable (deputy) clerk that robo-signing as the notary is unlawful under all circumstances.

**253.**   Violation of right.

  **A.**   Each member of any court's clerical staff, which job duties include Custodian of Record duties, owes a duty to every party involved in every matter before the court to remain an impartial Custodian so as to maintain the integrity of the Record, for purposes of preserving each party's right to a fair trial.

  **B.**   By impugning the integrity of the trial Record, by serving as complainant against NADLER-OLENICK which instantly and irretrievably gives the clerk/Custodian an interest in the outcome of the matter, and as Custodian of

that Record, simultaneously, each clerk/Custodian/complainant violated NADLER-OLENICK's right to a fair trial.

**254.** Usual and recurring circumstances.

    **A.**    Every single matter, or an extremely high percentage of the matters, initiated in this muni. court for the past several years has been initiated by a clerk/Custodian/complainant.

    **B.**    This clerk/Custodian/complainant practice is found STATE-wide; it's not limited to this one muni. court.

**255.** Inadequate training or inadequate supervision. Either each member of the clerical staff understands the role of Custodian of Records or not. If each clerk doesn't understand that role, then there's at least a training problem. If each clerk understands the role and is as deliberately indifferent as is found in this matter, then there's (also) a supervision problem (or a problem with training for the supervisor, etc.).

**256.** Deliberate indifference is cause of inadequate training.

    **A.**    CITY trains or should train both the judges and the clerks.

    **B.**    Where CITY comes across a gap like this one, which is wider than the Pacific Ocean, in the training of the muni. court's clerical staff, the duty arises to address the problem.

    **C.**    Where CITY is as fully aware not only of the conflict of interest between simultaneously being a clerk/Custodian *and* the complaining witness, and perpetuates the practice rather than ending it, all the more so with the full

awareness, or intent to depend on, robo-signing, then the deliberate indifference to the rights of the defendants becomes indelibly unmistakable.

**D.**     By this practice of having the clerk/Custodians also serve as complainants, the risk of harm of violation of a right to a fair trial is substantial, because those serving as Custodians acquire an interest in the outcome of the matter, having assumed the role of complaining witness.

**E.**     Since no formal ruling exists that holds clerks accountable, CITY just doesn't care that the right to a fair trial is being so systemically, so fundamentally, so habitually compromised.

**F.**     CITY's policy, of failing or refusing to provide training for the offices that CITY fills on the significance of the problem that arises when the integrity of a trial Record is compromised, is maintained with deliberate indifference not only to the inevitability of but also the commission of a violation of the right to a fair trial in every Record where a clerk/Custodian is also the complainant.

**257.**   Lack of training causes the rights violation.

**A.**     Clerks are not attorneys.  They depend on training to understand the duties and limits of their office.

**B.**     It's well beyond an administrative task or duty to assume the (robo-signed) role of active witness against the respondent.

**C.**     Since a reasonable (deputy) clerk wouldn't assume the active role of witness in a matter for which s/he is the (deputy) Custodian of Records, it follows that the training fails to inform the (deputy) clerk of the consequences, including

direct violations of rights of the respondents, of assuming the role of active witness against a respondent.

**258.** For damages, since failure to train due to deliberate indifference is tantamount to direct participation in the conspiracy, NADLER-OLENICK demands from CITY one million dollars ($1,000,000) actual damages and also one million dollars ($1,000,000) punitive damages, for the wanton, malicious, grossly indifferent, callous disregard, deliberately indifferent failure or refusal to train clerks (and, indirectly, then, as a result, the judges) on the consequences of impugning the integrity of the trial Record.

**259.** In the event damages are unavailable for this claim, NADLER-OLENICK demands equitable relief, whether sounding in injunction or mandamus, that prevents CITY from continuing to remain silent, whether due to refusal or negligence, regarding teaching clerks that assuming the role of complainant for matters filed in the court in/for which they work impugns the integrity of the Record which violates the respondent's, here NADLER-OLENICK's, fundamental and clearly established right to a fair trial.

**CLAIM 42 – M. RAE NADLER-OLENICK's CLAIM AGAINST STATE FOR VIOLATION OF STATE's DEBT COLLECTION PRACTICES ACT**

**260.** Claims arising under ordinances are commercial matters.

**261.** By asserting that a "fine" is due in the ordinance enforcement context, what STATE is alleging is that there's a liquidated damages provision in a viable commercial nexus.

**262.** Even if such commercial nexus existed, which it doesn't, STATE violates its own law by attempting to collect that alleged debt by means of charging someone criminally.

**263.** STATE is both a commercial player and a litigation initiator; hence, has no immunity.

**264.** STATE, in its baseless role as debt collector, has violated the Debt Collection Practices Act by charging NADLER-OLENICK criminally in an effort to collect that alleged and non-existent debt.

**265.** For damages, NADLER-OLENICK demands from STATE the maximum amount allowed for claims arising under that statutory plan, plus additional damages, plus treble damages, for all amounts that qualify for additional and treble damages, as ascertained under the Deceptive Trade Practices Act.

**266.** In the event damages are unavailable for this claim, NADLER-OLENICK demands equitable relief, whether sounding in injunction or mandamus, that prevents STATE from continuing in the role of debt collector where the alleged claim arising under any of CITY's ordinances.

**CLAIM 43 – M. RAE NADLER-OLENICK's CLAIM AGAINST CITY FOR VIOLATION OF STATE's DEBT COLLECTION PRACTICES ACT**

**267.**   Claims arising under ordinances are commercial matters.

**268.**   By asserting that a "fine" is due in the ordinance enforcement context, what CITY is alleging is that there's a liquidated damages provision in a viable commercial nexus.

**269.**   Even if such commercial nexus existed, which it doesn't, CITY violates STATE's law by attempting to collect that alleged debt by means of charging someone criminally.

**270.**   CITY is both a commercial player and a litigation initiator; hence, has no immunity.

**271.**   CITY, in its baseless role as debt collector, has violated the Debt Collection Practices Act by charging NADLER-OLENICK criminally in an effort to collect that alleged and non-existent debt.

**272.**   For damages, NADLER-OLENICK demands from CITY the maximum amount allowed for claims arising under that statutory plan, plus additional damages, plus treble damages, for all amounts that qualify for additional and treble damages, as ascertained under the Deceptive Trade Practices Act.

**273.**   In the event damages are unavailable for this claim, NADLER-OLENICK demands equitable relief, whether sounding in injunction or mandamus, that prevents CITY from continuing in the role of debt collector where the alleged claim arising under any of CITY's ordinances.

**CLAIM 44 – M. RAE NADLER-OLENICK's CLAIM AGAINST STATE FOR VIOLATION OF THE NATIONAL DEBT COLLECTION PRACTICES ACT**

**274.**   Claims arising under ordinances are commercial matters.

**275.**   By asserting that a "fine" is due in the ordinance enforcement context, what STATE is alleging is that there's a liquidated damages provision in a viable commercial nexus.

**276.**   Even if such commercial nexus existed, which it doesn't, STATE violates national law by attempting to collect that alleged debt by means of charging someone criminally.

**277.**   STATE is both a commercial player and a litigation initiator; hence, has no immunity.

**278.**   STATE, in its baseless role as debt collector, has violated the national Debt Collection Practices Act by charging NADLER-OLENICK criminally in an effort to collect that alleged and non-existent debt.

**279.**   For damages, NADLER-OLENICK demands from STATE the maximum amount allowed for claims arising under that statutory plan, plus any punitive damages that apply, given STATE's wanton, malicious, grossly indifferent, callous disregard for its flagrant violation of the national Debt Collection Practices Act.

**280.**   In the event damages are unavailable for this claim, NADLER-OLENICK demands equitable relief, whether sounding in injunction or mandamus, that prevents STATE from continuing in the role of debt collector where the alleged claim arising under any of CITY's ordinances.

## CLAIM 45 – M. RAE NADLER-OLENICK's CLAIM AGAINST CITY FOR VIOLATION OF THE NATIONAL DEBT COLLECTION PRACTICES ACT

**281.**   Claims arising under ordinances are commercial matters.

**282.**   By asserting that a "fine" is due in the ordinance enforcement context, what CITY is alleging is that there's a liquidated damages provision in a viable commercial nexus.

**283.**   Even if such commercial nexus existed, which it doesn't, CITY violates national law by attempting to collect that alleged debt by means of charging someone criminally.

**284.**   CITY is both a commercial player and a litigation initiator; hence, has no immunity.

**285.**   CITY, in its baseless role as debt collector, has violated the national Debt Collection Practices Act by charging NADLER-OLENICK criminally in an effort to collect that alleged and non-existent debt.

**286.**   For damages, NADLER-OLENICK demands from CITY the maximum amount allowed for claims arising under that statutory plan, plus any punitive damages that apply, given CITY's wanton, malicious, grossly indifferent, callous disregard for its flagrant violation of the national Debt Collection Practices Act.

**287.**   In the event damages are unavailable for this claim, NADLER-OLENICK demands equitable relief, whether sounding in injunction or mandamus, that prevents CITY from continuing in the role of debt collector where the alleged claim arising under any of CITY's ordinances.

## Request for Relief

**288.**   THE OLENICKS request all the relief requested throughout this Original

Complaint, and any and all other relief to which they may show themselves justly

entitled.


Respectfully submitted,

/s/ Walt Olenick
WALTER OLENICK
1205 East 52nd Street
Austin, TX  78723

/s/  M. Rae Nadler-Olenick
M. RAE NADLER-OLENICK
1205 East 52nd Street
Austin, TX  78723


### § 1746 Declaration – WALTER OLENICK

Per 28 U.S.C. § 1746, and under the laws of perjury of the United States, I,
WALTER OLENICK, depose and declare (or certify, verify or state), that I am at
least 21 years of age, in fact, I am more than 65 years of age, that I am competent to
make this Affidavit / Declaration, that I have personal knowledge of these facts, and
that these facts are true and correct.

The facts asserted in this Original Complaint are true and correct.

The documents attached are true and correct copies of the originals.

I have no commercial nexus with CITY or with STATE.

Further, Declarant sayeth not.

Executed on this the 6th day of January, 2015

/s/ Walt Olenick
WALTER OLENICK
Declarant

### § 1746 Declaration – M. RAE NADLER-OLENICK

Per 28 U.S.C. § 1746, and under the laws of perjury of the United States, I, M. RAE NADLER-OLENICK, depose and declare (or certify, verify or state), that I am at least 21 years of age, in fact, I am more than 65 years of age, that I am competent to make this Affidavit / Declaration, that I have personal knowledge of these facts, and that these facts are true and correct.

The facts asserted in this Original Complaint are true and correct.

The documents attached are true and correct copies of the originals.

I have no commercial nexus with CITY or with STATE.

Further, Declarant sayeth not.

Executed on this the 6th day of January, 2015

/s/ M. Rae Nadler-Olenick
M. RAE NADLER-OLENICK,
Declarant